Amy R. Atwood
*pro hac vice* application pending
Center for Biological Diversity
P.O. Box 11374
Portland, Oregon 97211-0374
Tel: 503-283-5474
atwood@biologicaldiversity.org

Neil Levine
*pro hac vice* application pending
Grand Canyon Trust
2539 Eliot Street
Denver, Colorado 80211
Tel: 303-455-0604
nlevine@grandcanyontrust.org

Roger Flynn
*pro hac vice* application pending
Western Mining Action Project
P.O. Box 349
440 Main St., #2
Lyons, CO 80540
Tel: 303-823-5738
wmap@igc.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; GRAND CANYON TRUST; and SIERRA CLUB, | ) ) ) ) | Case No._____ |
| Plaintiffs, | ) ) ) | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | ) ) | |
| KEN SALAZAR, Secretary of the Interior; U.S. BUREAU OF LAND MANAGEMENT; and | ) ) ) | |

1

U.S. FISH AND WILDLIFE SERVICE,                    )
                                                   )
                        Defendants.                )

## INTRODUCTION

1.      Plaintiffs Center for Biological Diversity, Grand Canyon Trust, and Sierra Club challenge Defendant Bureau of Land Management's ("BLM") refusal to take actions required by environmental, public lands, and hardrock mining laws and regulations and evaluate the environmental impacts of exploration and mining activities at the "Arizona 1 Mine" ("Arizona 1 Mine" or "Mine"), a proposed uranium mine located on public land within 10 miles of the boundary of the Grand Canyon National Park ("Grand Canyon" or "Park").  The Arizona 1 Mine is located on land that is subject to a July 21, 2009 Order of defendant U.S. Department of the Interior ("DOI") ("Segregation Order"), which segregated public lands in the Grand Canyon watershed from mining activities for two years in order to protect the watershed's sensitive habitat, endangered species, groundwater, air quality, archeological resources, and recreational opportunities until "various studies and analyses" of the "adverse effects of locatable hardrock mineral exploration and mining" could be completed.  74 Fed. Reg. 35887 (July 21, 2009).

2.      BLM originally approved uranium exploration and mining activities at the Arizona 1 Mine in 1988 through a "Plan of Operations."  Activities at the Mine site did not commence until 1990 and have been completely dormant since shortly thereafter. The Mine never produced any commercial quantities of uranium ore.  The Plan of Operations for the Arizona 1 Mine is no longer in effect because it has expired by its own

terms and because the Mine's claimants have not been conducting operations since the 1990s.

3.      Although the Mine's 1988 Plan of Operations expired over a decade ago and is no longer in effect, the current Arizona 1 Mine claimant, Denison Mines Corporation ("Denison Mines"), has expressed its intent to recommence exploration and mining activities at the Arizona 1 Mine.  In response, BLM has indicated that it will not require a new Plan of Operations even though the 1988 Plan of Operations is no longer in effect, or verify whether Denison's mineral claims are valid or consider the environmental impacts of uranium exploration or mining activities at Arizona 1 pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*. ("NEPA") or the Endangered Species Act, 16 U.S.C. § 1531, *et seq*. ("ESA").  By allowing mining and exploration operations to recommence on these public lands after being dormant for many years without requiring a new plan of operations or verifying whether are any valid and existing mineral rights for Arizona 1 Mine, BLM is in violation of the Federal Land Policy and Management Act, 43 U.S.C. § 1701, *et seq*. ("FLPMA") and the General Mining Law of 1872, 30 U.S.C. § 22, *et seq*. ("Mining Law").  BLM is also violating NEPA and the ESA by allowing such activities to recommence without conducting any reviews of the environmental consequences of such activities.

4.      Even absent a new Plan of Operations, BLM is violating NEPA by failing to prepare and circulate for public review and comment a supplemental environmental review document.  Significant new information since BLM's 1988 environmental assessment bears on the manner and degree to which uranium mining and exploration

operations at the Arizona 1 Mine could directly, indirectly, and cumulatively affect

fragile desert resources and the Grand Canyon.  This includes new information about

potential impacts to hydrology, water, and threatened and endangered species, and

impacts from and alternatives to the transportation of uranium ore.

5.     To remedy all of these violations of law, Plaintiffs seek injunctive relief

enjoining Defendants from authorizing or allowing any mining or exploration operations

to proceed at the Mine site unless and until BLM complies with all applicable laws.

<u>JURISDICTION</u>

6.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331, 5 U.S.C. § 701,

*et seq.*, 16 U.S.C. § 1540, and 28 U.S.C. § 1346, because this action involves the United

States as a defendant and arises under the laws of the United States, including NEPA, the

ESA, FLPMA, and the Mining Law, and the implementing regulations of these laws.  An

actual, justiciable controversy exists between Plaintiffs and Defendants.  The requested

relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 and 706.  The

challenged agency actions and/or inactions are subject to this Court's review under the

Administrative Procedure Act, 5 U.S.C. §§ 702, 704, and 706 ("APA") and the citizen

suit provision of the ESA, 16 U.S.C. § 1540(g).

