Amy R. Atwood, *pro hac vice*
Center for Biological Diversity
P.O. Box 11374
Portland, Oregon 97211-0374
Tel: 503-283-5474
atwood@biologicaldiversity.org

Neil Levine, *pro hac vice*
Grand Canyon Trust
2539 Eliot Street
Denver, Colorado 80211
Tel: 303-455-0604
nlevine@grandcanyontrust.org

Roger Flynn, *pro hac vice*
Western Mining Action Project
P.O. Box 349
440 Main St., #2
Lyons, CO 80540
Tel: 303-823-5738
wmap@igc.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY;<br>GRAND CANYON TRUST; SIERRA CLUB;<br>and KAIBAB BAND OF PAIUTE INDIANS,<br><br>Plaintiffs,<br><br>v.<br><br>KEN SALAZAR, Secretary of the Interior and<br>U.S. BUREAU OF LAND MANAGEMENT,<br><br>Defendants. | Case No. 3:09-cv-08207-DGC<br><br>FIRST AMENDED<br>COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF |

## **INTRODUCTION**

1.      Plaintiffs Center for Biological Diversity, Grand Canyon Trust, Sierra Club,

and the Kaibab Band of Paiute Indians of the Kaibab Indian Reservation challenge

Defendants Secretary of the Interior Ken Salazar and the U.S. Bureau of Land

Management's (collectively "BLM") failure to take actions required by law and approve

a new plan of operations for the "Arizona 1 Mine Project" ("Arizona 1 Mine", "Project," or "Mine") and evaluate its environmental impacts.  The Arizona 1 Mine is a uranium mine located on public land within 10 miles of the boundary of the Grand Canyon National Park ("Grand Canyon" or "Park").  The Mine is located on public land that is subject to a July 21, 2009 Order of Defendant U.S. Department of the Interior ("DOI") ("Segregation Order"), which segregates about one million acres of public lands in the Grand Canyon watershed from hardrock uranium mining in order to protect the watershed from the adverse effects of mining until studies and analyses of the "adverse effects of locatable hardrock mineral exploration and mining" can be completed.  74 Fed. Reg. 35887 (July 21, 2009).  Despite this, BLM has taken no action to protect the area from the Arizona 1 Mine Project.

2.       A quarter of a century ago, BLM first allowed uranium exploration activities at Arizona 1 through approval of a "Plan of Operations" ("1984 Plan of Operations" or "1984 Plan").  After 24 holes were drilled pursuant to the 1984 Plan, in 1988 BLM approved a second Plan of Operations that modified and expanded mining activities at Arizona 1 ("1988 Plan of Operations" or "1988 Plan").  Despite BLM's approval of the 1988 Plan of Operations, activities at the Mine did not commence until 1990 and ceased shortly thereafter, and from approximately 1992 until recently, the Mine was dormant and produced no commercial quantities of uranium ore.  Meanwhile, the term of the 1988 Plan of Operations expired and the plan became defunct, while ownership of any mining claims changed hands at least four times.

3.       Over two decades since BLM last considered the environmental effects of uranium mining at the Arizona 1 Mine, the agency recently allowed mining activities to recommence at the Mine.  BLM has allowed these long-dormant activities to resume without requiring a new plan of operations as required by the Federal Land Policy and Management Act, 43 U.S.C. § 1701, *et seq*. ("FLPMA"), the General Mining Law of 1872, 30 U.S.C. § 22, *et seq*. ("Mining Law") and their implementing regulations.

4.      To the extent the long-defunct 1988 Plan of Operations is deemed to still be effective, BLM failed to conduct any review of the environmental impacts from the Mine in light of the substantially changed circumstances since 1988 in violation of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA").  Significant new information has emerged since BLM prepared the 1988 EA that bears on the manner and degree to which uranium mining and exploration operations at the Arizona 1 Mine could directly, indirectly, and cumulatively affect fragile resources and the Grand Canyon, particularly when considered together with similar effects resulting from many other uranium mines and a uranium ore processing mill in the area.

5.      In failing to comply with these and other laws, BLM is also failing to meet its affirmative duty, under FLPMA, 43 U.S.C. § 1732(b), to prevent the unnecessary or undue degradation to public lands.

6.      To remedy these violations of law, Plaintiffs seek an order declaring that Federal Defendants have violated these environmental laws in relation to the Arizona 1 Mine Project, and an injunction directing operations to cease and stopping Defendants from authorizing or allowing any further mining or exploration operations at the Project site until BLM complies with all applicable laws.

## **JURISDICTION**

7.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331, 5 U.S.C. § 701, *et seq.*, and 28 U.S.C. § 1346, because this action involves the United States as a defendant and arises under the laws of the United States, including FLPMA, the Mining Law, NEPA, and the implementing regulations for these laws.  An actual, justiciable controversy exists between Plaintiffs and Defendants.  The requested relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 and 706.  The challenged agency actions and/or inactions are subject to this Court's review under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, and 706 ("APA").  While not required to establish jurisdiction, by letter dated September 8, 2009, Plaintiffs notified Defendants of their

intent to file a lawsuit against BLM if BLM did not comply with FLPMA, the Mining Law, NEPA, and other laws in connection with renewed uranium mining and exploration activities at the Arizona 1 Mine.  To date, BLM has failed to respond to or take actions to correct violations of the laws outlined in Plaintiffs' letter.

