DENNIS K. BURKE
United States Attorney
District of Arizona

IGNACIA S. MORENO
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
CHARLES FINDLAY
Assistant Chief

TYLER WELTI
Trial Attorney, CA Bar #257993
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington D.C. 20044-0663
202-305-0481(tel.); 202-305-0506 (fax)
tyler.welti@usdoj.gov
MICHAEL D. THORP
Trial Attorney
Environment and Natural Resources Division
601 D. Street , N.W., No. 3112
Washington, D.C.  20004
(202) 305-0456

*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br>                              Plaintiffs,<br><br>              vs.<br><br>KEN SALAZAR, Secretary of the Interior, *et al.*<br>                      Defendants,<br><br>and<br><br>DENISON ARIZONA STRIP, LLC, *et al.*,<br>            Defendants-Intervenors. | Case No. 3:09-cv-08207-DGC<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND .................................................................................. 2

III.  STATUTORY AND REGULATORY BACKGROUND ......................................... 2

    A.  The Mining Law of 1872 ............................................................................... 2

    B.  Federal Land Policy and Management Act ..................................................... 3

    C.  The Regulatory Framework under the Mining Law and FLPMA .................. 4

    D.  National Environmental Policy Act ............................................................... 5

    E.  Administrative Procedure Act ........................................................................ 7

IV.   STANDARD OF REVIEW ................................................................................... 7

V.    ARGUMENT ....................................................................................................... 9

    A.  Plaintiffs Fail to Show Likelihood of Success on the Merits of their Claims ............... 10

        1.  Plaintiffs Fail to Show a Likelihood of Success on the Mining Law Claim ........... 10

            i.   BLM Has Sole Discretion To Interpret The Part 3809 Regulations. ............... 11

            ii.  Under Section 3809.05, Temporary Closures Are Included Within The Meaning Of Mining "Operations." ................................................................... 11

            iii. Section 3809.423 Does Not Void An MPO By Operation Of Law ................ 12

        2.  Plaintiffs Fail to Show a Likelihood of Success on their NEPA Claim ................... 15

            i.   Plaintiffs' NEPA Claim Cannot Proceed because a NEPA Analysis, Standing Alone, is not a Final Agency Action. ....................................................... 15

            ii.  NEPA "Supplementation" is not Required. ...................................................... 18

                 a.  BLM Completed the Relevant Major Federal Action when it Approved the MPO in 1988. ........................................................................ 20

                 b.  No Major Federal Action Remains to Occur ........................................ 21

            iii. Plaintiffs have not Met their Burden by Showing that Alleged "New Information" Raises Substantial Questions that "Remaining Action" may Significantly Affect the Quality of the Environment. ..................................... 29

            iv.  Plaintiffs' NEPA claim is barred by the statute of limitations because BLM completed the relevant final agency action in 1988. ....................................... 31

    B.  Plaintiffs Fail To Make The Necessary Showing of Irreparable Harm. ....................... 32

    C.  The Balance of Hardships and the Public Interest do not Favor Plaintiffs. .................. 34

VI.   CONCLUSION ..................................................................................................... 34

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Aberdeen & Rockfish R. Co. v. SCRAP,*
  409 U.S. 1207 (1972).................................................................... 34

*Am. Radio Relay League, Inc. v. F.C.C.,*
  524 F.3d 227 (D.C. Cir. 2008)........................................................ 9

*Am. Trucking Ass'ns, Inc. v. City of L.A.,*
  559 F.3d 1046 (9th Cir. 2009) ....................................................... 8

*Atlanta Coal. v. Atlanta Reg'l Comm'n,*
  599 F.2d 1333 (5th Cir. 1979) ...................................................... 23

*Auer v. Robbins,*
  519 U.S. 452 (1997)........................................................... 9, 11, 12

*Balt. Gas & Elec. v. NRDC,*
  462 U.S. 87 (1983)................................................................ 7, 19

*Bennett v. Spear,*
  520 U.S. 154 (1997)................................................................. 15

*Born Free USA v. Norton,*
  2004 WL 180263 (D.C. Cir. Jan. 21, 2004)................................... 23

*Born Free USA v. Norton,*
  278 F.Supp.2d 5 (D.D.C. 2003) .................................................... 23

*Bowles v. Seminole Rock & Sand Co.,*
  325 U.S. 410 (1945)................................................................... 9

*Buckeye Forest Council v. U.S. Forest Serv.,*
  378 F. Supp. 2d 835 (S.D. Ohio 2005) ......................................... 21

*Cal. Sportfishing Prot. Alliance v. FERC,*
  472 F.3d 593 (9th Cir. 2006) ....................................................... 30

*Caribbean Marine Serv. Co. v. Baldridge,*
  844 F.2d 668 (9th Cir. 1988) ....................................................... 33

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984)............................................................... 4, 8

*Citizens Against Rails-to-Trails,*
  267 F.3d 1144 (D.C. Cir. 2001) ..................................................... 6

*Citizens for Responsible Area Growth v. Adams,*
  680 F.2d 835 (1st Cir. 1982)....................................................... 23

*Cold Mountain v. Garber,*
  375 F.3d 884 (9th Cir. 2004) ................................ 7, 20, 22, 23, 24, 27

*Custer County Action Ass'n v. Garvey,*
  256 F.3d 1024 (10th Cir. 2001) .................................................... 32

*Dep't of Transp. v. Public Citizen,*
  541 U.S. 752 (2004)............................................................ 19, 20

*Earthlink, Inc. v. FCC,*
  462 F.3d 1, 12 (D.C. Cir. 2006) ................................................... 31

*Environmental Protection Information Center, et al v .United States Fish Wildlife Service,.*
  2005 WL 3021939 ........................................... 22, 24, 26, 27

*Environmental Protection Information Center, et al. v. United States Fish and Wildlife Service,*
*et al.*, 2005 WL 3877605 ...................................................................................... 24

*Fina Oil & Chem. Co. v. Norton,*
332 F.3d 672 (D.C. Cir. 2003) ................................................................................ 8

*Forest Conservation Council v. U.S. Forest Serv.,*
66 F.3d 1489 (9th Cir. 1995) ............................................................................... 34

*Forest Guardians v. Fosgren,*
478 F.3d 1149 (9th Cir. 2007) ............................................................................. 30

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ............................................................................................. 16

*Friends of the Clearwater v. Dombeck,*
222 F.3d 552 (9th Cir. 2000) ................................................................................. 6

*Friends of the Earth v. U.S. Forest Serv.,*
95 F. Supp. 2d 206 (D. Vt. 2000) ........................................................................ 34

*Fund for Animals, Inc. v. Lujan,*
962 F.2d 1391 (9th Cir. 1992) ............................................................................. 33

*Goldie's Bookstore, Inc. v. Superior Court of Cal.,*
739 F.2d 466 (9th Cir. 1984) ............................................................................... 33

*Goodrich v. United States,*
434 F.3d 1329 (Fed. Cir. 2006) ........................................................................... 16

*Greater Yellowstone Coal. v. Tidwell,*
572 F.3d 1115 (10th Cir. 2009) ............................................................... 21, 23, 26

*Hammond v. Norton,*
370 F. Supp. 2d 226 (D.D.C. 2005) ..................................................................... 22

*Heckler v. Chaney,*
470 U.S. 821 (1985) .......................................................................................... 9, 24

*Hells Canyon Pres. Council v. U.S. Forest Serv.,*
593 F.3d 923 (9th Cir. 2010) ........................................................... 10, 16, 19, 32

*Highway J Citizens Group v. U.S. Dep't of Transp.,*
456 F.3d 734 (7th Cir. 2006) ............................................................................... 16

*Humane Soc. of U.S. v. Johanns,*
520 F. Supp. 2d 8 (D.D.C. 2007) ................................................................... 23, 24

*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir.1998), *overruled on other grounds by*
*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).......................................... 9

*Indian Lookout Alliance v. Volpe,*
484 F.2d 11 (8th Cir. 1973) ................................................................................. 23

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.,*
88 F.3d 754 (9th Cir. 1996) ............................................................................ 6, 20

*Jersey Heights Neighborhood Ass'n v. Glendening,*
174 F.3d 180 (4th Cir.1999) ............................................................................... 16

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
379 F. Supp. 2d 1071 (N.D. Cal. 2005) ................................................................. 6

*Klamath Siskiyou Wildlands Project v. U.S. Forest Serv.,*
2007 WL 2068667 (D. Or. July, 16, 2007).......................................................... 28

*Kleppe v. Sierra Club,*
427 U.S. 390 (1976) ............................................................................................. 19

iii

*Laub v. U.S. Dep't of the Interior*,
   342 F.3d 1080 (9th Cir. 2003) .................................................................. 16
*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007).................................................................................. 8, 9
*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990).................................................................................. 7
*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360 (1989)........................................... 6,7,21,22,26,27,31
*Martin v. Occupational Safety & Health Review Comm'n*,
   499 U.S. 144 (1991).................................................................................. 8
*Mazurek v. Armstrong*,
   520 U.S. 968 (1997).................................................................................. 7
*Mineral Policy Ctr. v. Norton*,
   292 F.Supp. 2d 30 (D.D.C. 2003) ....................................................... 4, 23
*NAACP v. Med. Ctr., Inc.*,
   584 F.2d 619, 628-29 (3d Cir.1978) ................................................... 23
*Nat'l Ass'n of Home Builders v. Norton*,
   340 F.3d 835 (9th Cir. 2003) ............................................................... 31
*Nat'l Wildlife Fed'n v. Goldschmidt*,
   677 F.2d 259 (2d Cir.1982) ................................................................. 17
*Natural Res. Def. Council, Inc. v. U.S. EPA*,
   822 F.2d 104 (D.C. Cir. 1987) ............................................................. 23
*Ness Inc. Corp. v. U.S. Dept. of Agric.*,
   512 F.2d 706 (9th Cir. 1975) ............................................................... 9
*Norfolk Energy, Inc. v. Hodel*,
   898 F.2d 1435 (9th Cir. 1990) ............................................................. 13
*Norton v. S. Utah Wilderness Alliance*,
   542 U.S. 55 (2004)................................. 7,10,15,17,18,20,21,22,24,27,28
*NRDC v. Hodel*,
   624 F. Supp. 1045 (D. Nev. 1985), aff'd, 819 F.2d 927 (9th Cir. 1987)................. 3
*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998).................................................................................. 18
*Or. Natural Res. Council Action v. BLM*,
   150 F.3d. 1132 (9th Cir. 1998) ............................................................. 7
*Oregon Natural Desert Ass'n v. BLM*,
   531 F.3d 1114 (9th Cir. 2008) ........................................................ 16, 18, 31
*Oregon Natural Resources Council Action v. U.S. Forest Service*,
   445 F. Supp. 2d 1211 (D. Or. 2006) ................................................ 28, 29
*Price Road Neighborhood Ass'n v. U.S. Dept. of Transp.*,
   113 F.3d 1505 (9th Cir. 1997) ............................................................. 6
*Pub. Citizen v. Office of U.S. Trade Representatives*,
   970 F.2d 916 (D.C. Cir. 1992) ............................................................. 17
*Rapid Transit Advocates, Inc. v. So. Cal. Rapid Transit Dist.*,
   752 F.2d 373 (9th Cir.1985) ................................................................. 17
*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)........................................................................ 5, 6, 7, 19

