**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Center for Biological Diversity; Grand Canyon Trust; Sierra Club; Kaibab Band of Paiute Indians of the Kaibab Indian Reservation; and the Havasupai Tribe,<br><br>Plaintiffs,<br><br>vs.<br><br>Ken Salazar, Secretary of the Interior; United States Bureau of Land Management; Denison Arizona Strip, LLC; and Denison Mines (USA) Corp.,<br><br>Defendants. | No. CV-09-8207-PCT-DGC<br><br>**ORDER** |

This case arises out of the renewed operation of a uranium mine near Grand Canyon National Park. Plaintiffs allege that the Bureau of Land Management violated mining and environmental laws when it allowed the mine to resume operations. Plaintiffs have filed a motion for a preliminary injunction that seeks to halt mine operations until this case can be finally resolved. Dkt. #36. The motion is fully briefed, and the Court heard oral arguments on June 11, 2010. For reasons that follow, the Court will deny the motion.

**I.   Background.**

The Arizona 1 mine is located 35 miles south of Fredonia, Arizona and approximately 6 miles north of Grand Canyon National Park. The mine occupies 19 acres of surface land and extracts uranium ore from a shaft more than 1,000 feet deep into a Breccia Pipe – an

underground formation that contains uranium ore. Ore is brought to the surface and transported by truck to a mill in Blanding, Utah.

The mine originally was owned and operated by Energy Fuels Nuclear, Inc. ("Energy Fuels"). In 1984, the Bureau of Land Management ("BLM") approved Energy Fuels' plan to explore for uranium at the site. In February of 1988, Energy Fuels submitted a plan of operations to develop the mine and extract ore. BLM performed an environmental assessment under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), and found that the mine would have no significant environmental impact. BLM approved the plan of operations in a decision record dated May 9, 1988.

Energy Fuels constructed the mine, but ceased operations in 1992 when uranium prices dropped. Denison Arizona Strip, LLC and Denison Mines (USA) Corp. (collectively, "Denison") purchased the mine in 2007 and resumed operations in late 2009. Before resuming operations, Denison was required by BLM to increase the amount of the reclamation bond posted for the mine and to obtain an air permit from the Arizona Department of Environmental Quality ("ADEQ"). After Plaintiffs filed this action against BLM, the Court allowed Denison to intervene as a Defendant. Dkt. ##19, 31.

Plaintiffs' second amended complaint asserts three claims for relief. Dkt. #68. First, Plaintiffs claim that the plan of operations approved by BLM in 1988 became ineffective when mining operations ceased in 1992, and that BLM violated the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.* ("FLPMA"), the General Mining Law of 1872, 30 U.S.C. § 21 *et seq.*, and the implementing regulations for those statutes, when it allowed operation of the mine to resume in 2009 without approving a new plan of operations. Dkt. #68, ¶¶ 57-62. Second, Plaintiffs claim that if the 1988 plan of operations is effective, then BLM violated NEPA by failing to prepare a supplement to the environmental assessment performed in 1988. *Id.* ¶¶ 63-68. Third, Plaintiffs claim that BLM violated the FLPMA when it failed to prevent unnecessary and undue degradation of public lands. *Id.* ¶¶ 69-72. Plaintiffs seek a preliminary injunction on claims one and two. *See* Dkt. #37 at 16-41.

1  **II.    Preliminary Injunction Standard.**

2  To obtain a preliminary injunction, Plaintiffs must show that they are likely to succeed
3  on the merits, they are likely to suffer irreparable harm in the absence of preliminary relief,
4  the balance of equities tips in their favor, and an injunction is in the public interest. *See*
5  *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Court first
6  will address whether Plaintiffs have shown they are likely to succeed on the merits of claims
7  one or two.

8  **III.   Claim One – Was BLM Required to Approve a New Plan of Operations?**

9  The Arizona 1 mine is subject to regulations issued by BLM under the FLPMA. 43
10 C.F.R. § 3809.1 *et seq*. These regulations require mine owners to prepare a "plan of
11 operations" and obtain BLM approval before beginning mining operations. *Id*. at § 3809.11.
12 As noted above, BLM approved a plan of operations for the Arizona 1 mine in 1988.
13 Denison restarted the mine in 2009 under the 1988 plan.