<u>VENUE</u>

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the

area of the Arizona 1 Mine is located on federal lands within Arizona.  In addition,

Plaintiff Center for Biological Diversity has a main office is located in Tucson, Arizona

and maintains a field office in Flagstaff, Arizona; the Grand Canyon Trust is

headquartered in Flagstaff, Arizona; and the Sierra Club has offices within the state. Defendant BLM has an office within the district.  Assignment is proper in the Prescott Division because the Mine site is located in Mohave County.

PARTIES

8.     Plaintiff Center for Biological Diversity is a non-profit corporation with over 43,000 members dedicated to the preservation, protection, and restoration of biodiversity and ecosystems throughout the world.  The Center's main office is located in Tucson, Arizona.  The Center also has an office in Flagstaff, Arizona.  The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.

9.     Plaintiff Grand Canyon Trust is a non-profit corporation headquartered in Flagstaff, Arizona with over 3,500 members.  The mission of the Grand Canyon Trust is to protect and restore the canyon country of the Colorado Plateau – its spectacular landscapes, flowing rivers, clean air, diversity of plants and animals, and areas of beauty and solitude.  One of the Trust's goals is to ensure that the Colorado Plateau is a region characterized by vast open spaces with restored, healthy ecosystems, and habitat for all native fish, animals, and plants.

10.     Plaintiff Sierra Club is a non-profit, public interest environmental organization with over 700,000 members, whose mission is to explore, enjoy and protect the planet.

11.     Plaintiffs' members use and enjoy the BLM lands that are located north of Grand Canyon National Park, including the lands that are at the site of, or that will be

affected by, operation of the Arizona 1 Mine.  Plaintiffs' members use and enjoy these federal lands for hiking, fishing, hunting, camping, and photography, and for engaging in other vocational, scientific, and recreational activities.  Plaintiffs' members derive recreational, inspirational, religious, scientific, educational, and aesthetic benefits from their activities on these federal public lands.  Plaintiffs' members intend to continue to use and enjoy these lands frequently and on an ongoing basis in the future.  Plaintiffs also have a procedural interest in the proper management of these federal lands that is in full compliance with public lands and environmental laws and regulations.  Defendants' failure to comply with NEPA and the ESA as described herein injures Plaintiffs and their members because it denies them the ability to adequately participate in the public review process and denies them information concerning environmental and other impacts that NEPA and the ESA require the agencies to disclose and analyze, and solicit public review of, prior to allowing uranium exploration or mining operations to recommence at the Mine site.

12.     The aesthetic, recreational, scientific, educational, religious, and procedural interests of Plaintiffs and their members have been and will continue to be adversely affected and irreparably injured if uranium exploration and mining recommences at the Arizona 1 Mine.  These are actual, concrete injuries caused by Defendants' refusal to comply with the ESA, NEPA, FLPMA, the Mining Law, the APA, and the implementing regulations of these laws.  The injuries will be redressed by the relief sought.

13.     Defendant Ken Salazar is sued in his official capacity as DOI Secretary. Mr. Salazar is the official responsible for the Segregation Order and delegated with

management responsibility over public lands surrounding the Grand Canyon National Park, including the lands at and affected by the Arizona 1 Mine.

14.    Defendant BLM is an agency within DOI, and is responsible for the lawful management of the federal lands within the Arizona 1 Mine area.  BLM originally approved the Arizona 1 Mine and now refuses to conduct the required actions discussed in this complaint.

15.    Defendant U.S. Fish and Wildlife Service ("FWS") is an agency within DOI, and is responsible for implementing the ESA with respect to terrestrial species. FWS refuses to reinitiate consultation with BLM to consider the effects of uranium exploration and mining activities at Arizona 1.

<u>FACTUAL ALLEGATIONS</u>

16.    The Arizona 1 Mine is located in Sections 22 and 23, T36N, R5W, Mojave County, Arizona, about 45 miles southwest of Fredonia.  Arizona 1 consists of 10 unpatented mining claims encompassing approximately 207 acres.  Arizona 1 Mine is located on public lands that are administered by BLM.

17.    On September 11, 1984, Energy Fuels Nuclear submitted to BLM a Plan of Operations for uranium exploration activities.  BLM approved the Plan on October 4, 1984.  Prior to Plan approval, BLM prepared an environmental assessment under NEPA. Under this Plan of Operations, Energy Fuels Nuclear drilled 24 exploratory holes between 1984 and 1988.

18.    Subsequently, Energy Fuels Nuclear submitted a modified and expanded Plan of Operations to encompass mining activities.  In response, BLM underwent another

NEPA process on the Arizona 1 Mine.  On May 9, 1988, BLM issued a final

Environmental Assessment and Decision Record approving construction and ore

extraction activities at the Arizona 1 Mine for a period of 10 years.  In BLM's Decision

Record, the agency also concluded that there would be no significant environmental

impacts that necessitated preparation of an environmental impact statement under NEPA.