## VENUE

8.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the Arizona 1 Mine is located on federal lands within Arizona.  In addition, Plaintiff Center for Biological Diversity maintains a main office Tucson, Arizona and a field office in Flagstaff, Arizona; the Grand Canyon Trust is headquartered in Flagstaff, Arizona; and the Sierra Club has offices within the state.  Plaintiff Kaibab Band of Paiute Indians has a 121,000-acre Reservation in northern Arizona, near the Arizona 1 Mine site.  Defendant BLM has an office within the district.  Assignment is proper in the Prescott Division because the Project site is located in Mohave County.

## PARTIES

9.   Plaintiff Center for Biological Diversity is a non-profit corporation with over 43,000 members dedicated to the preservation, protection, and restoration of biodiversity and ecosystems throughout the world.  The Center's main office is located in Tucson, Arizona.  The Center also has an office in Flagstaff, Arizona.  The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.

10.   Plaintiff Grand Canyon Trust is a non-profit corporation headquartered in Flagstaff, Arizona with over 3,500 members.  The mission of the Grand Canyon Trust is to protect and restore the canyon country of the Colorado Plateau – its spectacular landscapes, flowing rivers, clean air, diversity of plants and animals, and areas of beauty and solitude.  One of the Trust's goals is to ensure that the Colorado Plateau is a region characterized by vast open spaces with restored, healthy ecosystems, and habitat for all native fish, animals, and plants.

4

11.     Plaintiff Sierra Club is a non-profit, public interest environmental organization with over 700,000 members, whose mission is to explore, enjoy and protect the planet.

12.     Plaintiff Kaibab Band of Paiute Indians ("Tribe") is a federally-recognized Native American Indian tribe that was established in 1934 under the Indian Reorganization Act.  The Tribe has a tribal constitution and is governed by a seven-person tribal council.  The Tribe is based on the 121,000-acre Kaibab Indian Reservation, which is located approximately 30 miles from the Arizona 1 Mine site and along the route used to haul ore from the Mine and many other uranium mine sites to the White Mesa Mill located near Blanding, Utah.  The Arizona 1 Mine Project is located on lands that are traditional homelands for the Tribe and which contain areas of great religious significance.

13.     Plaintiffs' members use and enjoy the BLM lands that are located north of Grand Canyon National Park, including the lands that are at the site of, or that will be affected by, operation of the Arizona 1 Mine Project.  Plaintiffs' members use and enjoy these federal public lands for hiking, fishing, hunting, camping, and photography, and for engaging in other environmental, vocational, scientific, educational, religious, cultural, aesthetic, and recreational activities.  Plaintiffs' members intend to continue to use and enjoy these lands frequently and on an ongoing basis in the future.  Defendants' failure to comply with FLPMA, the Mining Law, and/or NEPA as described herein injures Plaintiffs and their members because uranium mining activities at the Arizona 1 Mine, as well as new truck traffic and ore haulage across public lands and the Kaibab Paiute Reservation, injures Plaintiffs' ability to derive these benefits.  Plaintiffs also have a procedural interest in the proper management of these lands in full compliance with public lands and environmental laws and regulations, including FLPMA, the Mining Law, NEPA, and these statutes' implementing regulations.  Defendants' failure to comply with NEPA as described herein particularly injures Plaintiffs and their members because

it denies them both the ability to adequately participate in the public review process and information concerning environmental impacts that NEPA requires the agencies to disclose and analyze, and to solicit public review of, prior to allowing uranium exploration or mining operations to recommence at the Arizona 1 Mine.

14.     The environmental, vocational, scientific, educational, religious, cultural, aesthetic, recreational, and procedural interests of Plaintiffs and their members have been and will continue to be adversely affected and irreparably injured by the resumption of uranium exploration and mining recommence at the Arizona 1 Mine without compliance with law.  These are actual, concrete injuries caused by Defendants' refusal to comply with FLPMA, the Mining Law, and/or NEPA, the implementing regulations for these laws, and the APA.  The injuries will be redressed by the relief sought.

15.     Defendant Ken Salazar is sued in his official capacity as DOI Secretary. Mr. Salazar is the official responsible for the Segregation Order and for management over public lands surrounding the Grand Canyon National Park, including the lands encompassed by and affected by the Arizona 1 Mine Project.

16.     Defendant BLM is an agency within DOI, and is responsible for the lawful management of the federal lands within the Arizona 1 Mine Project area.  BLM originally approved the Arizona 1 Mine and now refuses to conduct the required actions discussed in this amended complaint.

## FACTUAL ALLEGATIONS

17.     The Arizona 1 Mine Project is located in Sections 22 and 23, T36N, R5W, Mojave County, Arizona, about 45 miles southwest of Fredonia.  Arizona 1 consists of 10 mining claims encompassing approximately 207 acres.  The Arizona 1 Mine is located on public lands that are administered by BLM.

18.     On September 11, 1984, Energy Fuels Nuclear ("EFN") submitted to BLM the 1984 Plan of Operations for uranium exploration activities, which BLM approved on October 4, 1984.  Prior to Plan approval, BLM prepared an Environmental Assessment

("EA") under NEPA.  Pursuant to the 1984 Plan of Operations, EFN drilled 24 exploratory holes between 1984 and 1988.