*Salmon River Concerned Citizens v. Robertson,*
32 F.3d 1346 (9th Cir. 1994) ............................................................................. 6
*Save Barton Creek Ass'n v. Fed. Highway Admin.,*
950 F.2d 1129 (5th Cir. 1992), *cert. denied,* 505 U.S. 1220 (1992) ............... 23
*Save the Bay, Inc. v. U.S. Army Corps. of Eng'rs,*
610 F.2d 322 (5th Cir.1980) .............................................................................. 23
*Save the Yaak Comm. v. Block,*
840 F.2d 714 (9th Cir. 1988) ............................................................................ 33
*Sierra Club v. Bosworth,*
465 F. Supp. 2d 931 (N.D. Cal. 2006) ......................................................... 27, 28
*Sierra Club v. Penfold,*
857 F.2d 1307 (9th Cir. 1988) ......................................................... 6. 25, 26, 33, 34
*Sierra Pac. Power Co. v. EPA,*
647 F.2d 60 (9th Cir. 1981) .............................................................................. 11
*Sugarloaf Citizens Ass'n v. F.E.R.C.,*
959 F.2d 508 (4th Cir. 1992) ......................................................................... 6, 23
*Sw. Williamson County Cmty. Ass'n v. Slater,*
243 F.3d 270 (6th Cir. 2001) ............................................................................ 23
*Thomas Jefferson Univ. v. Shalala,*
512 U.S. 504 (1994) ........................................................................................... 8
*Landmark West! v. U.S. Postal Serv.,*
840 F. Supp. 994 (S.D.N.Y.1993) ...................................................................... 23
*Udall v. Tallman,*
380 U.S. 1 (1965) ................................................................................................ 9
*United States v. Coleman,*
390 U.S. 599 (1968) ............................................................................................ 3
*United States v. Curtis-Nevada Mines,*
611 F.2d 1277 (9th Cir. 1980) ............................................................................ 3
*Vitality Rehab, Inc. v. Sebelius,*
641 F. Supp. 2d 984 (C.D. Cal. 2009) ............................................................... 13
*Vt. Yankee Nuclear Pow. Corp. v. Natural Res. Def. Council,*
435 U.S. 519 (1978) ........................................................................................ 6, 17
*Wetlands Water District v. U.S. Dep't of Interior,*
376 F.3d 853 (9th Cir. 2004) ............................................................................. 19
*Winter v. Natural Res. Def. Council, Inc.,*
129 S. Ct. 365 (2008) ..................................................................................... 8, 33
*Wyoming v. U.S. Dep't of Interior,*
360 F. Supp. 2d 1214 (D. Wyo. 2005) .............................................................. 32

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 701(a)(2) ............................................................................................. 24
5 U.S.C. § 704 ................................................................................................. 15, 18
5 U.S.C. § 706(1) ............................................................................................. 7, 10
16 U.S.C. § 1536(o)(2) ......................................................................................... 21

28 U.S.C. § 2401(a) .................................................................................... 32, 33
30 U.S.C. § 22 ................................................................................................ 2, 3
30 U.S.C. §§ 22-54 ............................................................................................... 1
30 USC § 181 ....................................................................................................... 3
30 USC § 601 ....................................................................................................... 3
42 U.S.C. § 4321 ................................................................................................. 5
42 U.S.C. §§ 4321-4370 ..................................................................................... 1
42 U.S.C. § 4332(c) ............................................................................................ 6
42 U.S.C. § 4332(2)(C) ..................................................................................... 19
43 U.S.C. §§ 1332(a) .......................................................................................... 3
14 Stat. 251 (1866) ............................................................................................. 3
43 U.S.C. §§ 1701 ............................................................................................... 4
43 U.S.C. §§ 1701-1784 ..................................................................................... 1
43 U.S.C. § 1701(7) .......................................................................................... 34
43 U.S.C. § 1702(e) ............................................................................................ 3
43 U.S.C. § 1714 .............................................................................................. 31
43 U.S.C. § 1732 .............................................................................................. 34
43 U.S.C. § 1732(b) ............................................................................................ 4
43 U.S.C. § 1740 ................................................................................................. 4
40 C.F.R. §§ 1500-08 (2005) ............................................................................. 6
40 C.F.R. § 1501.1 (2005) .................................................................................. 5
40 C.F.R. §§ 1501.3 ........................................................................................... 6
40 C.F.R. §§ 1501.4(b) ....................................................................................... 6
40 C.F.R. § 1502.9(c)(1) ................................................................................ 7, 29
40 C.F.R. § 1505.2(a) ....................................................................................... 16
40 C.F.R. § 1508.18(a) ..................................................................................... 24
40 C.F.R. § 1508.9 ........................................................................................ 6, 16
40 C.F.R. §§ 1508.7 .......................................................................................... 20
43 C.F.R. §3809 ........................................................................................ 2, 4, 28
43 C.F.R. § 3809.05 ..................................................................................... 11, 12
43 C.F.R. § 3809.11 (2009) ............................................................................ 4, 5
43 C.F.R. § 3809.401(b)(5) (2009) .................................................................. 12
43 C.F.R. 3809.420 ............................................................................................. 5
43 C.F.R. § 3809.423 ............................................................................... 10, 11, 12
43 C.F.R. § 3809.424 ..................................................................................... 13, 14
43 CFR § 3809.432(b) ...................................................................................... 21
43 C.F.R. §§ 3809.505 ...................................................................................... 25
43 CFR 3809.600 ............................................................................................... 28
43 C.F.R. § 3809.601(a) .................................................................................... 13

FEDERAL REGISTER
43 Fed. Reg. 78902 (Nov. 26, 1980) .................................................................. 4
65 Fed. Reg. 69998 ........................................................................................ 5, 12
66 Fed. Reg. 54 .................................................................................................. 4
74 Fed. Reg. 35887 ........................................................................................... 31

## I.    INTRODUCTION

Federal Defendants submit this opposition to Plaintiffs' motion for a preliminary injunction.  Plaintiffs contend that U.S. Bureau of Land Management ("BLM") violated the Mining Law of 1872 ("Mining Law"), 30 U.S.C. §§ 22–54, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701–1784, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370, by allowing Denison Mines Corp. ("Denison") to mine uranium at Denison's Arizona 1 Mine ("Mine"), which is located on BLM-managed public land in Mohave County, Arizona.

Although some Plaintiffs have been aware of BLM's approval of the Mine's Mining Plan of Operations ("MPO") for over 20 years, alleged "new information" presumably since its emergence, and Denison's intention to resume production at the Mine for at least eleven months, Plaintiffs have waited until now to move for extraordinary emergency relief that would immediately stop Denison's operations.

As explained below, Plaintiffs are not entitled to preliminary injunctive relief because they fail to meet their burden of demonstrating a likelihood of success on the merits, irreparable injury, and that the balance of equities tips in their favor.  Plaintiffs lack a likelihood of success on the merits because the Arizona 1 Mine MPO remains valid and in effect.  BLM is not legally required to demand a new MPO or to supplement environmental analysis of the MPO.  Plaintiffs' delay in bringing this action undercuts their argument that continued mining operations will irreparably harm them and, in any event, Plaintiffs' conclusory and unsubstantiated affidavits do not show that Plaintiffs are suffering any concrete environmental harm.  BLM's continued inspection of the Mine and monitoring of the surrounding land's health cast further doubt on Plaintiffs' assertions that Denison's continued operation of the Mine would cause irreparable harm.  Instead, development of valuable mineral resources at the Mine is in accord with the public interests embodied by the Mining Law and FLPMA.

Accordingly, Federal Defendants respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction.

## I.      FACTUAL BACKGROUND

In 1988, Denison's predecessor submitted a proposed MPO for the Arizona 1 Mine.  *See* Ex. A (1988 MPO).  BLM carefully considered the proposal and found that it was complete and consistent with the Mining Law, FLPMA, and the mining regulations promulgated at 43 C.F.R. 3809 ("the Part 3809 Regulations").  Ex. B (1988 decision record finding no significant impact and approving the MPO).  BLM therefore undertook an environmental analysis under NEPA to consider the potential effects that the proposed mining operations would have on the environment.  *Id.*; Pls. PI Br. Ex. 3 (1988 Environmental Assessment).  BLM ultimately determined that the MPO would not have a significant impact on the human environment and issued a finding of no significant impact ("FONSI").  Ex. B.  Accordingly, BLM issued a decision record that approved the MPO.  *Id*.  The Arizona 1 MPO decision was never challenged and remains in effect.  *See id.*; Ex. C (Feb. 19, 2008 letter re reclamation bond review); Ex. D (Apr. 7, 2008 reclamation bond approval letter).

By mid-1989, the operator began constructing the Mine, a process that took several years to complete.  *See* Pl. First Amended Compl. ("FAC") ¶ 24 (dkt. no. 17).  Although the Mine was largely constructed by 1992, the operator informed BLM that, for economic reasons, it would place the Mine on "Standby" of "interim management" status.  *See id*; Denison's Answer ¶ 24 (dkt. no. 28).  Importantly, as required by regulations, the MPO included a plan to maintain the Mine during periods of temporary closure.  Ex. A.  Between 1992 and 2006, the Mine changed hands at least twice, culminating in Denison's ownership.  *See* FAC ¶ 2.  During that period, the operators ensured they were complying with the MPO's temporary closure requirements.  *See* Ex. A.  Throughout that period, BLM conducted field inspections of the Mine and prepared compliance reports.  Ex. G (Decl. of Scott R. Florence and attached exhibits).  BLM also required the operator to update its financial guarantee.  *Id*. at ¶ 6; Ex. C; Ex. D.  At all times, the Mine's interim management status was authorized by the MPO and in accordance with applicable regulations.  *See* Ex. A; Ex. G.

In 2008, Denison posted an updated financial reclamation bond and sought air permits from the Arizona Department of Environmental Quality ("ADEQ").  Ex. C; Ex. E (Sept. 6, 2007

update letter from Denison to BLM regarding mining-related activities); FAC ¶ 29; Denison's

Answer ¶ 29.  Denison has resumed mining uranium.  *Id.* at ¶ 33.  On May 3, 2010, EPA issued a

finding of violation ("FOV") to Denison, stating that that Denison violated the Clean Air Act and

implementing regulations.  *Id.*  Based on BLM's review of the EPA's FOV, BLM issued a

noncompliance order.  *Id.*  The order required Denison, within thirty days, to (1) provide BLM

with copies of correspondence and any documents that demonstrate Denison has contacted the

EPA and initiated action to resolve the FOV; and (2) provide BLM a proposed plan of action that

indicates the process and timeframe Denison will adhere to in resolving the FOV.  *Id.*  The order

also provides that, within 90 days of receipt of the order, BLM will evaluate Denison's progress

towards resolving the FOV and will determine if the order will be lifted or if BLM will take

further action.  *Id.*

## II.      STATUTORY and REGULATORY BACKGROUND

### A.      The Mining Law of 1872

Under the Mining Law, public lands are open to exploration "under regulations

prescribed by law" to enable miners to locate mining claims and to secure exclusive rights to

mine those claims.  *See* 30 U.S.C. § 22.  Through the Mining Law, "Congress has made public

lands available to people for the purpose of mining valuable mineral deposits and not for other

purposes."  *United States v. Coleman*, 390 U.S. 599, 602 (1968).  Notably, unlike the Mineral

Leasing Act of 1920, 30 USC § 181 *et. seq.*, and the Materials Act of 1947, 30 USC § 601 *et.*

*seq.*, the Mining Law does not include any requirement to "diligently develop" or extract

minerals on the claim within a certain timeframe, but relies instead on the claimant's interest in

profiting from a claim's development.  *United States v. Curtis-Nevada Mines*, 611 F.2d 1277,

1281–82 (9th Cir. 1980) ("As a practical matter, mining claimants could remain in exclusive

possession of the claim without ever proving a valid discovery or actually conducting mining

operations.").  While there is no requirement to operate on a mining claim, mining claims located

under the Mining Law must comply with applicable federal regulation, and applicable state,

territorial, and local regulations not in conflict with Federal law.  *See* 30 U.S.C. § 22 (authorizing

mining "under regulations prescribed by law, and according to the local customs or rules of

miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States"); 14 Stat. 251 (1866) (predecessor statute).

### B.    Federal Land Policy and Management Act

FLPMA authorizes the Secretary of the Interior to manage the public lands,[1] including lands on which mining claims are located under the Mining Law.  FLPMA requires the Secretary of the Interior to manage the public lands for multiple uses, which include use of the land's renewable and non-renewable resources (i.e. forage, timber, and minerals), recreation, and preservation of natural values (i.e. wildlife, wildlife habitat, and scenic values).  43 U.S.C. §§ 1332(a); 1702(c).  The agency's balance of those complex and competing concerns is entitled to deference.  *See NRDC v. Hodel*, 624 F. Supp. 1045, 1063 (D. Nev. 1985), *aff'd*, 819 F.2d 927 (9th Cir. 1987) (court declines invitation to become a "rangemaster" deciding how to balance between multiple uses).

FLPMA imposed a new requirement that directs the Secretary to, "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation" of the public lands. 43 U.S.C. § 1732(b).  This language reiterates Congress's intent that all public lands activities, including those conducted under the Mining Law, are subject to the standard for preventing unnecessary or undue degradation ("UUD").  While Congress did not define UUD in FLPMA, it gave BLM authority to do so.  43 U.S.C. § 1740; *see* 43 U.S.C. §§ 1701 *et seq.* Importantly, the Secretary's reasonable interpretation of whether an action violates FLPMA's requirement to prevent UUD should be afforded deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 45–46 (D.D.C. 2003).