14 Plaintiffs contend that the 1988 plan of operations ceased to be effective when Energy
15 Fuels stopped active operation of the mine in 1992, and that BLM therefore was required to
16 approve a new plan of operations before the Arizona 1 mine could resume operations.
17 Dkt. #37 at 16-19. Because no new plan was approved by BLM, Plaintiffs argue that the
18 regulations and the FLPMA have been violated and that operations at the Arizona 1 mine
19 should be halted until a new plan has been approved.

20 Plaintiffs' argument that a plan of operations becomes ineffective when a mine closes
21 is based primarily on § 3809.423 of the regulations, which reads as follows:

22 **How long does my plan of operations remain in effect?**

23 Your plan of operations remains in effect as long as you are conducting
   operations, unless BLM suspends or revokes your plan of operations for failure
24 to comply with this subpart.

25 43 C.F.R. § 3809.423 (bolded type in original). Plaintiffs rely on the plain language of this
26 regulation to argue that when a mine operator stops "conducting operations," the plan of
27 operations no longer is "in effect."

28 The regulations define "operations" to mean "all functions, work, facilities, and

- 3 -

1  activities on public lands in connection with prospecting, exploration, discovery and
2  assessment work, development, extraction, and processing of mineral deposits locatable
3  under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses,
4  whether on a mining claim or not, including the construction of roads, transmission lines,
5  pipelines, and other means of access across public lands for support facilities." 43 C.F.R. §
6  3809.5. Plaintiffs argue that this definition of "operations" clearly requires active mining and
7  work, not inactive and closed operations.
8  　　　　BLM disagrees with Plaintiffs' reading of its regulations. BLM asserts that the
9  regulations never were intended to create an automatic termination provision for plans of
10 operations. Dkt. #52 at 21. BLM interprets the § 3809.5 definition of "operations" more
11 broadly than Plaintiffs, arguing that it includes not only active operation of a mine, but also
12 the existence of mining facilities. The definition includes "facilities . . . on public lands in
13 connection with" mining. 43 C.F.R. § 3809.5. BLM further notes that the regulations
14 require a plan of operations to include an "interim management plan" for "periods of
15 temporary closure" of the mine, 43 C.F.R. § 3809.401(b)(5), and therefore clearly anticipate
16 precisely the kind of temporary closure that occurred at the Arizona 1 mine. BLM notes that
17 the regulations include no requirement that a new plan be approved before a mine can resume
18 operations.
19 　　　　Although both parties have provided plausible readings of the regulations, ambiguity
20 arises when one considers 43 C.F.R. § 3809.424. That section responds to the following
21 question: "What are my obligations if I stop conducting operations?" The section proceeds
22 to explain that a mine operator who stops conducting operations must follow the "approved
23 interim management plan." *Id*. at § 3809.424(a)(1). As noted above, the "interim
24 management plan" is a required portion of every approved plan of operations. 43 C.F.R.
25 § 3809.401(b)(5). Section 3809.424 further explains that if mine operations "are inactive for
26 5 consecutive years," then "BLM will review your operations and determine whether BLM
27 should terminate your plan of operations and direct final reclamation and closure." *Id*. at
28 § 3809.424(a)(3).

Plaintiffs' argument – that a plan of operations ceases to be effective when mine operations cease – would seem to be inconsistent with § 3809.424's provision that the interim management portion of the plan continues to govern the mine. It also would seem inconsistent with § 3809.424's provision that BLM can terminate the plan after five consecutive years of inactivity. If the plan is automatically inoperative under § 3809.423, there would be no need to terminate it.