19.     Construction of the Arizona 1 Mine under the 1988 Plan of Operations at

the Arizona 1 Mine began in 1990 but construction and other activities ceased shortly

thereafter due to uranium market conditions.  When construction and other activities

ceased, the depth of the mining shaft was 1,254 feet.  The Mine never produced any

uranium ore in commercial quantities.  No mining activities occurred between 1992 and

2007.  The 1988 Plan of Operations expired under its own terms in 1998.

20.     Energy Fuels was acquired by the Concord group in the early 1990s.

Concord declared bankruptcy in 1995.  In 1997, most of the Energy Fuels assets were

acquired by International Uranium Corporation ("IUC").  After a December 1, 2006

merger with Denison Mines Inc., IUC changed its name to Denison Mines Corporation.

21.     On March 17, 2008, the Grand Canyon Watersheds Protection Act of 2008

was introduced in Congress.  As proposed, this legislation would permanently withdraw

over one millions acres of public and national forest lands in the vicinity of Grand

Canyon National Park and in House Rock Valley from location, entry, and patent under

the Mining Law.  To date, this legislation has not been passed in Congress.  The Arizona

1 Mine is located on public lands covered by the Grand Canyon Watersheds Protection

Act of 2008.

22.     On June 25, 2008, the U.S. House of Representatives' Committee on Natural Resources issued an "emergency resolution" (hereinafter "Emergency Resolution"), pursuant to Section 204(e) of FLPMA, 43 U.S.C. § 1714(e) and 43 C.F.R. § 2310.5.  The Emergency Resolution is intended to maintain the status quo until Congress fully considered the Grand Canyon Watersheds Protection Act of 2008.  The Emergency Resolution directs the Chair of the Committee to notify the Secretaries of Interior and Agriculture that an emergency situation exists regarding uranium mining near Grand Canyon.  The Emergency Resolution also orders the Secretary of Interior to immediately withdraw the approximately 1,068,908 acres of federal land near the Park from all forms of mineral location and entry under the U.S. mining laws for up to three years.  The Arizona 1 Mine is located on lands that are subject to the Emergency Resolution.

23.     The House Committee passed the Emergency Resolution based on the Committee's findings that the international demand for uranium has escalated dramatically, and that there are more than 1,100 uranium mining claims within five miles of Grand Canyon.  The Committee also found that management of public lands adjacent to Grand Canyon has direct impacts to endangered species, surface water and groundwater, air quality, archeological resources, recreational opportunities, and the health and safety of Park visitors and residents in the area.  The Committee further found that uranium is radioactive when mined, produces radium, thorium, and radon gas, and that exposure to these elements is known to cause cancer, kidney damage, and birth defects in humans.  Moreover, the Committee found that previous uranium mining operations near Grand Canyon have left a legacy of debilitating illness and death among

American Indians, and have resulted in contaminated soil and ground water that remains unremediated.  For all these reasons, the Committee declared that an emergency situation exists regarding uranium mining near Grand Canyon and that extraordinary measures must be taken in order to preserve the values that would otherwise be lost absent the withdrawal.

24.     The Secretary did not withdraw the lands near the Park from all forms of mineral location in accordance with the Emergency Resolution.  As a result, on June 25, 2008, Plaintiffs in this action petitioned the Secretary under the Administrative Procedure Act to immediately issue a rule withdrawing all lands subject to the Emergency Resolution.  The Secretary did not respond to Plaintiffs' APA Petition,  On September 29, 2008, Plaintiffs filed suit challenging the Secretary's failure to withdraw the lands covered by the Emergency Resolution and to respond to their petition as contrary to the Emergency Resolution, NEPA, FLPMA, and the Administrative Procedure Act.  *Center for Biological Diversity et al v. Salazar et al*., 3:08-cv-08117-NVW (D. Ariz.).

25.     On January 22, 2009, the Grand Canyon Watersheds Protection Act was reintroduced.

26.     On July 21, 2009, after "carefully considering the issue of uranium mining near Grand Canyon National Park," DOI issued the Segregation Order.  74 Fed. Reg. 35887 (July 21, 2009).  The Segregation Order applies to the same lands identified in the Emergency Resolution and the Grand Canyon Watersheds Protection Act.  The Segregation Order removes approximately one million acres of federal public lands in the Arizona Strip from mining activities, except those activities with demonstrated valid

existing rights, for two years while the Department evaluates whether to withdraw some or all of these lands from new mining claims for an additional 20 years.  According to DOI, the Segregation Order is necessary to "protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining" and to allow for additional time for "various studies and analysis."  In issuing the Segregation Order, DOI recognized that Grand Canyon is an iconic American landscape and World Heritage Site that: encompasses 1.2 million acres on the Colorado Plateau; draws 4.4 million visitors each year; is home to numerous rare, endemic, and specially-protected plant and animal species; and contains vast archeological resources and sites of spiritual and cultural importance to American Indians.  It also recognized that the Colorado River and its tributaries flow through the Grand Canyon and supply water to agricultural, industrial, and municipal users, including the cities of Tucson, Phoenix, Las Vegas, Los Angeles, and San Diego.  DOI Secretary Salazar stated in a press release that the Segregation Order was issued to "ensure that we are developing our nation's resources in a way that protects local communities, treasured landscapes, and our watersheds[.]"  The Arizona 1 Mine is located on lands that are subject to the Segregation Order.