19.     Subsequently, EFN submitted the 1988 Plan of Operations to expand the Arizona 1 Mine Project to include full-blown mining activities.  In response, BLM underwent another NEPA process on the Arizona 1 Mine.  On May 9, 1988, BLM issued a second Environmental Assessment under NEPA ("1988 EA") and a Decision Record ("1988 Decision Record"), approving the 1988 Plan of Operations for modified and expanded construction and ore extraction activities at Arizona 1 Mine.

20.     The 1988 EA describes a two-phased plan for mining uranium at the Arizona 1 Mine to be completed within about 10 years.  First, during a three-year "development" phase, a vertical mine shaft would be drilled underground to a depth of approximately 1,650 feet and, once the presence of a uranium deposit was confirmed, horizontal chambers would be driven in or near the deposit.  Then, during a "production" phase, the ore would be mined at a rate of 300 tons per day – or, 109,500 tons per year – for about five years.  During full ore production, about twelve 25-ton capacity truck loads would leave the Project site daily and transport the ore along about 35 miles of gravel road to Arizona Road 389, including across portions of the Kaibab Paiute Reservation, and then along about 275 additional miles to the White Mesa Mill near Blanding, Utah.

21.     BLM's May 9, 1988 announcement approving the 1988 Plan of Operations stated that the approved Project was "temporary in nature" because it would take about seven to 10 years to complete.  The 1988 Decision Record stated that "the duration of this operation is approximately 10 years."

22.     In the 1988 Decision Record, BLM concluded that there would be no significant environmental impacts that necessitated preparation of an "Environmental Impact Statement" ("EIS") under NEPA.  This finding was based on the environmental review contained in the 1988 EA.

23.     Since 1988, much new and significant information has come to light that was not evaluated in the 1988 EA.  The 1988 EA did not assess or disclose to the public the Project's potential impacts to species that have been listed since 1988 as "threatened" or "endangered" pursuant to the Endangered Species Act, 16 U.S.C. § 1531, *et seq.* ("ESA"), such as the razorback sucker and humpback chub, Southwestern willow flycatcher, Kanab ambersnail, or Mexican spotted owl, or "critical habitat" that has been designated pursuant to the ESA for these and other species, or the 1994 reintroduction to the Grand Canyon of a population of condors– a highly-imperiled species that is attracted to toxic sump ponds typically maintained at mines and threatened by the increased vehicle traffic that they invariably cause.  Nor did the 1988 EA consider the effects of the Project's emissions of radon, a hazardous air pollutant, radioactive element, and known carcinogen that is regulated under the Clean Air Act, 42 U.S.C. § 7401, *et seq.* ("Clean Air Act").  The 1988 EA also does not reflect that any consultation took place between BLM and the Tribe – or any Native American tribes – about the potential impacts to Tribal property or cultural resources from the Project.  The 1988 EA also did not consider the Project's potential contamination of groundwater from the practice of mining uranium ore from breccia pipes, a renewed concern stemming from new information about the hydrogeology of the Kanab Plateau that suggests the potential for uranium mines to serve as conduits between perched aquifers.  Nor did the 1988 EA consider any of these potential impacts in combination with similar effects resulting from many other uranium mines in the same area as the Arizona 1 Mine, where development is now reasonably foreseeable.

24.     Development of the Arizona 1 Mine under the 1988 Plan of Operations at the Arizona 1 Mine began in 1990.  Development ceased shortly thereafter due to uranium market conditions.  When development ceased, the depth of the mining shaft was about 1,254 feet.  For 15 years, the Mine did not produce uranium ore in commercial quantities.  Indeed, there were no workers or mining operations at all at Arizona 1 Mine

for an extended period of time, during which, among other things: (1) the 1988 Plan of Operations expired; (1) mining claims at the Mine changed ownership at least four times; (3) radon became a "hazardous air pollutant" subject to regulation under the Clean Air Act; (4) a population of condors was reintroduced to the Grand Canyon National Park; (5) new information emerged about the hydrogeology of the Kanab Plateau that underlies the Arizona Strip; (6) the regulatory scheme applicable to uranium mining on federal public lands changed; and (7) DOI issued the Segregation Order.

25.     On March 17, 2008, the Grand Canyon Watersheds Protection Act of 2008 was introduced in Congress.  As proposed, this legislation would permanently withdraw over one million acres of public and national forest lands in the vicinity of Grand Canyon National Park from location, entry, and patent under the Mining Law, subject to valid, existing rights.  To date, this legislation has not been passed in Congress.  The Arizona 1 Mine is located on public lands that are covered by the Grand Canyon Watersheds Protection Act of 2008.