### C.    The Regulatory Framework under the Mining Law and FLPMA

As authorized by the Mining Law and FLPMA, the Department of the Interior, through BLM, promulgated the Part 3809 Regulations to manage mining activities on public lands.  43 C.F.R. §§ 3809, *et seq.*  These regulations define UUD with respect to mining operations and

---

[1] "Public lands" are lands and interests in lands owned by the United States within the several states and administered by the Secretary through the Bureau of Land Management, with limited exceptions.  43 U.S.C. § 1702(e).

create a regulatory scheme whereby mine operators who seek to disturb more than five acres of public lands are compelled to submit a proposed MPO for approval before they can commence surface disturbing activities.  *See* 43 Fed. Reg. 78902 (Nov. 26, 1980) (original Part 3809 Regulations); *see also* 66 Fed. Reg. 54,834 (Oct. 30, 2001) (current regulations).  The Part 3809 Regulations require a proposed MPO to explain in detail what surface-disturbing activities the operator intends to undertake and how the operator will comply with all applicable local, state, and Federal mining and environmental regulations.  43 C.F.R. § 3809.11 (2009); *id.* § 3809.1-4(a).  A proposed MPO is also required to include an "interim management plan" describing the measures to be taken during periods of temporary closure or non-operation, *see id.* § 3809.401(b)(5) (2009); *id.* § 3809.1-5(c)(6) (1987), and a reclamation plan that identifies how the mine site will be restored once operations cease.  *Id.* § 3809.401(b)(3),(b)(4) (2009); *id.* § 3809.1-5(c)(5) (1987).

BLM conducts a substantive review of each proposed MPO to determine if the anticipated activities will cause UUD.  *Id.* § 3809.411 (2009); *id.* § 3809.1-6(a) (1987).  BLM's review includes preparing an environmental analysis under NEPA and consulting with other Government agencies as appropriate.  *See id.* § 3809.411(a)(3) (2009); *see also id.* §§ 3809.2-1, 3809.2-2 (1987).  Under FLPMA and the Part 3809 Regulations, BLM has authority to reject, approve, or conditionally approve (i.e. approve subject to additional monitoring, mitigation, and reclamation) each proposed MPO.  *See id.* § 3809.411(d) (2009); § 3809.2-1(a) (1987).

If an MPO is approved, an operator must post a financial guarantee that is adequate to cover all costs of reclaiming the approved surface disturbance.  *Id.* § 3809.500 (2009); *see also id.* § 3809.1-9 (1987).  Importantly, BLM's approval of an MPO and its authorization to conduct surface disturbing activities are subject to the operator's ongoing compliance with performance standards set forth in the MPO and regulations, including standards to avoid UUD.  *See* 43 C.F.R. 3809.420.  BLM has the authority to inspect an approved mining site at any time to confirm that the operator is not deviating from or exceeding the disturbance approved under its MPO.  *Id.* § 3809.600(a).  If BLM determines that an operator is causing UUD, deviating from its MPO, or learns that the operator is violating any applicable state or Federal regulation, BLM

may, pursuant to its enforcement authority, order a suspension of work, issue a notice of noncompliance with direction as to how the operator must remedy the noncompliance, revoke the MPO, or seek criminal penalties if appropriate.  *Id.* §§ 3809.601, 3809.601(b)(2), 3809.602, 3809.604, 3809.700.  Once active mining is completed, BLM reviews the reclamation work.  If BLM deems the work unsatisfactory, BLM can order further efforts or do the work itself using the company's financial guarantee.  *Id.* §§ 3809.595-3809.598.

Consistent with the absence of a diligence requirement in the Mining Law, MPOs issued by BLM do not contain a set expiration date.  *See generally id.* § 3809, *et seq.*  This omission is intentional.  *See* 65 Fed. Reg. 69998, 70053 (Nov. 21, 2000) (discussing a commenter's suggestion that BLM impose a 5-year term for active MPOs and 1-year term for inactive operations, and BLM's decision to allow operators to propose a schedule instead).

### D. National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision makers of the environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public.  *See* 42 U.S.C. § 4321; 40 C.F.R. § 1501.1 (2005); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA achieves its objectives by imposing procedural rather than substantive requirements.  *Id.* at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action."); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA does not work by mandating that agencies achieve particular substantive environmental results."); *Vt. Yankee Nuclear Pow. Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978) (NEPA's mandate is "essentially procedural"); *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996).

To fulfill NEPA's dual purposes, when a federal agency proposes a "major Federal action[] significantly affecting the quality of the human environment," the agency must prepare an environmental impact statement ("EIS") analyzing the potential impacts of the proposed action and possible alternatives.  42 U.S.C. § 4332(c).[2]  Not every action or proposal requires

---

[2]  Specific guidance for complying with NEPA is provided by regulations promulgated by the Council on Environmental Quality ("CEQ").  *See* 40 C.F.R. §§ 1500-08 (2005).

1    preparation of an EIS.  In order to determine whether a major Federal action requires an EIS, an

2    agency may prepare an environmental assessment ("EA").  40 C.F.R. §§ 1501.4(b), 1508.9.  An

3    EA is a "concise public document" that "briefly" describes the proposal, examines alternatives,

4    considers impacts, and provides a listing of individuals and agencies consulted.  40 C.F.R.

5    § 1508.9.  If, after a "hard look" at the proposed action, an agency concludes there will not be

6    any significant environmental impact, the agency may issue a Finding of No Significant Impact

7    ("FONSI"), and is not required to prepare an EIS.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e),

8    1508.9; *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355–56 (9th Cir. 1994).

9         These requirements are triggered only by a proposal for "major Federal action."  *Sierra*

10   *Club v. Penfold*, 857 F.2d 1307, 1313 (9th Cir. 1988).[3]  As NEPA is a planning statute intended

11   to ensure informed decision-making, even where major federal action triggering NEPA existed

12   in the first instance, NEPA continues to apply only when "major Federal action" is still

13   contemplated.  *See Robertson*, 490 U.S. at 349 (discussing NEPA's "statutory requirement that a

14   federal agency *contemplating* a major action prepare" an environmental analysis (emphasis

15   added) (citations omitted)); *Balt.  Gas & Elec. v. NRDC*, 462 U.S. 87, 97 (1983) (explaining that

16   in enacting NEPA, Congress "required only that the agency take a 'hard look' at the

17   environmental consequences *before taking a major action*" (emphasis added) (citations

18   omitted)).  "[T]he decision whether to prepare a supplemental EIS is similar to the decision to

19   prepare an EIS in the first instance: If there remains 'major Federal action' to occur, and if the

20   new information is sufficient to show that the remaining action will 'affect the quality of the

21   human environment' in a significant manner or to a significant extent not already considered, a

22

23

24   [3]  *See also, e.g., Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557–58 (9th Cir. 2000); *Idaho*

25   *Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998); *Price Road Neighborhood Ass'n v. U.S.
     Dept. of Transp.*, 113 F.3d 1505, 1512 (9th Cir. 1997); *Citizens Against Rails-to-Trails*, 267 F.3d 1144,

26   1151 n.5 (D.C. Cir. 2001) ("[T]he threshold legal question [is] whether an action falls within NEPA in the
     first place."); *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1133 (5th Cir. 1992)

27   ("The requirements of NEPA, which include, among other things, the submission of an EIS, apply only
     when the federal government's involvement in a project is sufficient to constitute 'major federal

28   action.'"); *Sugarloaf Citizens Ass'n v. F.E.R.C.,* 959 F.2d 508, 512 (4th Cir. 1992); *Karuk Tribe of Cal. v.
     U.S. Forest Serv.*, 379 F. Supp. 2d 1071, 1091 (N.D. Cal. 2005).

1   supplemental EIS must be prepared." *Marsh*, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C));

2   *see* 40 C.F.R. § 1502.9(c)(1); *Cold Mountain v. Garber*, 375 F.3d 884, 892 (9th Cir. 2004).

3   **E.  Administrative Procedure Act**

4   Because neither the Mining Law, FLPMA, nor NEPA provide a right of action or a

5   waiver of sovereign immunity, Plaintiffs' claims seeking to compel Defendants to require a new

6   MPO and to complete supplemental NEPA review rely upon the limited waiver of sovereign

7   immunity and right of action in § 706(1) of the APA.  5 U.S.C. § 706(1); *see Lujan v. Nat'l*

8   *Wildlife Fed'n*, 497 U.S. 871, 882 (1990); *Or. Natural Res. Council Action v. BLM*, 150 F.3d

9   1132, 1135 (9th Cir. 1998).  Plaintiff's § 706(1) claim "can proceed only [if] plaintiff asserts that

10   an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah*

11   *Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original) ("SUWA").

12   **III.    STANDARD OF REVIEW**

13   A preliminary injunction is an extraordinary remedy and Plaintiffs bear a heavy burden to

14   prove by clear and convincing evidence that the remedy is appropriate in this case.  *Mazurek v.*

15   *Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is

16   an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear

17   showing, carries the burden of persuasion" (citation and emphasis omitted)).  To obtain

18   preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the

19   merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary

20   relief; (3) that the balance of equities tips in the favor of the moving party; and (4) that an

21   injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.,* 129 S. Ct. 365,

22   374–76 (2008).  If the party requesting the preliminary injunction fails to meet its burden of

23   proof on any of the four requirements, its request is to be denied.  *See id.* at 374 (stating that a

24   plaintiff "must establish" the four enumerated elements).[4]

25

26   ───────────────────

[4]  *Winter* overturned the Ninth Circuit's "sliding scale" test, under which a plaintiff could prevail on a

27   motion for injunctive relief merely by showing a "possibility of irreparable injury."  *Lands Council v. McNair*, 537 F.3d at 987.  The Supreme Court held "the Ninth Circuit's 'possibility' standard is too lenient" and that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is

28   inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 129 S. Ct. at 375–76

The merits of Plaintiffs' claims must be considered in light of the narrow scope of judicial review under the APA and applicable case law.  When reviewing an agency's construction of a statute, courts must give effect to clearly-expressed congressional intent. *Chevron*, *U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984).   If the statute is silent or ambiguous with respect to an issue, however, courts defer to an agency's interpretation as long as it is "based on a permissible construction of the statute." *Id.* at 843.  Where, as here, the construction of an administrative regulation rather than a statute is at issue, courts must give even greater, "substantial deference" to an agency's interpretation.  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 676 (D.C. Cir. 2003).  Courts lack authority to "decide which among several competing interpretations [of an agency's own regulation] best serves the regulatory purpose," *Shalala*, 512 U.S. at 512, and instead must "give effect to the agency's interpretation so long as it . . . sensibly conforms to the purpose and wording of the regulations." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150–51 (1991)) (internal quotation marks omitted).  Accordingly, an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (internal notation and citations omitted); *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Udall v. Tallman*, 380 U.S. 1, 16–17 (1965); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).

Under the APA, "[w]here a highly technical question is involved, courts necessarily must show considerable deference to an agency's expertise." *Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 233 (D.C. Cir. 2008) (citation and quotations omitted); *Marsh*, 490 U.S. at 377.  In fact, certain agency decisions, such as "an agency's decision not to . . . enforce . . . [are] generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (citation omitted); *see* APA § 701(a)(2); *Ness Inc. Corp. v. U.S. Dep't of Agric.*, 512 F.2d 706, 715–16 (9th Cir. 1975) (dismissing a challenge to the Forest Service's refusal to issue a

---

(citation omitted); *see also Am. Trucking Ass'ns, Inc. v. City of L.A.,* 559 F.3d 1046, 1052 (9th Cir. 2009) (recognizing that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable").

special use permit to operate a resort in a national forest and noting that "a federal court does not have jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion consists only of the making of an informed judgment by the agency . . . . What is needed, and where, are questions best answered by the forest service, which is involved on a daily basis with the management and use of the national forests.").

## IV.    ARGUMENT

Plaintiffs fail to show that the "extraordinary and drastic remedy" of a preliminary injunction is justified. First, Plaintiffs fail to show a likelihood of success on the merits. In particular, Plaintiffs fail to establish subject matter jurisdiction under § 706(1) of the APA for either of their claims and fail to state a NEPA claim. Moreover, their NEPA claim is time-barred. Second, Plaintiffs have not met their burden of showing irreparable harm. Third, they fail to show that the balance of harms tips in their favor and that continued mining is not in the public interest.