Plaintiffs responded to this point at oral argument by contending that there is a difference between a plan being "ineffective" under § 3809.423 and a plan being "terminated" under § 3809.424. They argue that § 3809.424 reflects a step-down process: (1) the plan of operations governs as long as the mine is actively operated; (2) the plan becomes ineffective when operations cease, except for the interim management portion of the plan which continues to govern; (3) BLM may terminate the entire plan, including the interim management portion, and require that the site be closed if inactivity continues for five consecutive years; and (4) any resumption of activity after step (1) requires a new plan. This creative reading of § 3809.424 has several flaws. First, the regulations include detailed definitions in § 3809.5, and yet never draw Plaintiffs' distinction between "ineffective" and "terminate." If BLM had intended to establish the detailed step-down approach Plaintiffs suggest, one would think it would have done so clearly. Second, the regulations do not distinguish between the plan and its interim management section. They instead require a single plan of operations, with the interim management plan constituting a portion of that plan of operations. For example, § 3809.423 – Plaintiffs' key provision – states that the "plan of operations remains in effect as long as you are conducting operations," implying, under Plaintiffs' reading, that the entire plan of operations becomes ineffective when mine operations cease. It does not say that the plan of operations becomes ineffective "with the exception of the interim management portion of the plan." Third and most significantly, the regulations never state that a new plan must be approved before operations resume.

BLM's interpretation of the regulation is also problematic. If the term "operations" includes periods of inactivity as BLM contends, then there would be no need for § 3809.424.

- 5 -

1  Under § 3809.423, the plan of operations would remain in effect "as long as you are
2  conducting operations," and "operations" would include periods of inactivity when facilities
3  remain at the mine site. An end to "operations" would occur only when all activities cease
4  and all facilities are removed. In other words, the plan of operations would become
5  ineffective under § 3809.423 only when a mine owner vacates the site entirely. In that event,
6  there would be no need for § 3809.424's provision for interim management – there would
7  be nothing to manage. Nor would there be a need to terminate the plan after five years – the
8  site would be vacant and there would be nothing to terminate.

9  Despite these ambiguities, the Court concludes that BLM's interpretation of the
10  regulations more likely is correct. There simply is no requirement in the regulations that a
11  new plan of operations be approved after a temporary closure. To the contrary, the
12  regulations require that a mine owner submit a plan of operations at the outset of the project,
13  "before *beginning* operations greater than casual use[.]" 43 C.F.R. § 3809.11(a); *see also*
14  § 3809.412 ("You must not *begin* operations until BLM approves your plan of operations[.]")
15  (emphases added). More importantly, the regulations provide that the plan of operations will
16  cover periods of inactivity at the mine, requiring the plan to include "interim management"
17  provisions for periods of "temporary closure." 43 C.F.R. §§ 3809.401(b)(5), 3809.424(a)(1).
18  The words "interim" and "temporary" suggest that the closure is not permanent – that mining
19  operations are expected to resume – and yet the regulations never require that a new plan be
20  approved before operations start again. The clear implication is that the plan of operations
21  and its interim management provisions govern before, during, and after a temporary closure.
22  This implication is reinforced by the provision that BLM may "terminate [the] plan of
23  operations and direct final reclamation and closure" if the site remains inactive for five years.
24  43 C.F.R. § 3809.424(a)(3) (emphasis added). Such termination would not be necessary if
25  the plan terminated automatically the moment an owner stopped conducting operations.
26  Considering the regulations as a whole, as is required, *see Alaska Trojan Partnership v.*
27  *Gutierrez*, 425 F.3d 620, 628 (9th. Cir. 2005), the Court concludes that BLM's interpretation
28  is more consistent with the overall regulatory scheme than Plaintiffs' interpretation.

BLM's interpretation also appears to comport with the original intent of the regulations. In November of 2000, after issuing for public comment the amendments that added § 3809.423, BLM explained its decision to adopt § 3809.423 as originally proposed. BLM noted that some comments had "suggested that BLM should establish a term or duration after which a plan of operations would have to be renewed." 65 Fed. Reg. 70053. BLM declined to do so, explaining that the duration of operations would vary from mine to mine, and concluding that the plan of operations should be "good for the life of the project as described in the plan." *Id.* BLM also explained that § 3809.424 was adopted to "define conditions of temporary closure, and define conditions under which temporary closure becomes permanent and all reclamation and closure requirements must be completed." *Id.* at 70054. This comment confirms the obvious fact that temporary closures are not "permanent." In lengthy discussions of §§ 3809.423 and 3809.424, BLM never suggested that a mine operator must prepare a new plan of operations before restarting a mine after temporary closure. 65 Fed. Reg. 70053-57.