27.     During the time covered by the Segregation Order, mining operations may only occur if the claimant has a valid pre-existing claim.  Under the Mining Law and its implementing regulations, a valid pre-existing claim is where a claimant has discovered a "valuable mineral deposit" as of the date of segregation – here, July 21, 2009.  43 C.F.R. § 3809.100.  Claim validity cannot be based solely upon a mineral discovery which may have existed at some previous time.

28.     The Interior Department has never conducted a review of the validity of the claims proposed to be utilized at the Arizona 1 Mine site and has never determined whether such claims are valid under the Mining Law.  Neither DOI nor BLM have ever verified whether the current claimant, Denison Mines, had discovered a "valuable mineral deposit" on each of the claims proposed to be utilized by the Arizona 1 Mine as of July 21, 2009, the date of the Segregation Order.

29.     Despite the requirements of the Segregation Order as well as the Emergency Resolution and Grand Canyon Watersheds Protection Act, Arizona Strip BLM District Manager Scott Florence indicated that Denison could recommence operations at the Arizona 1 Mine site, including ore extraction, upon final issuance of the Class II air quality permit from the Arizona Department of Environmental Quality ("ADEQ"), without any environmental reviews.

30.     On September 1, 2009, ADEQ issued a Class II air quality permit to Denison Mines Corporation for operations at the Arizona 1 Mine.  The permit allows for underground mining of uranium ore at a production rate of 109,500 tons per year.  The ore will be shipped to an off-site processing mill.  If the ore cannot be shipped immediately to the mill, it will be placed in nearby stock piles within the Ore Stockpile Area.  The Ore Stockpile Area will encompass approximately one acre and can accommodate up to 9,680 tons of ore.

31.     On September 8, 2009, Plaintiffs notified Defendants of their intent to file a lawsuit against BLM in 60 days if BLM did not comply with NEPA, the ESA, and FLPMA in connection with renewed uranium mining and exploration activities at the

Arizona 1 Mine.  To date, BLM has failed to take actions to correct violations of the laws outlined in Plaintiffs' letter.  To date, Defendants have not responded to Plaintiffs' 60-day notice letter.

32.     The recommencement of uranium exploration and mining operations at the Arizona 1 Mine may cause environmental impacts that have never been considered in any NEPA document.  There is new information that bears on, *e.g.*, the Mine's direct, indirect, and/or cumulative impacts to surface water, ground water, aquifers, transportation, recreation, national monuments, and plants, fish, and wildlife, including threatened and endangered species and/or their designated critical habitat.  In addition, unlike in 1988 – when BLM last considered the environmental consequences of uranium exploration and mining operations at Arizona 1 – uranium exploration and mining operations in the Grand Canyon watershed has become highly controversial and is opposed by units of every level of government, and, Plaintiffs contend, is unlawful at Arizona 1 in light of DOI's Segregation Order.

<u>STATUTORY AND REGULATORY BACKGROUND</u>

<u>The Federal Land Policy Management Act</u>

33.     FLPMA establishes requirements for land use planning on public lands, including the land encompassed by the Arizona 1 Mine site.  43 U.S.C. §§ 1701-1785.

34.     FLPMA provides that the nation's public lands are to be managed "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that

will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use[.]"  43 U.S.C. § 1701(a)(8).

35.     FLPMA mandates that the Secretary of the Interior "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands."  43 U.S.C. § 1732(b).  Regulations adopted by the Department of Interior provide that "unnecessary or undue degradation" means "conditions, activities, or practices" that "[f]ail to comply" with, among other things, "other Federal and state laws related to environmental protection …."  43 C.F.R. § 3809.5.

36.     FLPMA authorizes the Secretary "to make, modify, extend, or revoke withdrawals … in accordance with the provisions and limitations of this section."  43 U.S.C. §§ 1714(a), (b)(1); 43 C.F.R. § 3809.100.  Segregation acts as a withdrawal of the segregated lands from mineral entry under the Mining Law.

The General Mining Law of 1872

37.     The Mining Law is a general statute that authorizes the exploration and purchase of hard rock mineral deposits on lands belonging to the United States, subject to certain conditions.  30 U.S.C. §§ 22, 26.  The Mining Law opens "all valuable mineral deposits in lands belonging to the United States", including uranium deposits, and "the lands in which they are found" to exploration, occupation, and purchase.  30 U.S.C. § 22.