26.     On June 25, 2008 the U.S. House of Representatives' Committee on Natural Resources issued an "emergency resolution" pursuant to Section 204(e) of FLPMA, 43 U.S.C. § 1714(e) and 43 C.F.R. § 2310.5 ("Emergency Resolution").  The Emergency Resolution directed the Secretaries of Interior and the U.S. Department of Agriculture to immediately withdraw the 1,068,908 acres of Federal lands subject to the Grand Canyon Watersheds Protection Act of 2008 from all forms of location and entry under the Mining Law for up to three years, subject to valid existing rights, pursuant to FLPMA section 204(e), 43 U.S.C. § 1714(e), and its implementing regulations at 43 C.F.R. § 2310.5.  Under FLPMA, a "withdrawal" is the withholding of an area of federal land from settlement, sale, location, or entry in order to maintain other public values in the area or for reserving the area for a particular public purpose or program."  43 U.S.C. § 1714(a); 43 C.F.R. § 2300.0-5(h).  The Emergency Resolution sought to maintain the status quo until Congress fully considers the Grand Canyon Watersheds Protection Act of

2008.  The Arizona 1 Mine is located on lands that are subject to the Emergency
Resolution.

27.  After "carefully considering the issue of uranium mining near Grand Canyon National Park," on July 21, 2009 DOI issued a Segregation Order.  The Segregation Order removes approximately one million acres of federal public lands in the Grand Canyon watershed from location and entry under the Mining Law for two years, subject to valid existing rights, while DOI evaluates whether to withdraw some or all of these lands from new mining claims for 20 years.  74 Fed. Reg. 35887 (July 21, 2009). The Segregation Order was issued in response to a "Petition/Application for Withdrawal" submitted by BLM to DOI, and is intended to "allow time for various studies and analyses, including appropriate [NEPA] analysis" that will "support a final decision on whether or not to proceed with a withdrawal" of some or all of these lands from location and entry under the Mining Law.  *Id*.

28.  In issuing the Segregation Order, DOI recognized that the Grand Canyon is an iconic American landscape and World Heritage Site that: encompasses 1.2 million acres on the Colorado Plateau; currently draws 4.4 million visitors each year; is home to numerous rare, endemic, and specially-protected plant and animal species; and contains vast archeological resources and sites of spiritual and cultural importance to American Indians.  DOI also recognized that the Colorado River and its tributaries flow through the Grand Canyon and supply water to agricultural, industrial, and municipal users, including the cities of Tucson, Phoenix, Las Vegas, Los Angeles, and San Diego.  Defendant Secretary Salazar stated in a press release that the Segregation Order was necessary in order to "ensure that we are developing our nation's resources in a way that protects local communities, treasured landscapes, and our watersheds[.]"  The Segregation Order applies to the same lands identified in the Emergency Resolution and the Grand Canyon Watersheds Protection Act, including the public lands where the Arizona 1 Mine is located.

29.     On August 31, 2009, the Arizona Department of Environmental Quality ("ADEQ") issued a Class II air quality permit to Denison Mines Corporation ("Denison" or "Denison Mines") for operations at the Arizona 1 Mine.  The permit allows Denison Mines to "reactivate and operate" the Arizona 1 Mine at a production rate of 109,500 tons per year for five years, and establishes emissions limits and standards for opacity, particulate matter, sulfur dioxide, volatile organic compounds, and radon in connection with Project operations.  The ADEQ-issued air permit provides that radioactive ore mined from Arizona 1 will be shipped to the Denison-owned White Mesa Mill, unless ore cannot be transported to White Mesa immediately, in which case up to 9,680 tons will be stock-piled in an one-acre Ore Stockpile Area.  The permit also provides that up to 54,750 tons of development rock will be disposed of the 1.25-acre Development Rock Area and placed in mined-out areas underground.

30.     ADEQ's air permit recognizes the federal air quality standard for radon, and purports to permit Denison to emit radon from the Arizona 1 Mine vent shafts, an emergency generator, and ore storage piles and haul trucks.  However, ADEQ was not authorized to issue a permit for radon emissions under the Clean Air Act, because EPA regulates emissions of toxic radon gas from underground uranium mines under the hazardous air pollutant provisions of the Clean Air Act.  42 U.S.C. § 7412.  Thus for ADEQ to issue a binding permit for radon emissions under the Clean Air Act, EPA must first delegate to the State of Arizona the authority to regulate and issue permits for radon emissions, but has not done so.  40 C.F.R. § 61.04 (list of delegated States for hazardous air pollutants, with Arizona excluded); 40 C.F.R. Part 61, Subpart B ("National Emission Standards for Radon Emissions from Underground Uranium Mines").  Accordingly, before beginning operations at Arizona 1 Mine, Denison was required to secure from EPA an air permit for radon emissions from the Project.  Before restarting operations at the Arizona 1 Mine, Denison did not apply for or receive an EPA permit for radon emissions as required under the Clean Air Act.

1    31.    In July 2009, Arizona Strip BLM District Manager Scott Florence

2  informed Plaintiffs that Denison Mines could commence operations at the Arizona 1

3  Mine Project site, including ore extraction, upon final issuance of the Class II air quality

4  permit from ADEQ, without BLM's approval of a new plan of operations or preparation

5  of updated environmental reviews pursuant to NEPA.  By an electronic mail

6  communication to a representative for Plaintiff Sierra Club on July 27, 2009, Mr.

7  Florence also stated that BLM had "recently updated the reclamation bond[]" in order to

8  allow mining operations to commence at the Arizona 1 Mine.