### A.    Plaintiffs Fail to Show Likelihood of Success on the Merits of their Claims.

Because neither the Mining Law nor NEPA provides a right of action or a waiver of sovereign immunity, Plaintiffs' claims seeking to compel BLM to require a new Plan of Operations and to complete supplemental NEPA analysis purport to rely upon the limited waiver of sovereign immunity and right of action in § 706(1) of the APA. 5 U.S.C. § 706(1). As discussed above, Plaintiffs' § 706(1) claims "can proceed only [if] plaintiff asserts that an agency failed to take a [1] *discrete* agency action that [2] it is *required to take*." *SUWA*, 542 U.S. at 64 (emphasis in original); *see also Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932–33 (9th Cir. 2010) ("This provision serves important interests, but does not give us license to 'compel agency action' whenever the agency is withholding or delaying an action we think it should take . . . . Allowing plaintiffs' claim to proceed would invite us to compel the [agency] to do something . . . not clearly mandated in the Act.").

Both of Plaintiffs' claims fail under *SUWA's* second prong because no law requires BLM to demand a new MPO and NEPA does not require BLM to complete supplemental NEPA

analysis of an action BLM completed in 1988.  Plaintiffs' NEPA claim also fails under *SUWA's* first prong because a NEPA analysis, standing alone, is not a discreet and final agency action.

### 1. Plaintiffs Fail to Show a Likelihood of Success on the Mining Law Claim.

Plaintiffs assert that they are likely to succeed on their claim that the Arizona 1 MPO "is no longer in effect" and, therefore, "BLM must issue a new plan of operations before Denison can mine at Arizona 1." Dkt. 37 at 12.  To support this contention, Plaintiffs argue that § 3809.423 voids Denison's MPO as a matter of law because the operator was not conducting operations as defined in § 3809.05 during the Mine's standby period.  *See* Dkt. 37 at 9–10 (referencing 43 C.F.R. §§ 3809.423, 3809.05).  Plaintiffs are mistaken.

### i. BLM Has Sole Discretion To Interpret The Part 3809 Regulations.

Plaintiffs disregard BLM's interpretations of Sections 3809.05 and 3809.423 and ask the Court to adopt their interpretations of those regulations instead.  Dkt. 37 at 9-12.  It is well settled that an agency's interpretation of its own regulations is controlling and entitled to deference, unless "plainly erroneous." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Sierra Pac. Power Co. v. EPA*, 647 F.2d 60, 65–66 (9th Cir. 1981) ("An appellate court will ordinarily give substantial deference to a contemporaneous agency interpretation of a statute it administers.  When dealing with an interpretation of regulations the agency has itself promulgated, 'deference is even more clearly in order.'").  Accordingly, Plaintiffs are required to demonstrate that BLM's interpretations of the Part 3809 Regulations, as described below, are "plainly erroneous."

### ii. Under 43 C.F.R. § 3809.05, Temporary Closures Are Included Within The Meaning Of Mining "Operations."

According to applicable regulations governing mining operations, a "plan of operations remains in effect as long as you are conducting operations, unless BLM suspends or revokes your plan of operations for failure to comply with this subpart." 43 C.F.R. § 3809.423.

Operations are:

> [A]ll functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses, whether on a mining claim or not,

including the construction of roads, transmission lines, pipelines, and other means of access across public lands for support facilities.

*Id.* at § 3809.05.  Plaintiffs ask this Court to read § 3809.05 narrowly and in isolation to find that a mine's stand-by status is excluded from the definition of "operations."  In support of this reading, Plaintiffs offer no legal authority, but instead rely on various letters and permitting documents to show that the mine was not producing uranium from approximately 1992 through 2009.  Dkt. 37 at 9-12.  This undisputed fact is of no consequence to whether temporary mine closures are subsumed within § 3809.05's definition of operations.

The definition of operations in § 3809.05 is intentionally expansive to include "all functions, work, facilities, and activities on public lands in connection" with mining as well as "all other reasonably incident uses" of a mining operation.  43 C.F.R. § 3809.05 (emphasis added).  BLM intended this definition to be read in the broadest possible terms.  *See* 65 Fed. Reg. 69998, 70013 (Nov. 21, 2000) (the definition of operations in § 3809.05 "is intended to be broad in scope to address 'cradle to grave' activities authorized under the mining laws on the public lands").  The Regulations both now and at the time the Arizona 1 Mine MPO was approved make clear that temporary closures are authorized activities that routinely take place during the life of a mining claim.  For example, § 3809.401(b)(5) requires an MPO to describe an operator's plan for interim management during a temporary closure.  *See* 43 C.F.R. § 3809.401(b)(5) (2009) (MPO must include an interim management plan "to manage the project area during periods of temporary closure"); *id.* § 3809.1-5 (1987).  Consistent with this regulation, the Arizona 1 MPO included a detailed plan for maintaining the mine during a temporary closure.  *See* MPO at pp. 20–21(providing interim management of the mine in the event of non-operation for more than one year).  Similarly, § 3809.424(a) requires operators to modify their approved interim management plan if it does not cover the circumstances of the temporary closure.

Accordingly, the broad term "operations," as defined in § 3809.05, to encompass temporary closures like the one at issue here.  Plaintiffs have not and cannot show that BLM's interpretation of its own regulation is plainly erroneous.  *See Auer,* 519 U.S. at 461.  As acknowledged in their moving papers, in order for Plaintiffs to succeed on their claim that § 3809.423 voids the Arizona 1 MPO as a matter of law, Plaintiffs must first show that there were

1   no operations at the Mine under § 3809.05.  Because Plaintiffs have failed to make that showing,

2   they cannot demonstrate that they are likely to succeed on the merits of their first claim.

3             **iii.**    **Section 3809.423 Does Not Void An MPO By Operation Of Law.**

4         Plaintiffs also misconstrue 43 C.F.R. § 3809.423 as voiding the Arizona 1 MPO by

5   operation of law.  Dkt. 37 at 9–12.  Here, Plaintiffs fail to understand the well established Part

6   3809 regulatory scheme and the detailed process for terminating a mine plan.  As stated above,

7   MPOs approved by BLM under the Part 3809 Regulations do not have a specific expiration date.

8   Rather, § 3809.423 provides that "[y]our plan of operations remains in effect as long as you are

9   conducting operations, unless BLM suspends or revokes your plan of operations for failure to

10  comply with this subpart."  Plaintiffs ask this Court to read this regulation as an independent

11  basis for an operator to lose its surface-use authorization without notice or a formal appealable

12  decision by BLM.  The Part 3809 Regulations do not mandate this result.  It is well settled that

13  when interpreting an agency regulation, the Court must look to the entire regulatory scheme to

14  discern its meaning.  *See Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1442 (9th Cir. 1990)

15  ("[O]ur task is to interpret the regulation as a whole, in light of the overall statutory and

16  regulatory scheme, and not to give force to one phrase in isolation."); *accord Vitality Rehab, Inc.*

17  *v. Sebelius*, 641 F. Supp. 2d 984, 990 (C.D. Cal. 2009).  Plaintiffs rely on one sentence in Section

18  3809.423 and ignore the process prescribed within Part 3809 Regulations for terminating an

19  MPO.  Generally, that process begins with BLM issuing an enforcement order under § 3809.601

20  to notify the operator that it is not in compliance with its MPO and affording the operator the

21  opportunity to rectify the situation within a specific timeframe.  43 C.F.R. § 3809.601(a).  If the

22  operator does not come into compliance, BLM can suspend the operations after giving notice and

23  opportunity for an informal hearing with the State Director.  *Id.* § 3809.601(b)(1).  Where

24  necessary to protect health, safety, or the environment, however, BLM may issue an immediate

25  temporary suspension, without notice.  *Id.* § 3809.601(b)(2).

26        Further, under § 3809.602(b), if BLM determines that a pattern of violations have

27  occurred, BLM may institute notice and informal hearing procedures to revoke an MPO.  If, after

28  giving notice and opportunity for an informal hearing, BLM ultimately decides that the MPO

should be revoked, it will issue a formal written decision to that effect.  *Id.* § 3809.602.  The

operator may appeal a MPO revocation pursuant.  *Id.* § 3809.800.  An operator can request State

Director review of the revocation decision and/or file a notice of appeal before the Department's

Interior Board of Land Appeals.  *See id.* §§ 3809.800, 3809.801.  The operator can also bring a

challenge in Federal district court, under specified circumstances.  *See id.* §§ 4.21(c), 3809.803.

Plaintiffs' contention that a mine on "stand-by" status becomes automatically void under

§ 3809.423 also conflicts with 43 C.F.R. § 3809.424 which addresses an operator's obligation

during periods of non-operation and states that if operations cease, the operator must follow the

approved interim management plan within its MPO.  If operations are inactive for five (5)

consecutive years, "BLM will review your operations and <u>determine whether BLM should

terminate</u> your plan of operations and direct final reclamation and closure."  *Id.* § 3809.424(a)(3)

(emphasis added).  In promulgating § 3809.424, BLM described this regulation as defining,

among other things, "conditions under which temporary closure becomes permanent and all

reclamation and closure requirements must be completed."  65 Fed. Reg. at 70054.  Under

Plaintiffs' "automatic voidance" interpretation of § 3809.423, BLM's review and determination

that termination of the MPO is appropriate under § 3809.424(a)(3), and its subsequent

determination under § 3809.424(a)(4) that the operations have been abandoned,[5] would be

unnecessary because the MPO would already be void by operation of law.  The above-cited

regulations demonstrate that an MPO can only be terminated following affirmative enforcement

action by BLM under § 3809.600, and not pursuant to any automatic voidance as urged by

Plaintiffs.

Finally, in drafting the Part 3809 Regulations, BLM never intended to trigger automatic

voidance of an MPO.  In fact, in responding to a comment on proposed § 3809.423 that asked

how long BLM would give the operator before revoking an MPO, BLM stated that "[f]inal §

3809.423 provides that the <u>plan of operations approval is good for the life of the project as

described in the plan.</u>  In the event the operator fails to comply with an enforcement order,

---

[5] Plaintiffs also contend that the Arizona 1 Mine's temporary closure shows indicia of abandonment.  Dkt.
37 at 12.  Plaintiffs again fail to recognize that § 3809.424(a)(4) requires affirmative action on the part of
BLM to deem the mine abandoned.

however, the plan approval can be revoked under § 3809.602."  65 Fed. Reg. at 70053 (emphasis added).  Here, "the life of the project as described in the plan" includes periods of non-operation, consistent with the regulatory requirements in place at the time the Arizona 1 MPO was approved.  Plaintiffs argue that the "life of the project" is limited by the statement in the Decision Record approving the Arizona 1 MPO stating that the operations were expected to last for "approximately 10 years," and that this period continued to run even while no ore was being mined.  This reasoning is flawed here because it ignores the provision within the Arizona 1 MPO that addresses maintenance of the mine in the event of a suspension of operations for more than a year.  If such a shutdown were to occur, which it did, the 10-year operational timeframe would also be continued until operations resume.  Moreover, the 10-year projected mine life was based in part on an assumption that there would be about 5 years of ore production.  As Plaintiffs acknowledge, ore production did not begin until 2009.

Accordingly, the Part 3809 Regulations do not provide for an automatic termination of an MPO under § 3809.423 or otherwise.  Plaintiffs' allegations to the contrary—that a temporary closure voids or terminates an MPO without notice, appeals, or affirmative action by BLM—is thus of no moment.  Given that BLM has shown that § 3809.423 does not terminate an MPO by operation of law, Plaintiffs cannot show a likelihood of success on this claim.

**2.  Plaintiffs Fail to Show a Likelihood of Success on their NEPA Claim.**

Plaintiffs' second claim seeks to compel BLM to complete "supplemental" NEPA analysis of its approval of the Arizona 1 MPO in 1988.  This APA § 706(1) claim fails because a NEPA analysis, standing alone, is not a "final agency action."  Even if it were, supplementation is not required by law because BLM completed the relevant major federal action—approval of the MPO—over 20 years ago.  *See SUWA*, 542 U.S. at 73 (holding that although "'*[a]pproval* of a [land use plan]' is a 'major Federal action' requiring an EIS . . . , that action is completed when the plan is approved . . . .  There is no ongoing 'major Federal action' that could require supplementation") (alteration and emphasis in original)).