In addition to the fact that the Court finds BLM's interpretation to be consistent with the regulations as a whole and BLM's original intent, the Court must defer to BLM's interpretation of its own regulations. The Supreme Court has explained that an agency's interpretation of its own regulations "is controlling unless plainly erroneous or inconsistent with the regulation[s]." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citations and quotation marks omitted). For reasons explained above, the Court does not find that BLM's interpretation of the mining regulations is plainly erroneous or inconsistent with the regulations. BLM's interpretation therefore controls. *Id.*; *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (courts lack authority to "decide which among several competing interpretations [of an agency's own regulations] best serves the regulatory purpose."); *Sierra Pac. Power Co. v. EPA*, 647 F.2d 60, 65 (9th Cir. 1981) ("We have held that [an agency's] interpretation of its regulations is entitled to great deference[.]").

BLM's management of the Arizona 1 mine has been consistent with its interpretation of the regulations. The 1988 plan of operations included the required interim management

plan. Dkt. #52-1 at 23. The mine was managed under this plan while it was closed, with BLM conducting field inspections and preparing compliance reports. Dkt. #52-7 ¶ 5. When operations were to resume, BLM required the mine owners to increase the amount of the financial guarantee for reclamation costs and to obtain relevant state permits, evincing BLM's ongoing supervision of the mine under the original plan of operations. Dkt. #52-7 ¶ 6, 52-3, 52-5.

In sum, the Court finds BLM's interpretation of its regulations, although not problem-free, to be largely consistent with the language and intent of the regulations as a whole. The Court also concludes that it must defer to BLM's interpretation. Plaintiffs therefore have not shown that they are likely to succeed on the merits of claim one.[1]

**IV.     Claim Two – Must BLM Prepare a Supplemental NEPA Analysis?**

Before taking "major Federal actions significantly affecting the quality of the human environment," NEPA requires federal agencies to prepare a detailed statement on, among other things, "the environmental impact of the proposed action[.]" 42 U.S.C. § 4332(2)(C). The NEPA implementing regulations, 40 C.F.R. § 1500.1 *et seq.*, set forth relevant procedures. An environmental assessment is used to briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact, to aid the agency's compliance with NEPA when no environmental impact statement is necessary, and to facilitate preparation of a statement when one is necessary. 40 C.F.R. § 1508.9. The agency must prepare a supplement where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact." 40 C.F.R. § 1502.9(c)(1)(ii).

"An agency's decision not to prepare an [environmental impact statement] or other supplemental NEPA analysis may be overturned only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Cold Mountain v. Garber*, 375 F.3d

---

[1] The Court need not accept BLM's broad reading of the word "operations" to reach this conclusion. The Court need only conclude, as it does, that the regulations impose no requirement that a new plan of operations be approved before a mine resumes operations.

884, 892 (9th Cir. 2004); *see* 5 U.S.C. § 706(1)-(2)(A). This is a "highly deferential" standard of review. *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).

Plaintiffs agreed at oral argument that NEPA is triggered only by a "major federal action." In the absence of such action, NEPA analysis or supplemental analysis is not required. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1312 (9th Cir. 1988); *N. County Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 749 (9th Cir. 2009) ("There has been no major federal action in this case. Therefore, [the federal agency] had no obligation under NEPA."). Thus, in determining whether NEPA required BLM to prepare a supplemental environmental assessment in this case, the Court "must make the threshold determination whether there is a major federal action." *Minard Run Oil Co. v. U.S. Forest Serv.*, No. 09-125 Erie, 2009 WL 4937785, at *24 (W.D. Pa. Dec. 15, 2009) (citations and quotation marks omitted). "If there is no 'major federal action,' that is the end of the inquiry; the agency need not prepare [supplemental NEPA analysis]." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071, 1099 (N.D. Cal. 2005).

Before allowing operations to resume at the Arizona 1 mine, BLM required Denison to provide a new financial guarantee pursuant to 43 C.F.R. § 3809.593. BLM also required Denison to obtain a new air permit from ADEQ. Dkt. #37 at 23-24. BLM also recognized that it has authority to ensure compliance with the "unnecessary and undue degradation" standard set forth in the mining regulations, 43 C.F.R. § 3809.415(a). Dkt. #38 at 155. BLM continues to monitor the environmental impacts of the Arizona 1 mine. Dkt. #22 ¶ 23.