38.     The most intensive category of hard-rock mining on public lands is "plan-level operations."  Plan-level operations are those operations that cause a cumulative surface disturbance of more than five acres in any calendar year.  Before beginning

operations, operators must obtain government approval of a proposed "plan of operations."  43 C.F.R. Subpart 3809.

39.     A plan of operations describes what activities the applicant proposes to conduct on public land.  A plan of operations must be submitted to BLM for approval before certain mining operations may commence and must document all actions that the operator plans to take, from exploration through reclamation.  43 C.F.R. § 3809.401.

40.     Pursuant to regulations implementing the Mining Law as well as FLPMA, a plan of operations "remains in effect" as long as the claimant is "conducting operations." 43 C.F.R. § 3809.423.

41.     When lands are withdrawn or segregated from entry under FLPMA and the Mining Law, the Mining Law's authorization for citizens to explore for and develop minerals on those public lands terminates.  Thus, "[a]fter the date on which the lands are withdrawn from appropriation" under the Mining Law, BLM may not approve a plan of operations until it has prepared a "mineral examination report" that determines "whether the mining claim was valid before the withdrawal" and "whether it remains valid."  43 C.F.R. § 3809.100(a).  If a mineral examination report concludes that a mining claim is "invalid," BLM may not approve operations on the mining claim.  *Id.*

The National Environmental Policy Act

42.     NEPA requires federal agencies to consider the environmental consequences of their actions.  42 U.S.C. § 4331, *et seq*.  NEPA ensures that the agency will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be

made available to a larger audience to ensure the public can play a role in both the

decisionmaking process and the implementation of the agency's decision.

43.     NEPA requires federal agencies to prepare a detailed environmental impact

statement ("EIS") for any major federal action that may significantly affect the quality of

the environment.  42 U.S.C. § 4332(2)(C).  An EIS must be prepared if there are

substantial questions as to whether a proposed action may have a significant effect on the

environment.

44.     In some circumstances, an agency may prepare an environmental

assessment ("EA"), which is a "concise public document" that serves to "[b]riefly

provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a

finding of no significant impact".  40 C.F.R. § 1508.9.  If the EA concludes that a

proposed action will significantly affect the quality of the environment, or raises

substantial questions as to whether the proposed action may have a significant effect, an

EIS must be prepared.  If the agency determines, based on the EA, not to prepare an EIS,

the agency must adequately explain its decision not to do so by supplying a convincing

statement of reasons, in the finding of no significant impact ("FONSI"), for why the

action's effects are insignificant.

45.     In determining the significance of a proposed action, NEPA's

implementing regulations direct federal agencies to consider a number of "significance"

factors, including: the unique characteristics of the geographic area such as proximity to

park lands; the degree to which the environmental effects are likely to be highly

controversial; the degree to which the environmental effects may be highly uncertain or

involve unknown risks; the degree to which the action may establish a precedent for future actions with significant effects; whether the action may adversely affect an endangered or threatened species or their critical habitat; whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment; and whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  40 C.F.R. § 1508.27(b).

46.     Pursuant to NEPA's implementing regulations, federal agencies must review the direct and indirect impacts of their actions, as well as the cumulative impacts. Direct effects are those effects "which are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  Cumulative impacts include impacts of "other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.

47.     Regulations implementing NEPA require federal agencies to prepare supplements to either draft or final EISs or EAs if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.0(c)(1)(ii).

48.     NEPA directs federal agencies to comply with its procedures "to the fullest extent possible."  42 U.S.C. § 4332.

The Endangered Species Act

49.     The Endangered Species Act was enacted in part to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved ... [and] to provide a program for the conservation of such endangered species and threatened species ...."  16 U.S.C. § 1531(b).  Section 2(c) of the ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."  16 U.S.C. § 1531(c)(1).  The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."  16 U.S.C. § 1532(3).  Similarly, section 7(a)(1) of the ESA directs the DOI Secretary to review "other programs administered by him and utilize such programs in furtherance of the purposes of the Act."  16 U.S.C. § 1536(a)(1).

50.     To ensure that federal agencies fulfill the substantive purposes of the section 7 of the ESA, the statute requires that they engage in consultation with the Services to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species ... determined ... to be critical ...."  16 U.S.C. § 1536(a)(2) ("section 7 consultation").  Section 7 consultation is required for "any action [that] may affect listed species or critical habitat."  50 C.F.R. § 402.14.

51.     According to the implementing regulations for section 7 of the ESA, at the "earliest possible time" each federal agency must review its actions "to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a). If such a determination is made, "formal consultation" is required unless the agency prepares a "biological assessment" or engages in "informal consultation" and determines, with concurrence by FWS, that the proposed action is "not likely to adversely affect any listed species or critical habitat."  50 C.F.R. § 402.14(b).