9    32.    On September 8, 2009, Plaintiffs notified Defendants of their intent to file a

10  lawsuit against BLM if BLM did not comply with federal laws in connection with

11  renewed uranium mining and exploration activities at the Arizona 1 Mine.  After

12  receiving no response, Plaintiffs initiated this action on November 16, 2009.

13    33.    Based on information and belief, employees working for Denison Mines

14  began removing uranium ore at the Arizona 1 Mine and trucking it to the White Mesa

15  Uranium Mill near Blanding, Utah in late December 2009.  The Tribe has been affected

16  by the increased use of the area resulting from the resumption of long-dormant operations

17  at the Mine.

18    34.    There has been dramatic growth in the price of uranium in recent years,

19  with the price now relatively stable at around $100 kilograms of uranium ("kgU").  As a

20  result, there has been resurgence in interest in uranium mining in the Grand Canyon

21  watershed.  There are other Denison-owned uranium mines which, like Arizona 1, are

22  located on the Arizona Strip and within the Grand Canyon watershed, for which any

23  uranium exploration or mining activities were long-dormant before resuming only

24  recently, and for which environmental reviews were last prepared in the 1980s.  Such

25  mines include the Pinenut and Kanab North mines, both of which are located in the

26  Kanab Creek drainage, as well as the Canyon Mine, which is located on Forest Service

27  lands on the south rim of the Grand Canyon.  The Pinenut Mine is located about four

28

miles east of the Arizona 1 Mine.  The Kanab North Mine is located about 20 miles northeast of the Arizona 1 Mine and on the rim of Kanab Creek.  BLM is considering allowing uranium exploration and mining activities to resume at Pinenut and Kanab North, and the Forest Service is considering allow such activities to resume at the Canyon mine, without requiring new plans of operations or preparing updated environmental reviews pursuant to NEPA and the ESA.

35.     In addition to showing renewed interest in these older mines, Denison Mines has also recently proposed to conduct new uranium exploration and breccia pipe mining activities at the EZ1, EZ2, DB1, and WHAT mines, and the Moonshine Springs Mine, which would be developed as an open pit mine.  The EZ1, EZ2, DB1, and WHAT mines are located about 13 miles northwest of Arizona 1, and Moonshine Springs is located about 30 miles north of the Project.  Additionally, BLM has recently approved new uranium exploration on lands that are subject to the Segregation Order.

36.     The Arizona 1, the Kanab North, Pinenut, EZ1, EZ2, DB1, WHAT, and Moonshine Springs uranium mines are all located on the Arizona Strip and within the Grand Canyon watershed, and all but the Moonshine Springs Mine would be mined using methods similar to those used at Arizona 1.

37.     The 1988 EA considered the cumulative impacts of the Arizona 1 Mine only in combination with those uranium mines on the Arizona Strip that, in 1988, BLM believed would be developed during the 1988 Plan of Operations' 10-year lifespan. Thus, the 1988 EA did not consider the cumulative effects of Arizona 1 in combination with the Kanab North, EZ1, EZ2, DB1, WHAT, or Moonshine Springs mines.  Nor did the 1988 EA consider the indirect and cumulative effects resulting from the transportation and processing of the ore at the White Mesa Mill.  Meanwhile, uranium exploration and mining operations in the Grand Canyon watershed has become highly controversial, as it is now opposed by units of every level of government.

38.     Renewed uranium mining operations at the Arizona 1 Mine may cause environmental impacts that have never been considered in any NEPA document.  There is new information that bears on, for example, the Mine's direct, indirect, and cumulative impacts to surface water, ground water, air quality, aquifers, transportation, cultural resources, recreation, national monuments, and plants, fish, and wildlife, including threatened and endangered species and/or their designated critical habitat.  The lack of this type of comprehensive analysis motivated DOI to issue the Segregation Order and require preparation of an EIS on uranium mining in the region.

## STATUTORY AND REGULATORY BACKGROUND

### The Federal Land Policy Management Act

39.     Land management direction for BLM is provided in FLPMA and its implementing regulations.  FLPMA establishes requirements for land use planning on and management of public lands, including the public lands where the Arizona 1 Mine is located.  43 U.S.C. §§ 1701-1785.

40.     FLPMA provides that the nation's public lands are to be managed "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use[.]"  43 U.S.C. § 1701(a)(8).

41.     FLPMA mandates that the DOI Secretary "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands."  43 U.S.C. § 1732(b).  Regulations implementing FLPMA as well as the Mining Law establish the "procedures and standards" that "ensure that operators and mining claimants" meet their duties to "prevent unnecessary or undue degradation of the land and reclaim disturbed areas."  43 C.F.R. § 3809.1(a) (referring to 43 C.F.R. Subpart 3809).  These regulations also provide that "unnecessary or undue degradation" means,

among other things, "conditions, activities, or practices" that fail to comply with "other Federal and state laws related to environmental protection ...." 43 C.F.R. § 3809.5.