**i.  Plaintiffs' NEPA Claim Cannot Proceed because a NEPA Analysis, Standing Alone, is not a Final Agency Action.**

15

The APA only applies to "final agency action."  5 U.S.C. § 704.  An "action" includes a discrete rule, license, order, sanction, or relief, or denial thereof.  *See SUWA*, 542 U.S. at 62 (citing 5 U.S.C. § 551).   To be "final," an agency action "must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citation omitted). It must also be an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Id*. at 178 (internal quotation marks omitted); *see also Hells Canyon Pres. Council*, 593 F.3d at 930.[6]  The "final agency action" requirement is fatal to Plaintiffs' NEPA claim.

First, supplemental NEPA analyses, standing alone, are not final agency actions because they do not represent the consummation of BLM's decision-making process.  Such analyses are instead procedural prerequisites to a particular type of "final agency action"—in this case, a decision to approve or disapprove an MPO.  An EA, such as the one prepared for the Arizona 1 MPO, is "a concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact . . . [and] include[s, among other things,] brief discussion[] of the need for the proposal [and] of the environmental impacts *of the proposed action* and alternatives."  40 C.F.R. § 1508.9 (emphasis added); *see also id.* at § 1508.13 (describing FONSIs).  Similarly, an EIS is a "preliminary, procedural, or intermediate agency action" that is "not directly reviewable" under the APA, but "is subject to review on the review of the final agency action" that was analyzed in an EIS or EA, such as decisions to approve a land use plan, MPO, or construct a dam.  Thus, an EIS or EA is not the sort of undertaking that may itself be compelled under APA § 706(1).

Here, the proposed final agency action that BLM's 1988 EA analyzed was BLM's Decision Record approving the Arizona 1 Mine MPO.  Ex. B; *see* 40 C.F.R. § 1505.2(a) (in the context of an EIS, the record of decision ("ROD") "[s]tate[s] what the decision was"); *Or. Nat. Desert Ass'n ("ONDA") v. BLM*, 531 F.3d 1114, 1139 (9th Cir. 2008) ("Once an EIS's analysis

---

[6] *See also Franklin v. Massachusetts*, 505 U.S. 788, 796–97 (1992) ("To determine when an agency action is final, we have looked to, among other things, whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" (citation omitted)).

has been solidified in a ROD, an agency has taken final agency action reviewable under [the APA]"); *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1091 (9th Cir. 2003) (agency ROD represents culmination and final selection of NEPA process).[7]  While "BLM is required to perform additional NEPA analyses if a plan is amended or revised," a supplemental NEPA analysis analyzing approval of the 1988 MPO, standing alone and without a related implementing decision, is not a final agency action.  *See SUWA*, 542 U.S. at 73.

Second, NEPA analyses are not final agency actions because, unlike decision records and RODs, they do not determine legal consequences.  *Vt. Yankee Nuclear Pow. Corp.*, 435 U.S. at 558 (NEPA's mandate is "essentially procedural").  Accordingly, "courts routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular course of action but have not actually taken any final action at the time of suit."  *Pub. Citizen v. Office of U.S. Trade Representatives,* 970 F.2d 916, 920 (D.C. Cir. 1992) (citing *Ash Creek Mining Co. v. Lujan,* 934 F.2d 240, 243–44 (10th Cir. 1991)).[8]

Here, legal consequences flowed from BLM's 1988 decision approving the Arizona 1 Mine MPO, not from BLM's EA, which examined impacts and alternatives related to the then-proposed action.  *See* Ex. B; Pl. PI Br. at Ex. 3.  BLM issued a separate decision record approving the MPO and determining legal consequences, a final agency action it completed over 20 years ago.  Ex. B.  Likewise, legal consequences would not flow from supplemental NEPA analysis of BLM's 1988 approval of the MPO.  As such, a supplemental NEPA analysis alone is not final agency action that can be compelled under the APA.

The cases Plaintiffs cite involving claims that NEPA required an agency to supplement an EIS are not to the contrary.  Those cases involved challenges to agency decisions plaintiffs

---

[7] *See also Highway J Citizens Group v. U.S. Dep't of Transp.*, 456 F.3d 734, 737 n.6 (7th Cir. 2006); *Goodrich v. United States,* 434 F.3d 1329, 1335 (Fed. Cir. 2006) (collecting "case law from our sister circuits holding that, for purposes of the [APA] a ROD is a 'final agency action'"); *Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 187 (4th Cir.1999) (holding that the "designation of the ROD as final agency action under the APA is generally recognized").

[8] *See also Rapid Transit Advocates, Inc. v. So. Cal. Rapid Transit Dist.,* 752 F.2d 373, 378 (9th Cir.1985) (NEPA suit challenging initial EIS prepared in connection with preliminary design and engineering work for proposed subway not final because the subway might never actually be funded or built); *Nat'l Wildlife Fed'n v. Goldschmidt,* 677 F.2d 259, 263–64 (2d Cir.1982) (declining to review adequacy of EISs prepared for proposed highway sections that might never be built).

alleged a new or supplemental EIS should analyze. *Marsh*, for example, did not involve a freestanding challenge under APA § 706(1) to an agency's decision whether to supplement an EIS. 490 U.S. 360 (1989). Instead, the case involved a challenge to the Army Corps of Engineers' "formal decision to proceed with construction of the Elk Creek Dam," which was reflected in a final agency ROD that was reviewable final agency action. *Id.* at 367. The Corps' decision not to supplement its EIS was thus reviewable not because that decision was final agency action, but because it was "[a] preliminary, procedural, or intermediate agency action or ruling" reviewable together with the final agency action taken in the ROD. 5 U.S.C. § 704.

Thus, the APA's final agency action requirement bars the Court from compelling BLM to complete a supplemental NEPA analysis independent of a new or modified MPO.[9] If BLM were to take action approving a new MPO, Plaintiffs could seek review of that decision under APA § 706(2), including the NEPA analysis conducted by BLM in connection with it, provided that ripeness, standing, and other requirements were satisfied. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998); *ONDA*, 531 F.3d at 1140 ("There are many analytic errors that cause an EIS to fail under the § 706(2)(A) standard but are not independently violative of § 706(1)"). But absent an agency's intention or mandatory duty to take a final agency action, environmental analysis under NEPA—new or "supplemental"—cannot be compelled under the APA. Plaintiffs fail to meet the threshold requirements for bringing their challenge under the APA and, therefore, cannot establish a likelihood of success on its NEPA claim.[10]

---

[9]  In fact, during the case management conference held on April 9, Plaintiffs' counsel admitted that "[A]s to the fundamental merits of our claims, we are alleging not—we are not challenging final agency action in this case . . . ." Ex. H at 11 (excerpt of Apr. 9, 2010 Scheduling Conference transcript).

[10]  Plaintiffs also appear to argue that BLM's NEPA Handbook required it to document consideration of whether supplemental NEPA analysis is appropriate. Pl. Mot. 14 (quoting BLM NEPA Handbook, H-1790-1, at 30, *available at* http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.24487.File.dat/h1790-1-2008-1.pdf). For the same reasons stated above, a decision whether to conduct supplemental NEPA analysis is not a final agency action and therefore cannot be compelled under the APA. Moreover, the Handbook does not require BLM to make or document a decision whether to conduct supplemental NEPA analysis. Nothing in Section 5.4 of BLM's NEPA Handbook ("Supplementing an EIS") imposes an obligation for BLM to act where, as here, BLM completed the contemplated "major Federal action." *Id.* at 29 ("Supplementation is not appropriate when new information or changed circumstances arise after the Federal action has been implemented."). As discussed in detail below, the "new information" Plaintiffs allege did not arise "prior to the implementation of the Federal action" complained of here—approval of the MPO. BLM thus had

### ii.    NEPA "Supplementation" is not Required.

In any event, BLM is not subject to the sort of clear, non-discretionary duty that may be compelled under APA § 706(1) to take a "hard look" at whether to complete additional NEPA analysis for its previously-completed approval of the Arizona 1 Mine MPO.  *See SUWA*, 542 U.S. at 63 (comparing § 706(1) to mandamus, a "remedy [that] was normally limited to enforcement of 'a specific, unequivocal command'" (citations omitted)); *Hells Canyon Pres. Council*, 593 F.3d at 932–33.  Such a duty exists under NEPA only when an agency is proposing to take a "major Federal action," and there is no suggestion that BLM is proposing to approve a new or modified MPO or take any other "major Federal action" related to the Arizona 1 Mine. 42 U.S.C. § 4332(2)(C); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 401–02 (1976).

Plaintiffs concede that Congress' purpose in enacting NEPA was to ensure that federal agencies evaluate the potential environmental impacts of a proposed action and provide an opportunity for public participation "*before approving a project.*"  Pl. PI Br. 12–13 (citing 40 CFR §§ 1502.2, 1502.5, and *Robertson*, 490 U.S. at 349–50) (emphasis added); *see also, e.g. Wetlands Water District v. U.S. Dep't of Interior*, 376 F.3d 853, 874 (9th Cir. 2004) ("An SEIS is required if *a new proposal* 'will have a significant impact on the environment in a manner not previously evaluated and considered'" (emphasis added, citation omitted)).  NEPA's limited applicability to contemplated (rather than completed) "major Federal action" flows from the statute's purpose—NEPA is a procedural statute intended to inform decision-making rather than compel decisions.  *See* 40 CFR § 1502.9(c)(1)(ii); *Robertson*, 490 U.S. at 349 (discussing NEPA's "statutory requirement that a federal agency *contemplating* a major action prepare" an environmental analysis (emphasis added) (citations omitted)); *Balt. Gas & Elec.*, 462 U.S. at 97 (stating that in enacting NEPA, Congress "required only that the agency take a 'hard look' at the environmental consequences *before taking a major action*" (emphasis added) (citations omitted)).[11]

---

no obligation under its internal guidance or NEPA to prepare a supplemental NEPA analysis, let alone to document its considerations of whether to prepare such a document.  *Id.*

[11]  Plaintiffs' selective quotation of CEQ's regulations omits language that makes clear that NEPA regulations only require supplementation if there is significant new information "bearing *on the proposed action* or its impacts."  40 CFR § 1502.9(c)(1)(ii) (emphasis added); *see* Pl. PI Br. 15.

Many important NEPA principles flow from recognition that the statute's limited purpose is to inform decisions yet to be made rather than already made. For example, it is well established that a party "challenging an agency's compliance with NEPA must 'structure [its] participation so that it . . . alerts the agency to the [party's] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004) (citation omitted). If a party fails to "clearly state" or "alert" the agency to its NEPA concerns during the public comment period, before an agency completes an action, the party has "forfeited any objection" to seek judicial redress. *Id.* This principle highlights that the relevant decision point was BLM's approval of the MPO, which was completed in 1988. Similarly, Plaintiffs' NEPA supplementation theory is logically inconsistent with NEPA regulations and precedent providing that a NEPA analysis need only address impacts and future actions that are "reasonably foreseeable." 40 C.F.R. §§ 1508.7, 1508.8(b); *see also Inland Empire Pub. Lands Council*, 88 F. 3d 754.

Plaintiffs' concession—that NEPA applies *before a project is approved*—is fatal to their NEPA challenge because it is undisputed that BLM *already approved* the Arizona 1 MPO and that there is no decision or proposed action pending before the agency. Accordingly, Plaintiffs are unlikely to succeed on the merits of their NEPA claim.