Plaintiffs have not shown, however, that BLM's monitoring activities – as opposed to its approval of the original plan of operations – are "major federal actions" within the scope of NEPA or its regulations. The Ninth Circuit has made clear that "BLM's obligation to monitor compliance with statutory and regulatory requirements to deter undue degradation is insufficient" to constitute major federal action. *Penfold*, 857 F.2d at 1314. "The right of BLM to issue notices of noncompliance is also insufficient action." *Id.* The NEPA regulations themselves explicitly provide that major federal actions "'*do not include* bringing

- 9 -

judicial or administrative civil or criminal enforcement actions.'" *Id.* (quoting 40 C.F.R. § 1508.18(a)) (emphasis in original); *see also Envtl. Protection Info. Ctr. v. U.S. Fish & Wildlife Serv.*, No. C 04-4647 CRB, 2005 WL 3877605, at *2 (N.D. Cal. Apr. 22, 2005) (agency's imposition of sanctions for violations of environmental laws and an incidental take permit is not a major federal action under NEPA); *Tucson Rod & Gun Club v. McGee*, 25 F. Supp.2d 1025, 1029 (D. Ariz. 1998) (agency's temporary suspension of a special use permit is not a major federal action as defined in 43 C.F.R. § 1508.18). Thus, BLM's ongoing role of overseeing the Arizona 1 mine's compliance with environmental and mining laws does not constitute a major federal action requiring NEPA supplementation.

BLM's initial approval of the plan of operations was the "proposed action" contemplated by the regulation requiring NEPA analysis. 40 C.F.R. § 1502.9(c)(1)(ii). That action was completed in 1988 and has never been challenged. "There is no ongoing 'major Federal action' that could require supplementation." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004) ("*SUWA*"); *see Cold Mountain*, 375 F.3d at 894 ("Because the Permit has been approved and issued, the Forest Service's obligation under NEPA has been fulfilled."); *Envtl. Protection Info. Ctr.*, 2005 WL 3877605, at *2 ("In 1999 the government issued Pacific Lumber its incidental take permit. There is no other ongoing major federal action; accordingly NEPA does not apply."); *Wyoming v. U.S. Dep't of Interior*, 360 F. Supp. 2d 1214, (D. Wyo. 2005) ("[O]nce the [wolf] reintroduction plan went into effect the need for [NEPA] supplementation was at an end.").

Plaintiffs' reliance on *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), is misplaced. *Marsh* involved a three-dam construction project by the Army Corps of Engineers. NEPA supplementation was necessary in *Marsh* because the major federal action – construction of the dams – was not yet completed. 490 U.S. at 367, 373; *see also Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 555-59 (9th Cir. 2000) (supplemental environmental impact statement required for the Forest Service's "two remaining timber sales"). In this case, the major federal action was the approval of a plan of operations. *See* 43 C.F.R. § 3809.11(a). "[T]hat action is completed when the plan is approved." *SUWA*,

542 U.S. at 73. The fact that BLM continues to monitor the Arizona 1 mine to ensure compliance with relevant law does not require NEPA supplementation. *See id.* at 68 (noting that BLM monitored off-road vehicle use in connection with its approved land use plan); *Cold Mountain*, 375 F.3d at 889 (noting that the Forest Service had investigated alleged bison hazing violations in connection with the approved special use permit); *see also Penfold*, 857 F.2d at 1314 (BLM's regulatory involvement with notice mining operations "is insufficient to trigger NEPA").

Plaintiffs also cite *Sierra Club v. Bosworth*, 465 F. Supp. 2d 931 (N.D. Cal. 2006), in support of their NEPA claim. The district court in *Bosworth* provided three reasons for concluding that timber sale contracts approved by the Forest Service were "major ongoing federal actions" requiring supplemental NEPA analysis. First, the timber projects, like the dam project in *Marsh*, were "site-specific" projects. *Id.* at 939. But so was the bison facility in *Cold Mountain* (375 F.3d at 887), and yet the Ninth Circuit still found that no major federal action remained after approval of the special use permit authorizing the facility (*id.* at 894).