52.     Under the ESA's implementing regulations, an agency "action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.  Examples include, but are not limited to "actions directly or indirectly causing modifications to the land, water, or air."  50 C.F.R. § 402.02.

53.     When considering the effects of its action on threatened or endangered species and/or designated critical habitat, the federal agency must consider the "direct and indirect effects of an action on the species or critical habitat," together with the "environmental baseline", which includes the "past and present impacts" of all federal, State, or private actions and other human activities in the "action area," the "anticipated impacts of all proposed Federal projects in the action area", and the "impacts of all State or private actions which are contemporaneous with the consultation in process."  50 C.F.R. § 402.02.  "Indirect effects" are those effects which are "caused by the proposed action and are later in time, but still are reasonably certain to occur."  *Id*.  The "action

area" consists of "all areas to be affected directly or indirectly" by the proposed action,

and "not merely the immediate area involved in the action." *Id.*

54.    The requirements of section 7(a)(2) do not end with the conclusion of

consultation.  When an action is continuing, the agency must in certain circumstances

reinitiate consultation.  The ESA's implementing regulations provide:

> [R]einitiation of formal consultation is required and shall be requested by
> the Federal agency or by the Service, where discretionary Federal
> involvement or control over the action has been retained or is authorized by
> law and: (a) If the amount or extent of taking specified in the incidental take
> statement is exceeded; (b) If new information reveals effects of the action
> that may affect listed species or critical habitat in a manner or to an extent
> not previously considered; (c) If the identified action is subsequently
> modified in a manner that causes an effect to the listed species or critical
> habitat that was not considered in the biological opinion; or (d) If a new
> species is listed or critical habitat designated that may be affected by the
> identified action.

50 C.F.R.§ 402.16.  The duty to re-consult lies with both the action agency and FWS.  50

C.F.R. § 402.16.

## CLAIMS FOR RELIEF

First Claim:        Defendant BLM Has Violated FLPMA And The Mining Law By
                    Allowing Uranium Exploration And/Or Mining Activities To
                    Recommence At Arizona 1 Without Requiring A New Plan Of
                    Operations.

55.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

56.    The duration of BLM's 1988 Plan of Operations for the Arizona 1 Mine

was ten years.  Thus, the 1988 Plan of Operations for the Arizona 1 Mine expired in 1998

and is no longer in effect.  Accordingly, a new Plan of Operations must be prepared and

approved before any uranium mining activities may recommence at the Arizona 1 Mine

site.

57.     BLM's implementing regulations for FLPMA and the Mining Law state

that a plan of operations is only in effect as long as the claimant is "conducting

operations." 43 C.F.R. § 3809.423. The Arizona 1 Mine claimants have not conducted

operations for many years. Accordingly, a new Plan of Operations must be prepared and

approved before any uranium mining activities may recommence at the Arizona 1 Mine

site.

58.     BLM's failure to require a new plan of operations for the Arizona 1 Mine is

a violation of the Mining Law's implementing regulations and is agency action

unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of

the APA. 43 C.F.R. § 3809.423; 5 U.S.C. § 706(1). BLM's failure to act in this manner

is also an abuse of discretion, not in observance of procedure required by law, in excess

of statutory jurisdiction, authority, or limitations, and is otherwise not in accordance with

law, within the meaning of the APA, 5 U.S.C. § 706(2).

Second Claim:          Defendant BLM Has Violated FLPMA And The Mining Law By
                       Allowing Uranium Exploration And/Or Mining Activities To
                       Recommence At Arizona 1 Without Verifying The Validity Of
                       Claims For The Mine In Light Of The Segregation Order.

59.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

60.     When lands are withdrawn or segregated from entry under FLPMA and the

Mining Law, the Mining Law's authorization for citizens to explore for and develop

minerals on those public lands terminates. Thus, "[a]fter the date on which the lands are

withdrawn from appropriation" under the Mining Law, BLM may not approve a plan of operations until it has prepared a "mineral examination report" that determines "whether the mining claim was valid before the withdrawal" and "whether it remains valid."  43 C.F.R. § 3809.100(a).  If a mineral examination report concludes that a mining claim is "invalid," BLM may not approve operations on the mining claim.  *Id*.

61.     Only operations on "valid pre-existing claims" may continue or commence on public lands that have been segregated or withdrawn.  All federal public lands covered by the Order are segregated from location and entry under the Mining Law for up to two years to allow time for various studies and analyses.

62.     Because claim validity must have been established as of the date of segregation, which is July 21, 2009, verification of any valid mineral rights that existed as of that date must occur prior to any resumption of operations at Arizona 1 Mine.  43 U.S.C. § 1714; 43 C.F.R. § 3908.100.  Claim validity cannot be based upon a discovery which may have existed at some previous time.