42.   FLPMA also authorizes the Secretary to "make, modify, extend, or revoke withdrawals" of public lands.  43 U.S.C. §§ 1714(a), (b)(1); 43 C.F.R. Subpart 2310.  A "withdrawal" is the withholding of an area of federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities in order to maintain other public values in the area or for reserving the area for a particular public purpose or program ...." 43 C.F.R. § 2300.0-5(h).  A "withdrawal petition" is a request, originated within DOI and submitted to the Secretary, for a withdrawal.  43 C.F.R. § 2300.0-5(p).  A "segregation" is "the removal for a limited period, subject to valid existing rights, of a specified area of the public lands from the operation of the public lands laws, including the mining laws, in order to permit sufficient time for the gathering and completion of information, studies, analyses, and reports that will inform DOI's decision of whether to act on a withdrawal petition.  43 C.F.R. §§ 2300.0-5(m), 2310.3-2.

**The General Mining Law of 1872**

43.   The general statute for hardrock mining on federal lands is the 1872 Mining Law.  The Mining Law authorizes the exploration and purchase of hard rock mineral deposits on lands belonging to the United States, subject to certain conditions.  30 U.S.C. §§ 22, 26.  The Mining Law opens "all valuable mineral deposits in lands belonging to the United States", including uranium deposits and "the lands in which they are found", to exploration, occupation, and purchase.  30 U.S.C. § 22.  Regulations implementing the Mining Law are found at 43 C.F.R. Subpart 3809.

44.   The most intensive category of hard-rock mining on public lands is "plan-level operations."  43 C.F.R. § 3809.10(c).  Plan-level operations are those operations that cause a cumulative surface disturbance of more than five acres in any calendar year.  *Id*. § 3809.11(a).  Before beginning such operations, operators must obtain BLM approval

of a proposed plan of operations that describes the activities the applicant proposes to conduct, from exploration through reclamation, and the estimated period during which the proposed activity will take place. *Id*. § 3809.401.  A plan of operations must "demonstrate that the proposed operations would not result in unnecessary or undue degradation of public lands." *Id*. at § 3809.401(a).  A plan of operations must also describe how the affected lands will be managed during periods of non-operation. *Id*. § 3809.401(a)(b)(5) (2010); 43 C.F.R. § 3809.1-5(c)(6) (1980).

45.    In 2001, the regulatory scheme for hardrock mining on public lands changed when revisions to 43 C.F.R. Subpart 3809 went into effect.  For plan-level operations, the 2001 regulations provide that activities may not begin until: BLM approves a plan of operations that demonstrates that the proposed operations will not result in the unnecessary or undue degradation of public lands; BLM conducts and completes environmental review(s) pursuant to NEPA and consultation pursuant to the ESA; BLM consults with Native American tribes; BLM conducts an on-site visit; BLM reviews public comments on the plan of operations; BLM completes consultation with the State to ensure consistency with State water quality requirements; and the operator provides a financial guarantee.  43 C.F.R. §§ 3809.401, 3809.411, 3809.412.  The 2001 regulations provide that in the event that an operator had an existing or pending plan of operations at the time the regulations went into effect, the operator was permitted to operate pursuant to that plan of operations but was required to post new or updated financial guarantees by specific dates. *Id*. §§ 3809.400(a), 3809.505.

46.    BLM regulations provide that an existing plan of operations "remains in effect" only so long as the claimant is "conducting operations."  43 C.F.R. § 3809.423. "Operations" is defined to include "all functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses, whether on a

mining claim or not, including the construction of roads, transmission lines, pipelines, and other means of access across public lands for support facilities." 43 C.F.R. § 3809.5.

47.     BLM regulations further provide that if operations are inactive for any length of time, the operator must follow its plan for interim management, submit modifications as necessary, take all necessary actions to assure that unnecessary or undue degradation does not occur, and maintain an adequate financial guarantee.  43 C.F.R. § 3809.424(a)(1).  If operations are inactive for longer than five years, BLM is to review the operations and determine whether BLM should terminate the plan of operations and direct final reclamation and closure of the mine.  43 C.F.R. § 3809.424(a)(3).  If, after reviewing the plan of operations, BLM determines that the operations have been abandoned, it can initiate forfeiture and direct reclamation and closure.  43 C.F.R. § 3809.424(a)(4).  Abandonment is evaluated based on several factors, including whether the mine operator has left equipment in the project area, maintained the project area, or discharged workers, and/or whether there is any sign of activity in the project area over time.  *Id.*; 43 C.F.R. § 3809.336(a).

**The National Environmental Policy Act**

48.     NEPA requires federal agencies to consider the environmental consequences of their actions.  42 U.S.C. § 4321, *et seq*.  NEPA ensures that the agency will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to a larger audience to ensure the public can play a role in both the decisionmaking process and the implementation of the agency's decision.  NEPA serves to integrate BLM decision-making on particular mining proposals with evaluation of other environmental concerns, as well as with other state and federal permitting requirements.

49.     NEPA directs federal agencies to comply with its procedures "to the fullest extent possible."  42 U.S.C. § 4332.

50.     BLM may not approve a plan of operations pursuant to 43 C.F.R. Subpart 3809 until it completes environmental review(s) pursuant to NEPA.  43 C.F.R. § 3809.411(a)(3)(ii).

51.     NEPA requires federal agencies to prepare a detailed EIS for any major federal action that may significantly affect the quality of the environment.  42 U.S.C. § 4332(2)(C).  An EIS must be prepared if there are substantial questions as to whether a proposed action may have a significant effect.