### i. BLM Completed the Relevant Major Federal Action when it Approved the MPO in 1988.

The Supreme Court and Ninth Circuit have consistently held that "supplemental" NEPA analysis is not required after an agency issues its decision record consummating the major Federal action analyzed in a NEPA document. In *SUWA,* the Court considered whether major federal action remained when new circumstances arose after BLM approved a land use plan for federal lands. 542 U.S. at 72–73. An unanimous Court concluded that once BLM approved a land use plan, major federal action came to an end and there was no obligation to supplement the environmental analysis of that decision to approve the land use plan. *Id.* at 73. The Court reasoned that since BLM's approval of the land use plan was the action that required the initial EIS, and since that plan had already been approved, there was no ongoing federal action that the agency could be required to review in a supplemental NEPA analysis. *Id.*

Following *SUWA*, the Ninth Circuit held that after an agency takes action approving a regulated project, the agency's supplementation "obligation under NEPA has been fulfilled." *Cold Mountain*, 375 F.3d at 894 (citing *SUWA*, 542 U.S. 55). In *Cold Mountain*, a non-federal entity applied to the Forest Service for a permit to operate a bison-testing facility just outside of Yellowstone National Park. The purpose of the facility was to ensure that bison infected with brucellosis would not contaminate Montana's livestock. In connection with the Permit, the U.S. Fish and Wildlife Service issued an "Incidental Take Statement," anticipating that the bison facility might lead to the "take" of certain bald eagles within the meaning of the Endangered Species Act. *See* 16 U.S.C. § 1536(o)(2). Plaintiffs filed suit, alleging that new information regarding Montana's violations of the government's conditions set forth in the permit required the government to prepare a supplemental EIS. The Ninth Circuit held "that there is no ongoing 'major Federal action' requiring supplementation . . . . Because the Permit has been approved and issued, the Forest Service's obligation under NEPA has been fulfilled." *Id.* at 894; *see also Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1122 (10th Cir. 2009) (following *Norton*, *Marsh*, and *Cold Mountain* and holding that in the permitting context, because NEPA only applies to federal agencies, the relevant inquiry must focus on the actions of the agency, not the non-federal party actually implementing the project).[12]

Like the actions in these cases, the action here was BLM's approval of the MPO—which, like the bison-testing facility, is a permit to operate facilities on Federal lands—and, once approved, "there is no ongoing 'major Federal action' requiring supplementation." *Cold Mountain*, 375 F.3d at 894 ("Because the [MPO] has been approved . . . [BLM's] obligation

---

[12] *See also Envtl. Prot. Info. Ctr. v. U.S. Fish & Wildlife Serv.*, No. C 04-4647, 2005 WL 3877605, at *2 (N.D. Cal. Apr. 22, 2005) ("*EPIC*") (rejecting plaintiffs attempt to distinguish *SUWA* and holding: "In 1999 the government issued Pacific Lumber its incidental take permit. There is no other on-going major federal action; accordingly, NEPA does not apply."); *Envtl. Prot. Info. Ctr.* 2005 WL 3021939, at *5; *Wyoming v. U.S. Dept. of Interior*, 360 F. Supp. 2d 1214, 1238 (D. Wyo. 2005) (holding that an agency's 1994 decision approving a reintroduction plan for wolves was the action and "the need for supplementation was at an end"); *Buckeye Forest Council v. U.S. Forest Serv.*, 378 F. Supp. 2d 835, 845 (S.D. Ohio 2005) ("Because the Forest Plan was approved in 1988, the agency action was completed and there was no ongoing major federal action requiring supplementation. The Forest Service therefore committed no NEPA violation by failing to supplement the EIS for the Forest Plan after the Indiana bat was found on the forest.").

under NEPA has been fulfilled."). Importantly, the MPO remains in effect without change. In addition, the operator has not sought to modify its MPO in order to, for example, disturb lands or mine minerals other than those identified in the existing MPO. If the operator were to submit a substantive modification to its MPO, further NEPA analysis would be required. *See* 43 CFR § 3809.432(b); *see SUWA*, 532 U.S. at 73 (noting that "BLM *is* required to perform additional NEPA analyses if a plan is amended or revised" (emphasis in original)). Absent a modification or some other major federal action requiring NEPA analysis, BLM has no obligation to undertake NEPA analysis at this time for an already-issued approval. *Cold Mountain*, 375 F.3d at 894 (citing *SUWA*, 542 U.S. at 73; *Marsh*, 490 U.S. at 374)).

While BLM continues to monitor the Mine and surrounding public lands, and to require compliance with the MPO's terms and generally-applicable regulations, so did the agencies in *SUWA* and *Cold Mountain*. *See EPIC*, 2005 WL 3021939 at *5–6 (discussing *SUWA* and *Cold Mountain* and noting that the actions at issue in both cases required agency "oversight," "on-going federal monitoring[,] and perhaps even action"). Both the Supreme Court and Ninth Circuit nonetheless held that the agencies completed the major federal action when they approved the plan and permit, and NEPA no longer applied. *SUWA*, 542 U.S. at 72; *Cold Mountain*, 375 F.3d at 894. Accordingly, supplemental NEPA analysis of BLM's approval of the MPO is not legally required and Plaintiffs' claim fails.

### ii.    No Major Federal Action Remains to Occur.

Plaintiffs nevertheless argue that BLM was required to do supplemental environmental analysis here because, they claim, federal agencies have a duty to "prepare a supplemental EA or EIS when the approved project has yet to be completed and the agency maintains some oversight and control." Pl. PI Br. 15. As discussed above and as Plaintiffs appear to acknowledge, this is not the law in the Ninth Circuit. *Id.* at 18 (citing *Cold Mountain* as contrary authority).

Even under Plaintiffs' NEPA supplementation theory and in other jurisdictions, no major federal action remained after BLM approved the Arizona 1 Mine MPO.[13] "The Ninth Circuit,

---

[13] According to Plaintiffs, it would seem, "the Court must consider whether the actions remaining to BLM and other government entities after issuance of the [1988] ROD would constitute 'major federal action' that might be informed by further environmental analysis." *Hammond v. Norton*, 370 F. Supp. 2d 226,

however, has not been receptive to arguments that impact statements must accompany inaction, or actions that are marginally federal.  Where federal funding is not present, this court has generally been unwilling to impose the NEPA requirement."  *Penfold*, 857 F.2d at 1314 (holding that "BLM's approval of Notice mines [under the Mining Law] without an EA does not constitute major Federal action [because] [n]either BLM's approval process nor regulatory involvement is sufficient to trigger NEPA"); *see also Cold Mountain*, 375 F.3d at 894; *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d at 55 (noting that "the Ninth Circuit has generally been reluctant to impose the NEPA requirement on actions 'that are marginally federal'").  Thus, while "no litmus test exists to determine what constitutes 'major Federal action,'" *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1134 (5th Cir. 1992), *cert. denied*, 505 U.S. 1220 (1992), Ninth Circuit precedent before *SUWA* and *Cold Mountain* emphasized two primary and overlapping considerations: (1) federal funding; and (2) federal involvement.  *See Penfold*, 857 F.2d at 1314.

Neither factor supports NEPA's application here.  First, no major Federal action remains because the Mine is not federally-funded or operated.  *See id.*; *Sw. Williamson County Cmty. Ass'n v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001) ("Typically, a project is considered a major federal action when it is funded with federal money.").[14]  In fact, Denison's mining operation is completely non-federal, indicating that no major Federal action remains.[15]

---

255 (D.D.C. 2005).  *C.f. Marsh*, 490 U.S. at 374 (holding that in a situation where the approved project was to be carried out by a federal entity and was federally-funded, "the decision whether to prepare a supplemental EIS is similar to the decision to prepare an EIS in the first instance:  If there remains 'major Federal action' to occur, and if the new information is sufficient to show that the remaining action will 'affect the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared").

[14] *See also, e.g.*, *Greater Yellowstone Coal.*, 572 F.3d at 1123 ("It is important to note the relevant NEPA provisions expressly apply only to federal action."); *Save Barton Creek Ass'n*, 950 F.2d at 1137–38 (holding that state-funded highway construction projects were not major Federal actions triggering NEPA); *Natural Res. Def. Council, Inc. v. U.S. EPA*, 822 F.2d 104, 128 (D.C. Cir. 1987) ("[U]nless the construction itself is pursuant to federal financial assistance, NEPA review may only be conducted with regard to the issuance of a discharge permit, which constitutes, of course, the major Federal action."); *Citizens for Responsible Area Growth v. Adams*, 680 F.2d 835, 839 (1st Cir. 1982) ("[A] project such as this one, which is not itself federally funded nor significantly bound up in a federally funded project, is not 'federal.'"); *Atlanta Coal. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979) (regional development plan not a "major federal action"); *NAACP v. Med. Ctr., Inc.*, 584 F.2d 619, 628–29 (3d Cir.1978) (federal approval of private non-capital expenditure plan did not constitute a "major federal

Second, no major federal action remains because BLM has no ongoing involvement in Denison's operation other than enforcement responsibilities that are not subject to NEPA.  *C.f. Macht*, 916 F.2d at 18 ("[F]ederal involvement in a nonfederal project may be sufficient to 'federalize' the project for purposes of NEPA."); *Citizens Against Rails-to-Trails*, 267 F.3d at 1151.  Contrary to Plaintiffs' claim, neither BLM's enforcement authority under FLPMA, its general role as a steward of public lands, nor its ongoing monitoring and enforcement of activities on public lands amount to major federal action or indicate one is ongoing.  *See Penfold* 857 F.2d at 1314 (finding that BLM's ongoing obligations to monitor and ensure compliance with FLPMA, its Section 3809 Regulations, and the authorizations and approvals it issues thereunder for notice mining do not qualify as major Federal action); *Karuk Tribe of Cal.*, 379 F. Supp. 2d at 1099 ( "Significantly, the Ninth Circuit [in *Penfold*] reached this conclusion [that BLM's involvement was marginal rather than major] even after observing that: (1) the BLM's involvement in reviewing the notices was extensive; (2) the BLM was required to, and did, conduct compliance inspections of the notice mining; (3) the BLM was responsible for promulgating the regulations relating to notice mining; and (4) the BLM issued letters indicating that the notice mining was 'approved.'"

CEQ regulations specifically exempt enforcement actions from the definition of "major Federal action."  40 C.F.R. § 1508.18(a) ("Actions do not include bringing judicial or administrative civil or criminal enforcement actions."); *see also EPIC*, 2005 WL 3877605, at *2

---

action"); *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 16 (8th Cir. 1973) ("[A]ny project for which federal funds have been approved or committed constitutes a major federal action bringing into play the requirements of NEPA."); *Mineral Policy Ctr.*, 292 F. Supp. 2d at 54–55 ("Notice [mining] projects are not federally funded[, which] cuts against a finding for plaintiffs.").

[15] *See, e.g.*, *Sugarloaf Citizens Ass'n v. Fed. Energy Reg. Comm'n*, 959 F.2d 508, 514 (4th Cir.1992) (certification of small power production facility); *Born Free USA v. Norton*, 278 F.Supp.2d 5, 19 (D.D.C. 2003), *vac'd on other grounds*, 2004 WL 180263 (D.C. Cir. Jan. 21, 2004) (approval of permits to non-federal zoos to import African elephants not "major Federal action"); *Save the Bay, Inc. v. U.S. Army Corps. of Eng'rs*, 610 F.2d 322, 326 (5th Cir.1980) (grant of pipeline construction permit to nonprofit corporation); *Landmark West! v. U.S. Postal Serv.*, 840 F. Supp. 994, 1005–06 (S.D.N.Y.1993) (action to halt construction of skyscraper by private developers); *Humane Soc. of U.S. v. Johanns*, 520 F. Supp. 2d 8, 21 n.2 (D.D.C. 2007) (distinguishing "[r]elevant cases cited by Defendants . . . because the potential major Federal action at issue [in those cases] is a non-federal *project* rather than a federal *rule* promulgated by a federal agency" (emphasis added)).

24

1   (rejecting a supplementation claim because "[a]t most, the complaint alleges that Pacific Lumber

2   is violating state and federal law and that '[t]he Federal Defendants continue to sanction

3   activities pursuant to the [Habitat Conservation Plan].' . . .  These allegations do not sufficiently

4   allege ongoing major federal action").  Moreover, the Supreme Court has held that agency

5   decisions regarding enforcement actions are committed to agency discretion by law and,

6   therefore, not subject to judicial review under the APA.  *Heckler v. Chaney*, 470 U.S. at 834–35;

7   *see* 5 U.S.C. § 701(a)(2).

8          BLM's ongoing inspection and monitoring of the Mine for compliance with the MPO is

9   not indicative of major federal action either.  "Under *Cold Mountain* and *SUWA* Federal

10  Defendants' ongoing monitoring of [a private company's] compliance . . . does not constitute

11  major federal action."  *EPIC*, 2005 WL 3021939, at *6; *see* also *SUWA* 542 U.S. at 68–73.

12         In fact, BLM's involvement in operations after approving the MPO has been minimal.

13  Before Denison resumed mining, BLM advised Denison by letter that Denison must post a new

14  financial guarantee and obtain any permits required under state or federal law.  Exs. C, D.

15  Under BLM's regulations, mining operators must comply with the terms of their MPO,

16  BLM's performance standards, and other federal and state law, including BLM's bonding

17  requirements.  *See* 43 C.F.R. §§ 3809.505 (requiring a financial guarantee), 3809.415(a),

18  3809.420(a)(6) (operators must comply with federal and state law), 3809.420(b)(4) (operators

19  must comply with applicable federal and state air quality standards including the Clean Air Act).