Second, "approval of the contracts [was] not effectively final" because contract language permitted the Forest Service to terminate the contracts if additional information would alter the environmental analysis. 465 F. Supp. 2d at 939. Plaintiffs have identified no such language in the plan of operations (Dkt. #52-1), the 1988 environmental assessment (Dkt. #38 at 22-118), or the decision record approving the plan (Dkt. #38 at 9-20).

Finally, the court in *Bosworth* found that because each timber sale contract required Forest Service approval of operating plans prior to the commencement of logging, "final approval of the project had yet to be executed at the time the Forest Service awarded the contract and completed its initial NEPA reviews." 465 F. Supp. 2d at 939. In this case, only the plan of operations needed to be approved before mining operations could begin. 43 C.F.R. §§ 3809.11(a), 3809.412. BLM approved the plan in 1988 (Dkt. #38 at 9-20) and has taken no further major federal action in connection with the mine. *Bosworth* does not support Plaintiff's NEPA claim. *See Or. Natural Res. Council Action v. U.S. Forest Serv.*,

1  445 F. Supp. 2d 1211, 1222 (D. Or. 2006) (distinguishing between cases involving "past
2  federal actions that had been taken and completed pursuant to an adequate or unchallenged
3  NEPA process" and those where "the agency's decision has been set aside because its NEPA
4  analysis was inadequate").

5  Plaintiffs also rely on *Klamath-Siskiyou Wildlands Center v. United States Forest
6  Service*, No. 06-1604-CL, 2007 WL 2068667 (D. Or. July 16, 2007), which found that the
7  Forest Service's decision to proceed with a timber sale "falls under *Marsh*" because the
8  agency had approved "site-specific projects that have yet to be completed." 2007 WL
9  2068667 at *7. This Circuit's decision in *Cold Mountain* was distinguished on the ground
10 that "the only federal action (issuance of the permit) had long since been completed" when
11 the plaintiffs sought to compel supplemental NEPA analysis. *Id.* Because the same is true
12 in this case, *Cold Mountain* controls.

13 Plaintiffs asserted at oral argument that the major federal action in this case was
14 BLM's allowing the mine to reopen if Denison updated its financial commitment and
15 obtained an air permit from ADEQ. Plaintiffs argued that this action was tantamount to
16 approving the plan of operations in the first instance and therefore constituted another major
17 federal action. The Court is not persuaded. As noted in the preceding section, the mining
18 regulations do not require a new plan of operations before mining can resume. The original
19 plan of operations continues to control. BLM's requirement that Denison update its financial
20 commitment and obtain an ADEQ permit were thus oversight actions – monitoring of the
21 mine's continuing compliance with BLM regulations and applicable state and federal
22 environmental laws. Such oversight does not constitute a major federal action for purposes
23 of NEPA. *Penfold*, 857 F.2d at 1314.

24 In the absence of major federal action, BLM was not required to supplement its
25 previous environmental assessment. Plaintiffs therefore have not shown that BLM's decision
26 not to perform the supplemental analysis was "arbitrary, capricious, an abuse of discretion,
27 or otherwise not in accordance with law." *Cold Mountain*, 375 F.3d at 892.

28

## V. Conclusion.

Plaintiffs have not shown they are likely to succeed on the merits of claims one and two. The Court accordingly will deny their request for a preliminary injunction. The Court need not address the remaining preliminary injunction requirements. *See Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 906 n.15 (9th Cir. 2007).

**IT IS ORDERED:**

1. Plaintiffs' motion for preliminary injunction (Dkt. #36) is **denied**.
2. A second case management conference is set for **July 9, 2010 at 2:00 p.m.** (*see* Dkt. #44).
3. The parties shall file a joint case management report by **July 2, 2010**. The report should address the topics identified in paragraph 3 of the Court's order dated April 12, 2010 (Dkt. #44).

DATED this 17th day of June, 2010.

*/s/ Daniel G. Campbell*
David G. Campbell
United States District Judge