63.     Although the Arizona 1 Mine claimant began construction operations in 1990 under the belief that its claims were valid, it stopped operations soon thereafter. The Arizona 1 Mine never produced any valuable ore.  The fact that the claimant abandoned operations in the early 1990s raises a presumption that the claims are no longer valid (if they even were valid at some point, which has not been demonstrated). The Interior Department has never conducted a review of the validity of the claims proposed to be utilized at the Mine site and never determined whether such claims are valid under the Mining Law.

64.    BLM's failure to prepare a mineral examination report and verify the validity of any claims at the Arizona 1 Mine is a violation of FLPMA and the Mining Law, and is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA.  30 U.S.C. § 22; 43 C.F.R. § 3809.100; 5 U.S.C. § 706(1).  BLM's actions are also an abuse of discretion, are done without observance of procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA.  5 U.S.C. § 706(2).

Third Claim:        Defendant BLM Has Failed To Comply With NEPA And Consider The Environmental Impacts Of Uranium Mining And/Or Exploration Activities At The Mine.

65.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

66.    NEPA's implementing regulations require that for all major federal actions "significantly" affecting the quality of the human environment, federal agencies must prepare an EIS.  Federal agencies may only avoid preparation of an EIS in certain circumstances, including through preparation of an EA, or by determining that the action is one that typically does not require either an EIS or an EA.  40 C.F.R. § 1501.4(a).

67.    Because the Arizona 1 Mine claimant's plan of operations for the Arizona 1 Mine is outdated and no longer in effect, and because BLM has failed to verify that any claims are valid and existing, before any uranium exploration and/or mining activities occur at the Mine going forward, BLM must consider the environmental consequences of such activities pursuant to NEPA.

68.     BLM's failure to prepare an EIS or EA to disclose and evaluate the environmental consequences of uranium exploration and mining at the Arizona 1 Mine is a violation of NEPA's implementing regulations, and is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA. 40 C.F.R. § 1502.27(b); 40 C.F.R. §§ 1508.25(a)(2), (a)(3); 5 U.S.C. § 706(1).  BLM's actions are also an abuse of discretion, are done without observance of procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

Fourth Claim:          <u>Defendant BLM Has Failed To Ensure, Through Satisfaction Of The Consultation Procedures Set Forth In The Implementing Regulations For Section 7 Of The ESA, That The Arizona 1 Mine Will Not Jeopardize The Continued Existence Of Threatened And Endangered Species, Or Adversely Modify Designated Critical Habitat.</u>

69.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

70.     The ESA requires federal agencies to ensure through ESA section 7 consultation that their actions will not jeopardize the continued existence of threatened and endangered species or adversely modify their critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 400.

71.     BLM has not ensured through consultation with FWS that the effects of uranium exploration and/or mining operations at the Arizona 1 Mine will not jeopardize the continued existence of threatened and endangered species that occur within the action area for the Mine, including but not limited to the Colorado pikeminnow, humpback chub, bonytail, razorback sucker, Southwestern willow flycatcher, Kanab ambersnail, or Mexican spotted owl.  BLM also has not ensured through consultation with FWS that the

effects of uranium exploration and/or mining operations at the Arizona 1 Mine will not adversely modify designated critical habitat for listed species in the Mine's action area, including but not limited to critical habitat for the Colorado pikeminnow, humpback chub, bonytail, razorback sucker, Southwestern willow flycatcher, or Mexican spotted owl.

72.    BLM's failure to ensure, though ESA section 7 consultation with FWS, that the effects of uranium exploration and/or mining operations at the Arizona 1 Mine will not jeopardize the continued existence of threatened and endangered species or adversely modify designated critical habitat, by complying with the procedures set forth in the implementing regulations for section 7(a)(2) of the ESA, is a violation of the ESA's affirmative duties and implementing regulations and is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA.  16 U.S.C. §§ 1536(a)(2), 1540(g); 50 C.F.R. Part 400; 5 U.S.C. § 706(1).  BLM's actions also constitute an abuse of discretion, are done without observance of procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

Fifth Claim:    Defendant BLM Has Failed To Prepare A Supplement To The 1988 EA To Consider Significant New Circumstances And Information Relevant To Environmental Concerns Bearing On The Arizona 1 Mine And Its Impacts, In Violation Of NEPA.

73.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

74.    NEPA's implementing regulations require federal agencies to prepare supplements to draft or final EISs if there are "significant new circumstances or

information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

75.     Since 1988, new information has emerged and new circumstances have occurred that bear on the Arizona 1 Mine and its environmental consequences. Such information and circumstances, which have never been considered by BLM in connection with the impacts of the Arizona 1 Mine, include information about potential impacts to surface water, ground water, aquifers, transportation, recreation, national monuments, cultural resources, and plants, fish, and wildlife, including threatened and endangered species and/or their designated critical habitat. In addition, unlike in 1988, when BLM last considered the Mine's environmental consequences, uranium exploration and mining operations in the Grand Canyon watershed has become highly controversial and is opposed by units of every level of government.