52.     In some circumstances, an agency may prepare an EA, which is a "concise" public document that serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact".  40 C.F.R. § 1508.9.  If the EA concludes that a proposed action will significantly affect the quality of the environment, or raises substantial questions as to whether the proposed action may have a significant effect, an EIS must be prepared.  If the agency determines, based on the EA, not to prepare an EIS, the agency must adequately explain its decision not to do so by supplying a convincing statement of reasons for why the action's effects are insignificant in the finding of no significant impact ("FONSI").

53.     In determining the significance of a proposed action, NEPA's implementing regulations direct federal agencies to consider a number of "significance" factors, including: the unique characteristics of the geographic area such as proximity to park lands; the degree to which the environmental effects are likely to be highly controversial; the degree to which the environmental effects may be highly uncertain or involve unknown risks; the degree to which the action may establish a precedent for future actions with significant effects; whether the action may adversely affect an endangered or threatened species or their critical habitat; whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment; and whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  40 C.F.R. § 1508.27(b).

54.     Pursuant to NEPA's implementing regulations, federal agencies must review the direct and indirect impacts of their actions, as well as the cumulative impacts. Direct effects are those effects "which are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable."  *Id*. § 1508.8(b).  Cumulative impacts include impacts of "other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id*. § 1508.7.

55.     Regulations implementing NEPA require federal agencies to prepare supplements to either draft or final EISs or EAs if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.0(c)(1)(ii).

## CLAIMS FOR RELIEF

**First Claim:**     **Defendant BLM Has Violated FLPMA And The Mining Law By Failing To Require And Approve A New Plan Of Operations For The Uranium Exploration And/Or Mining Activities At The Arizona 1 Mine Project.**

56.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

57.     BLM's implementing regulations for FLPMA and the Mining Law state that a plan of operations is only in effect as long as the claimant is "conducting operations."  43 C.F.R. § 3809.423.  "Operations" include "all functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses, whether on a mining claim or not, including the construction of roads, transmission lines, pipelines, and other means of access across public lands for support facilities."  43 C.F.R. § 3809.5.  Operations at Arizona 1 Mine have not been conducted since at least the early 1990s.  Therefore, the 1988 Plan of Operations is no longer in effect.

58.     BLM has an ongoing duty to ensure that operations are being conducted in accordance with the implementing regulations for FLPMA and the Mining Law.  Before Denison could renew operations at the Arizona 1 Mine, BLM required Denison to post a new reclamation bond and secure an air permit.

59.     The duration of the 1988 Plan of Operations was about 10 years.  In 1998, the 1988 Plan of Operations became dormant by its own terms, and because it relied on the 1988 EA, which only considered the anticipated environmental impacts of the Arizona 1 Mine through about 1998.  Therefore, the 1988 Plan of Operations is no longer in effect.

60.     Because the 1988 Plan of Operations is no longer in effect, mining activities may not occur on BLM-managed lands unless BLM first approves a new plan of operations that demonstrates that the operations will not cause unnecessary or undue degradation to those public lands, and in the process, prepares environmental reviews as required by, among other laws, NEPA and the ESA.  43 C.F.R. §§ 3809.11, 3809.401.

61.     BLM's failure to require and approve a new plan of operations for the Arizona 1 Mine is a violation of FLPMA and the Mining Law and these statutes' implementing regulations, and is agency action unlawfully withheld or unreasonably delayed, and/or agency action that is arbitrary and capricious, an abuse of discretion, not in observance of procedure required by law, in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA.  30 U.S.C. § 22; 43 C.F.R. §§ 3809.11, 3809.401, 3809.423; 5 U.S.C. §§ 706(1), 706(2).

**Second Claim:**       **In The Alternative, If The Plan Of Operations Is Still In Effect, Defendant BLM Has Failed To Prepare A Supplement To The 1988 EA To Consider Significant New Circumstances And Information Relevant To Environmental Concerns Bearing On The Arizona 1 Mine Project And Its Impacts, In Violation Of NEPA.**

62.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

63.     NEPA's implementing regulations require federal agencies to prepare supplements to draft or final EAs or EISs if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).

64.     The 1988 EA's analysis of potential impacts resulting from the Arizona 1 Mine Project was limited to those impacts that, at the time, BLM believed could occur during implementation of the 1988 Plan of Operations.  Since the 1988 EA, new information has emerged and circumstances have changed that bear on the Arizona 1 Mine and its environmental consequences.  Such new information, which has never before been considered by BLM in connection with the impacts of the Arizona 1 Mine Project, includes information about the Project's potential impacts to surface water, ground water, air quality, aquifers, transportation, recreation, national monuments, cultural resources, and plants, fish, and wildlife, including threatened and endangered species and/or their designated critical habitat.  These potential impacts include not only the direct and indirect effects of the Arizona 1 Mine itself, but these effects in combination with the effects of other uranium mines in the Grand Canyon watershed as well as the White Mesa Mill.  Changed circumstances include the changed ownership of any valid claims at the Mine, the regulation of radon as a hazardous air pollutant pursuant to the Clean Air Act, the reintroduction of a population of condors in the Grand Canyon National Park, a new regulatory scheme for hardrock mining on federal public lands, and the Segregation Order.  Moreover, unlike in 1988, when BLM last considered the Mine's environmental consequences, uranium exploration and mining operations in the Grand Canyon watershed have become highly controversial and are opposed by units of every level of government.  When presented with this new information and changed circumstances, BLM completely ignored it, and refused to prepare a supplement to the 1988 EA to consider it.