20  BLM's role is to ensure its permitted operators comply with these requirements.  *Id*. §

21  3809.421.[16]  Given that the MPO remains in effect, if Denison posts a financial guarantee and is

22  otherwise in compliance with the MPO and applicable laws and regulations, Denison may

23  conduct any of the activities in its approved MPO, including active mining, without BLM

24  making an additional decision about whether to authorize the MPO.

25

26

27  ―――――――――――――
    [16]  The fact that BLM would not allow Denison to proceed without Denison updating its bond is not an
28  exercise of control by BLM, it is required under BLM's regulations; an operator must have an accepted
    financial guarantee in place before conducting active operations.  43 CFR §§ 3809.505, .593; *see* Pl. Br.
    at 16 (acknowledging this fact).

Applying these principles, the Tenth Circuit found no ongoing major federal action where an agency issued a permit for operation of an elk feed ground on federal land, but "remained largely uninvolved in the operations." *Tidwell*, 572 F.3d at 1123.  The court explained:

> That the Forest Service retains discretion to amend the permit does not alone lead to the conclusion there is ongoing major federal action or major federal action to occur.  While the Forest Service could potentially amend the permit in such a manner as to constitute a major federal action, there is no allegation this has occurred.  Because the State of Wyoming remains the only meaningful actor involved in the operation of the Forest Park feed ground, there is no ongoing major federal action or major federal action to occur.

*Id*.  Here, BLM was even less involved with Denison's operations because, unlike the Forest Service's permit in *Tidwell*, BLM's role with respect to the operations was purely as an enforcer of the Part 3809 regulations, and such decisions are not subject to NEPA.  While BLM can require a new Plan of Operation pursuant to its enforcement authority under FLPMA if BLM makes a UUD finding, BLM has not found UUD.  *See* Ex. G.

The cases cited by Plaintiffs are not to the contrary.  Plaintiffs rely primarily on *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989).  In that case, the Army Corp of Engineers proposed to build three dams and prepared an EIS in connection with the Federally-operated project.  After the agency had completed two of the three dams, it issued a supplement to its EIS that focused on the potential impacts of the agency's construction of the third dam.  *Id.* at 365.  Then, in 1982, the Corps decided to move forward with constructing the third dam.  *Id.* at 367.  After Congress appropriated funds for construction in 1985, construction of the dam began, and was approximately one-third complete when plaintiffs challenged the Corp's failure to prepare a supplemental EIS based on new information about the dam's impact on fish.  *Id.* at 388–89.  "The Supreme Court and the parties assumed that the construction of the dam constituted ongoing major federal action that could require EIS supplementation."  *EPIC*, 2005 WL 3021939 at *6 (citing *Marsh*, 490 U.S. at 370–74).  The Court stated, though, that whether the agency had correctly applied the "rule of reason" regarding when to prepare supplemental NEPA "turns on the value of the new information to the *still pending* decision making process."  *Marsh*, 490 U.S. at 374 (emphasis added); *id.* (explaining that supplementation could only be required "if there remained 'major Federal actio[n]' to occur").

Plaintiffs ignore the critical distinction between the agency's role in *Marsh* and the BLM's role here.[17]  The underlying project in *Marsh* was itself major Federal action—the agency was constructing the dam, which was to be a federally-owned dam.  *See id.* at 363 ("Congress authorized the Army Corps of Engineers to construct the project . . . .").  Thus, the major federal action at issue in *Marsh* was whether the agency should *construct* the dam, and two-thirds of that action remained to occur.  The agency's role in *Marsh* stands in stark contrast to BLM's role here.  The Arizona 1 Mine is Denison's mine, which Denison and its predecessors-in-interest have fully constructed.  More importantly, BLM's role is limited to approving *Denison's* MPO for that mine.  BLM made its decision to approve the MPO in 1988 and, unlike *Marsh*, BLM has no involvement in the ongoing operations at the "project," so no federal action remained remains to occur.  *See SUWA*, 542 U.S. 55; *Cold Mountain*, 375 F.3d at 894; *EPIC*, 2005 WL 3021939, at *6 ("Here, in contrast to *Marsh*, Federal Defendants are not building anything or even harvesting the trees.  The major federal action that required the EIS in the first place was the adoption of the Conservation Plan and issuance of the Take Permit, and those actions are complete.  All that remains is Federal Defendants' 'adaptive management' . . . . [which] is not as 'major' as building a dam.").

The other cases cited by Plaintiffs do not compel a contrary result.  For example, in *Sierra Club v. Bosworth*, the district court's finding that the timber contracts at issue were "ongoing action" and not subject to the Supreme Court's rule in *SUWA* was based in large part on its conclusion that the timber sales contracts contained a clause that "permit[ted] the Forest Service to unilaterally terminate the contract if its original environmental analysis has been altered by, for example, significant new information regarding its effects on a native species." 465 F. Supp. 2d 931, 939 (N.D. Cal. 2006).  Because of the unilateral termination clause, the district court determined that Forest Service's approval of the timber sales contracts is "not effectively final."  *Id.*  Importantly, the district court also noted that the awarding of the sales contract did not actually authorize logging activities, as the operator still needed to obtain

---

[17] Moreover, the *Marsh* discussion of this issue is *dicta*, since the Court ultimately sided with the Army Corps of Engineers, concluding that the Corps decision not to prepare a supplemental EIS was not arbitrary and capricious and therefore must be upheld.  *Id.* at 385.

separate approval of its operating plan from the Forest Service.  *Id.*  The district court thus

distinguished *SUWA* because it viewed the timber sale and the pending operating plan as two

parts of the same major Federal action.  *Id.* (finding supplementation appropriate because "*final*

*approval of the project had yet to be executed* at the time the Forest Service awarded the contract

and completed its initial NEPA reviews" (emphasis added)).

Unlike the timber sale in *Bosworth*, mining operations are not subject to a two-stage

process.  *See* 43 C.F.R. §§ 3809, *et seq*.  Under the Mining Law, operators do not first apply to

the government to be "awarded" the rights to develop a particular parcel of land—there is no

"timber sale" equivalent under the Mining Law.  Instead, the Mining Law creates a system of

self-initiation allowing mineral location on public lands.  BLM's approval of an MPO is the only

approval needed to engage in mining activities.  As such, BLM already gave Denison the "final

approval" here that the Forest Service had not yet given in *Bosworth*—in other words, the AZ1

MPO in this case is the equivalent of the logging plan of operation that the Forest Service had yet

to review and approve in *Bosworth*.  Moreover, the approved Arizona 1 MPO contains no

unilateral termination clause similar to that in the timber sale contract.  Indeed, as discussed

above, BLM cannot terminate or revoke surface-use authorization under an MPO unless the

operator has given the agency cause to do so, and, even when cause exists, the agency must

follow the procedural steps outlined at 43 CFR § 3809.600.[18]

*Oregon Natural Resources Council Action v. U.S. Forest Service*, 445 F. Supp. 2d 1211

(D. Or. 2006), is similarly inapposite.  The district court distinguished cases such as *SUWA* and

*Cold Mountain* based on the fact that those cases involved "past federal actions that had been

taken and completed pursuant to an adequate or unchallenged NEPA process."  *Id.* at 1222.  The

court found that, unlike the environmental analyses in those cases, the Forest Service's EA *had*

*been* challenged and found to be inadequate.  *Id.* (stating that "courts have implicitly recognized

---

[18]  The differences between this case and *Klamath Siskyou Wildlands Project v. U.S. Forest Serv.*, 2007 WL 2068667 (D. Or. July, 16, 2007), are even more pronounced than *Bosworth*.  In *Klamath Siskyou*, as in *Marsh*, the federal agency *was* the project proponent and performing party, and therefore, the court had no trouble finding that the agency's proposed actions were ongoing under NEPA.  In this case, BLM is not the project proponent.  Instead, as discussed, BLM's involvement is merely to monitor and ensure Denison's compliance with the AZ1 MPO and BLM's regulations.

that there remains major federal action to occur until the agency properly complies with NEPA").   Here, there has been no determination that BLM's NEPA analysis was inadequate. The case thus provides no basis on which to find that there is "ongoing action."

In summary, BLM's involvement with the Arizona 1 Mine is as marginal as can be expected for any project that must obtain and comply with an approval from a federal agency. This case stands in stark contrast to cases like *Marsh*, *Klamath Siskyou*, and *Bosworth*, where the federal agency was either the project proponent and performing party, or had a high level of involvement in the project following its initial decision.   Accordingly, Plaintiffs fail to establish a likelihood of success for their NEPA supplementation claim because Plaintiffs have not identified any major federal action that remained to occur after BLM approved the Arizona 1 Mine MPO.[19]

### iii.   Plaintiffs have not Shown that Alleged "New Information" Raises Substantial Questions that "Remaining Action" may Significantly Affect the Quality of the Environment.

CEQ's implementing regulations state that "supplemental" NEPA analysis is required where an agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or where "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed project."  40 C.F.R. § 1502.9(c)(1).  As discussed above, neither BLM nor the operator has made changes to the MPO and no proposed decision is pending before BLM.  As such Plaintiffs fail to satisfy the first condition of the CEQ regulations.

Even if major federal action did remain to occur, Plaintiffs' alleged new information is not sufficient to show that supplementation is required.  Plaintiffs argue that new information regarding water and air-quality concerns and the presence of the endangered California condor

---

[19] Adoption of Plaintiffs' position could lead to a never-ending NEPA cycle, with each alleged new "controversy" or changed condition requiring a new NEPA analysis and preventing any agency action from becoming final.  The Supreme Court has observed that the absence of finality would render agency decision-making intractable.  *Marsh*, 490 U.S. at 375 ("To require otherwise would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made").

1  requires supplemental NEPA analysis.  Plaintiffs argue that increased "controversy" regarding

2  uranium mining in the area also requires supplemental NEPA analysis.

3        BLM continues to inspect the Mine and monitor the health of surrounding public lands.

4  *See* Ex. G (Florence Decl.).  BLM's monitoring has indicated that the standards of rangeland

5  health are being met and that the Mine is not causing any degradation on the environment.  *Id.*

6        Plaintiffs' suggestion that "new information" about the California condor creates an

7  obligation to engage in new NEPA analysis is not persuasive.  The only support Plaintiffs offer

8  for this "obligation" is a section of the BLM Handbook which, as discussed above, does not

9  apply here.  By contrast, courts have consistently held that, in the absence of "agency action," the

10  mere listing of a new species under the Endangered Species Act does not create a duty to engage

11  in Section 7 consultation.  *Cal. Sportfishing Prot. Alliance v. FERC*, 472 F.3d 593, 595 (9th Cir.

12  2006) ("The ESA and the applicable regulations, however, mandate consultation with NMFS

13  only before an agency takes some affirmative agency action, such as issuing a license.").[20]

14        Plaintiffs' suggestion that the July 2009 segregation of lands on which the Arizona 1

15  Mine is situated from new hardrock mining claims somehow requires supplementation of BLM's

16  NEPA analysis of whether to approve the Arizona 1 MPO is equally unfounded.  *See* Pl. PI Br.

17  22–26.  Plaintiffs mischaracterize the segregation action as a "Segregation Order" and state that

18  the "Order" finds that uranium mining "will result in significant adverse impacts to the

19  environment."  *See* Pl. PI Br. 22.

20        The July 2009 segregation does nothing of the sort.  The Federal Register notice to which

21  Plaintiffs refer simply provides public notice that the Secretary has *proposed* a withdrawal (i.e.

22  closure) of the lands to location and entry under the Mining Law (subject to valid existing rights)

23  and recognizes the need to determine whether such a withdrawal is appropriate, including a study

24  as to whether *there will be* any adverse effects.  74 Fed. Reg. 35887.  The *proposal* has the effect

25

26  [20] Federal Defendants acknowledge that the definition of "action" under the ESA is not coextensive with
the definition of "major federal action" under NEPA.  To the extent Plaintiffs argue that a duty to
27  reinitiate consultation under the ESA triggers an obligation to prepare new NEPA analysis, however, the
absence of such a duty under ESA to reinitiate consultation means that their NEPA argument must fail.
28  *See Forest Guardians v. Fosgren*, 478 F.3d 1149 (9th Cir. 2007) (comparing "action" under ESA and
"major federal action" under NEPA).