76.     BLM cannot rest on the 1988 Arizona 1 EA, but must be alert to such new information and circumstances, which could alter the results of the original environmental analysis. Accordingly, BLM must take a new, hard look at the direct, indirect, and cumulative environmental impacts of Arizona 1 Mine activities. BLM must also fully review based on changed circumstances noted herein, including the Segregation Order, all reasonable alternatives to the Arizona 1 Mine.

77.     BLM's refusal to prepare a supplement to the 1988 Arizona 1 EA is a violation of NEPA's implementing regulations, and is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA. 40 C.F.R. § 1502.9(c)(1)(ii); 5 U.S.C. § 706(1). BLM's actions are also an abuse of discretion, are

done without observance of procedure required by law, are in excess of statutory

jurisdiction, authority, or limitations, and are otherwise not in accordance with law,

within the meaning of the APA, 5 U.S.C. § 706(2).

Sixth Claim:                Defendants BLM And FWS Has Failed to Reinitiate ESA Section 7
                            Consultation To Consider The Effects Of The Arizona 1 Mine To
                            Threatened And Endangered Species And Critical Habitat That Have
                            Been Listed And Designated Since 1988, In Violation Of The ESA.

78.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

79.     When it approved the Arizona 1 Mine plan of operations in 1988, BLM

determined that uranium mining activities at the Arizona 1 Mine would have no effect to

any threatened or endangered species, or designated critical habitat.  BLM's 1988 EA for

the Arizona 1 Mine states that the agency surveyed the Arizona 1 Mine site's direct

footprint for threatened and endangered species.  BLM determined that no threatened or

endangered species were found.

80.     Since BLM prepared the EA for the Arizona 1 Mine in 1988, the razorback

sucker, Southwestern willow flycatcher, Kanab ambersnail, and Mexican spotted owl

have been added to the lists of threatened and endangered species under the ESA.  In

addition, critical habitat has been designated for the razorback sucker, Colorado

pikeminnow, humpback chub, bonytail, and Southwestern willow flycatcher.  These

species and critical habitat occur in the "action area" of the Arizona 1 Mine and may be

affected by uranium mining activities at the Mine.

81.     BLM retains discretionary involvement or control over the Arizona 1 Mine.

The duty to re-consult lies with both BLM and FWS.  50 C.F.R. § 402.16.

82.     Neither BLM nor FWS have reinitiated consultation pursuant to the ESA's implementing regulations to assess the effects of uranium mining operations at Arizona 1 to the razorback sucker, Southwestern willow flycatcher, Kanab ambersnail, or Mexican spotted owl.  Neither BLM nor FWS have reinitiated consultation to consider the effects of Arizona 1 operations to critical habitat for the razorback sucker, Colorado pikeminnow, humpback chub, and bonytail.

83.     BLM's and FWS's failure to ensure, through satisfaction of the regulations implementing section 7 of the ESA, that operations at the Arizona 1 Mine will not jeopardize the continued existence of newly-listed species and will not adversely modify newly-designated critical habitat, is a violation of the ESA's affirmative duties as well as the procedures set forth in the ESA's implementing regulations, and is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA.  16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 400; 5 U.S.C. § 706(1).  BLM's actions are also an abuse of discretion, are done without observance of procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

<u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that Defendants are in violation of the FLPMA, the Mining Law, NEPA, the ESA, implementing regulations for the cited laws, and the APA;

B.     Set aside and vacate any approvals or authorizations of exploration and mining operations at the Arizona 1 Mine;

C.      Enjoin Defendants from authorizing or allowing uranium exploration and mining at the Arizona 1 Mine unless and until BLM prepares a mineral examination report to verify whether there any valid existing claims at the Arizona 1 Mine site and in so doing, comply with NEPA, the ESA, and require a new plan of operations for the Arizona 1 Mine;

E.      Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the ESA, 16 U.S.C. § 1540, and the Equal Access to Justice Act, 28 U.S.C. § 2412; and,

F.      Grant Plaintiffs such further relief as may be just, proper, and equitable.


Respectfully submitted,

November 16, 2009

Amy R. Atwood
*pro hac vice* application pending
Center for Biological Diversity
P.O. Box 11374
Portland, Oregon 97211-0374
Tel: 503-283-5474; Fax: 502-283-5528
atwood@biologicaldiversity.org

Neil Levine
*pro hac vice* application pending
Grand Canyon Trust
2539 Eliot Street
Denver, Colorado 80211
Tel: 303-455-0604; Fax: 303-484-8470
nlevine@grandcanyontrust.org

Roger Flynn
*pro hac vice* application pending
Western Mining Action Project

29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

P.O. Box 349
440 Main St., #2
Lyons, CO 80540
Tel: 303-823-5738; Fax: 303-823-5732
wmap@igc.org

**Attorneys for Plaintiffs**