65.     The Arizona 1 Mine Project has only been partially implemented.  BLM required Denison to update the reclamation bond and secure an air permit before allowing operations to recommence at the Arizona 1 Mine.  Under applicable laws, BLM has an ongoing duty to: ensure that operations are in full compliance with any current plan of operations, FLPMA and its implementing regulations, and other federal and state laws related to environmental protection and protection of cultural resources; review the Mine following periods of non-operation to determine whether the Mine has been abandoned; and approve a current or modified plan of operations as well as updated financial guarantees.  Accordingly, BLM retains discretionary control over and involvement in the Mine and there are significant new circumstances or information relevant to environmental concerns and/or bearing on the Arizona 1 Mine Project or its impacts.

66.     Even if the 1988 Plan of Operations may be deemed to be still in effect, BLM cannot rest on the 1988 EA for the Arizona 1 Mine Project, but must be alert to and inform the public and decisionmakers about new information and circumstances that could alter the results of the original environmental analysis.  Accordingly, BLM must take a new, hard look at the direct, indirect, and cumulative environmental impacts of Project activities.  Additionally, based on changed circumstances including the Segregation Order, BLM must also develop and fully consider all reasonable alternatives to the Arizona 1 Mine Project as originally conceived of in the 1988 Plan of Operations.

67.     BLM's failure to prepare a supplement to the 1988 EA is a violation of NEPA and its implementing regulations, and is agency action unlawfully withheld or unreasonably delayed, and/or agency action that is arbitrary and capricious, an abuse of discretion, not in observance of procedure required by law, in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA.  40 C.F.R. § 1502.9(c)(1)(ii); 5 U.S.C. §§ 706(1), 706(2).

1
2
3

**Third Claim:**          **By Failing To Comply With FLPMA And/Or NEPA And These Statutes' Implementing Regulations, BLM Has Failed To Prevent The Unnecessary And/Or Undue Degradation Of Public Lands.**

4

68.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

5
6

69.     FLPMA imposes on BLM an ongoing duty to "take any action necessary to

7

prevent unnecessary or undue degradation of the [public] lands."  43 U.S.C. § 1732(b).

8

Regulations implementing this FLPMA duty establish the "procedures and standards"

9

that "ensure that operators and mining claimants" "prevent unnecessary or undue

10

degradation of the land and reclaim disturbed areas."  43 C.F.R. § 3809.1(a).  These

11

regulations provide that the standards and procedures for ensuring compliance with the

12

duty to prevent unnecessary or undue degradation.  43 C.F.R. § 3809.1(a).  These

13

regulations also provide that "unnecessary or undue degradation" means, among other

14

things, "conditions, activities, or practices" that fail to comply with "other Federal and

15

state laws related to environmental protection …."  43 C.F.R. § 3809.5.

16

70.     Denison Mines is operating the Arizona 1 Mine without an air permit from

17

EPA for radon emissions in violation of the Clean Air Act.  By failing to require Denison

18

Mines to comply with the Clean Air Act and by committing the violations of law

19

described herein and above, BLM has failed to comply with its ongoing duty to ensure

20

that the Arizona 1 Mine does not cause unnecessary or undue degradation of public lands

21

in accordance with FLPMA and its implementing regulations.

22

71.     BLM's failure to "take any action necessary to prevent unnecessary or

23

undue degradation of the [public] lands" including through ensuring compliance with

24

Federal and state laws related to environmental protection and the implementing

25

regulations for FLPMA and the Mining Law, is a violation of FLPMA's prohibition

26

against unnecessary or undue degradation and is agency action unlawfully withheld or

27

unreasonably delayed, and/or agency action that is arbitrary and capricious, an abuse of

28

discretion, not in observance of procedure required by law, in excess of statutory

jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA.  43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1(a), 3809.5; 5 U.S.C. §§ 706(1), 706(2).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that Defendants are in violation of the FLPMA, the Mining Law, and/or NEPA, implementing regulations for the cited laws, and the APA;

B.     Set aside and vacate any approvals or authorizations of exploration and mining operations at the Arizona 1 Mine;

C.     Enjoin Defendants from authorizing or allowing any further uranium exploration or mining activities at the Arizona 1 Mine unless and until BLM approves a lawful plan of operations and in so doing, fully complies with FLPMA, the Mining Law, NEPA, the ESA, the Segregation Order, and all other applicable environmental laws and regulations;

D.     Enjoin Defendants from authorizing or allowing any further uranium exploration or mining activities at the Arizona 1 Mine unless and until BLM completes lawful, supplemental, and updated environmental reviews pursuant to NEPA and its implementing regulations;

E.     Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and,

F.     Grant Plaintiffs such further relief as may be just, proper, and equitable.

Respectfully submitted,


February 1, 2009                          /s/ *Amy Atwood*
                                          Amy R. Atwood
                                          Neil Levine
                                          Roger Flynn
                                          Attorneys for Plaintiffs