1    of segregating the lands (once notice of it is published in the Federal Register).  43 U.S.C. § 1714

2    (b)(1).  In other words, the July 2009 segregation simply preserves the status quo; there have

3    been no findings that uranium mining *will* result in significant adverse impacts.   Indeed, the very

4    purpose of the segregative period is to allow the Secretary time to make that determination.  This

5    proposal to study the effects of uranium mining is not new information that requires

6    supplemental NEPA analysis and does not suggest any need for NEPA supplementation.

7        In fact, pursuant to its monitoring and inspections, BLM has not made a finding that new

8    environmental concerns in the area merit supplemental analysis.  While Plaintiffs cite to broad

9    reports that are not specific to the Mine or surrounding public lands, BLM is entitled to rely on

10   its own experts.  *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 843 (9th Cir. 2003)

11   (noting that "an agency must have discretion to rely on the reasonable opinions of its own

12   qualified experts") (citing *Marsh*, 490 U.S. at 378)); *Dombeck*, 222 F.3d at 556; *see also*

13   *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) ("An agency's predictive judgments

14   about areas that are within the agency's field of discretion and expertise are entitled to

15   *particularly deferential* review, as long as they are reasonable.") (emphasis in original)); *Price*

16   *Road Neighborhood Ass'n*, 113 F.3d at 1509–12; *Cold Mountain*, 375 F.3d at 892.

17       Plaintiffs have failed to meet their burden of demonstrating why BLM is not entitled to

18   such deference in the present case.  Plaintiffs also fail to meet their burden of showing their

19   alleged new information raises substantial questions that any ongoing "major Federal action"—

20   of which there is none—will significantly impact the human environment to an extent not

21   already analyzed.  *See Marsh*, 490 U.S. at 374.  Plaintiffs thus fail to establish a likelihood of

22   success on the merits of their NEPA claim.

23              **iv.    Plaintiffs' NEPA claim is barred by the statute of limitations because**
                         **BLM completed the relevant final agency action in 1988.**

24       As discussed above, the relevant final agency action for purposes of this case is BLM's

25   issuance of Decision Record approving the MPO in 1988.  *See* Ex. B; *see generally ONDA v.*

26   *BLM*, 531 F.3d at 1139 ("Once an EIS's analysis has been solidified in a ROD, an agency has

27   taken agency action reviewable under [the APA].").  To the extent Plaintiff is challenging the

28   1988 decision record's finding of no significant impact, their NEPA challenge is time-barred

1    because the agency decision is well outside the APA's six-year statute of limitations.  28 U.S.C.

2    § 2401(a); *Hells Canyon Pres. Council*, 593 F.3d at 930 (holding that APA challenge to Forest

3    Service's wilderness boundary determination accrued, and the statute of limitations began to run,

4    when the agency published notice of wilderness boundary description in the Federal Register

5    after three-year public notice and comment process); *Wind River Mining Corp.*, 946 F.2d at 712–

6    13.

7            Plaintiffs' requested remedy highlights that, at base, Plaintiffs seek to challenge the 1988

8    MPO approval and attendant EA and FONSI.  They ask the Court to "enjoin operations and

9    ground disturbing activities" at the Arizona 1 Mine until the Court reaches a decision on the

10   merits.  Pl. PI Br. 1.  Since BLM is not the mine operator, Plaintiffs actually seek an order to

11   enjoin BLM's *decision* approving the mining operations—a decision it completed 20 years ago.

12           Any challenge to BLM's decision to prepare an EA rather than an EIS is similarly time-

13   barred.  28 U.S.C. § 2401(a).  "Simply put, [Plaintiffs] are bringing a decade old claim now.

14   Furthermore, . . . there remains no further major federal action to take place, as defined in *SUWA*

15   in this case, and thus [Plaintiffs'] claims under NEPA are not properly before the Court."

16   *Wyoming v. U.S. Dep't of Interior*, 360 F. Supp. 2d 1214, 1236–1238 (D. Wyo. 2005) (also

17   admonishing plaintiffs for "attempting to manipulate the actions of the Federal Defendants into a

18   NEPA claim" and "conflate[ing] the concepts of what is required for an initial EIS under NEPA

19   and what circumstances are required for supplementation"); *see also Custer County Action Ass'n*

20   *v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (a NEPA challenge to an implementation

21   decision "does not provide Petitioners a vehicle in which to pursue allegations that past [agency]

22   actions received insufficient environmental analysis.  The time has passed to challenge past

23   actions").

24           **B.  Plaintiffs Fail To Make The Necessary Showing of Irreparable Harm.**[21]

25

26   [21] During the April 9, 2010 status conference, the Court ordered Federal Defendants and Denison to avoid
     duplicative briefing.  Based on this directive, counsel for the Federal Defendants and Denison held

27   several conference calls regarding their oppositions.  Federal Defendants understand that Dension's brief
     will address, in detail, (a) the likelihood of irreparable harm to the Plaintiffs absent preliminary injunctive

28   relief; (b) the balance of equities; and (c) the public interest.  Accordingly, those arguments will not be
     duplicated herein.

1    It is well settled that in order to obtain the extraordinary relief of a preliminary injunction,

2    a Plaintiff must show that it will suffer an irreparable injury. *Winter*, 129 S. Ct. at 374.  Here,

3    Plaintiffs contend that they "will suffer irreparable environmental injury" as well as "procedural

4    harm" absent an injunction.  Dkt. 37 at 34, 40.  In support of their "environmental injury" claims,

5    Plaintiffs offer a series of conclusory affidavits that suggest that Plaintiffs' recreational and

6    cultural use of an undefined area allegedly near the mine will be limited due to mining activities.

7    *Id.* at 34-39.  Such affidavits are simply not sufficient to justify injunctive relief pending a review

8    of the merits.  *See Caribbean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 674-75 (9th Cir.

9    1988) (holding that unsupported allegations do not suffice); *Goldie's Bookstore, Inc. v. Superior*

10   *Court of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) (purely speculative injury "does not constitute

11   irreparable injury").  Simply, without offering any substantive proof of any concrete

12   environmental injury, Plaintiffs have not shown entitlement to the extraordinary relief of a

13   preliminary injunction.

14   The attached Declaration of Scott R. Florence, BLM's District Manager for the Arizona

15   Strip District, makes clear that BLM has continuously monitored and inspected the Mine and the

16   surrounding area and has found no evidence of UUD.  Ex. G.  Mr. Florence notes that the Mine

17   site encompasses only 19 of the 2,768,206 acres of BLM-administered public lands in the

18   Arizona Strip District, and that access to the areas surrounding the Mine—including areas of

19   sacred or cultural significance and areas used for recreation and conservation activities—is not

20   being impeded, as Plaintiffs contend, due to the Mine or Denison's use of Mt. Trumbell Road.

21   Id.  In fact, Mr. Florence confirms that Mt. Trumbell Road is being maintained by Denison in

22   accordance with an agreement between Denison and Mojave County.  Id.  Mr. Florence's

23   declaration demonstrates that Plaintiffs' assertions of environmental injury are contradicted by

24   what BLM has observed over many years during its inspections and monitoring of the Mine site

25   and the surrounding areas.

26   Plaintiffs also fail to show any procedural harm as a result of any alleged NEPA and

27   FLPMA violations.  Even if Plaintiffs could establish a violation of either of these statutes,

28   Plaintiffs' "procedural harm" argument must be rejected because it would mean that every

1    violation of NEPA or FLPMA would result in an injunction.  This is not the law.  "[I]n the

2    context of environmental injury, irreparable damage is not presumed in evaluating agency

3    action."  *Penfold*, 857 F.2d at 1318 (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531,

4    545 (1987)); *see also Save the Yaak Comm. v. Block*, 840 F.2d 714, 722 (9th Cir. 1988) (citing

5    *Amoco* for the conclusion that "the Supreme Court has rejected a presumption of irreparable

6    injury when an agency fails to thoroughly evaluate the environmental impact of a proposed

7    action") (emphasis omitted).  The Ninth Circuit has made clear that "[m]erely establishing a

8    procedural violation of NEPA does not compel the issuance of a preliminary injunction."  *Fund*

9    *for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992).  Thus, even if there were some

10   NEPA or FLPMA violation, an injunction is not the appropriate remedy.

11          Finally, given that Plaintiffs have been aware of the Arizona 1 Mine MPO, alleged new

12   information, and Denison's intention to resume active mining for at least eleven months, their

13   delay negates their claims of claims of irreparable harm.  Pl. PI Br. Ex. 8 (July 27, 2009 letter

14   from Sierra Club to BLM); *see, e.g., Friends of the Earth v. U.S. Forest Serv.*, 95 F. Supp. 2d.

15   206 (D. Vt. 2000).

16          **C.     The Balance of Hardships and the Public Interest do not Favor Plaintiffs.**

17          Plaintiffs also fail to show that the balance of hardships favor an injunction.  The loss of

18   economic value and detriment to the public interest in developing valuable minerals posed by

19   enjoining Denison's mining operation outweigh any attenuated environmental harm alleged by

20   Plaintiffs.  "[T]he Supreme Court has not established that, as a rule, any potential environmental

21   injury merits an injunction. . . . Our law does not . . . allow us to abandon a balance of harms

22   analysis just because a potential environmental injury is at issue."  *McNair*, 537 F.3d at 1004–05;

23   *see also Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995)

24   ("Injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance

25   of harms analysis, even in the context of environmental litigation." (citation omitted)).  "Indeed,

26   the Supreme Court has instructed us not to 'exercise [our] equitable powers loosely or casually

27   whenever a claim of 'environmental damage' is asserted."  *McNair*, 537 F.3d at 1005 (citing

28

1    *Aberdeen & Rockfish R. Co. v. SCRAP*, 409 U.S. 1207, 1217–18 (1972); *Weinberger*, 456 U.S. at

2    313; *Dombeck*, 222 F.3d at 559.

3        Similarly, Plaintiffs have not met their burden to show that a preliminary injunction is in

4    the public interest.  FLPMA requires that BLM manage public lands under principles of multiple

5    use and sustained yield while preventing UUD.  *See* 43 U.S.C. § 1732.  FLPMA also declares a

6    policy that "public lands be managed in a manner which recognizes the Nation's need for

7    domestic sources of minerals, food, timber, and fiber from the public lands".  43 U.S.C. §

8    1701(7), (8), (12).  An injunction would impede these statutory objectives.  BLM has taken

9    appropriate actions to prevent UUD when it approved the Arizona 1 MPO, and when it exercised

10    its enforcement authority by requiring Denison to update its bond.  Congress, through FLPMA,

11    has made clear that it is in the public interest to allow such activities to occur.  *See Mineral*

12    *Policy Ctr.*, 292 F. Supp. 2d at 33.

13    **V.**      **CONCLUSION**

14        For the reasons set forth above, Federal Defendants respectfully request that this Court

15    deny Plaintiffs' emergency motion for a preliminary injunction.

16

17    Respectfully submitted this 13th day of May, 2010.

18

19                           DENNIS K. BURKE
                              United States Attorney

20                           District of Arizona

21                           IGNACIA MORENO
                          Assistant Attorney General

22                           United States Department of Justice
                          Environment and Natural Resources Division

23                           MICHAEL D. THORP
                          Trial Attorney

24                           U.S. Department of Justice, Environment and Natural
                          Resources Division

25                           601 D. Street , N.W., No. 3112
                          Washington, D.C.  20004

26                           202-305-0456 (tel.)

27

28                           /s/ Tyler Welti
                          Tyler Welti (CA Bar No. 257993)
                          Trial Attorney

United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington D.C. 20044-0663
202-305-0481 (tel) 202-305-0506 (fax)
Tyler.Welti@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing to be served upon counsel of record through the Court's electronic service system (ECF/CM):

Dated: May 13, 2010

DENNIS K. BURKE
United States Attorney
District of Arizona

IGNACIA MORENO
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
CHARLES FINDLAY
Assistant Chief

MICHAEL D. THORP
Trial Attorney
U.S. Department of Justice, Environment and Natural Resources Division
601 D. Street , N.W., No. 3112
Washington, D.C.  20004
202-305-0456 (tel.)

/s/ Tyler Welti
Tyler Welti (CA Bar No. 257993)
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington D.C. 20044-0663
202-305-0481 (tel) 202-305-0506 (fax)
Tyler.Welti@usdoj.gov

*Attorneys for Federal Defendants*