Amy R. Atwood, *pro hac vice*
Center for Biological Diversity
P.O. Box 11374
Portland, Oregon 97211-0374
Tel: 503-283-5474
atwood@biologicaldiversity.org

Neil Levine, *pro hac vice*
Grand Canyon Trust
2539 Eliot Street
Denver, Colorado 80211
Tel: 303-455-0604
nlevine@grandcanyontrust.org

Roger Flynn, *pro hac vice*
Western Mining Action Project
P.O. Box 349
440 Main St., #2
Lyons, CO 80540
Tel: 303-823-5738
wmap@igc.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, *et al.*, | Case No. 3:09-cv-08207-DGC |
| Plaintiffs, | PLAINTIFFS' MOTION FOR AN INJUNCTION PENDING APPEAL AND MEMORANDUM IN SUPPORT |
| vs. | |
| Salazar, *et al.*, | |
| Defendants, | |
| and | |
| Denison Mines, Corp., | |
| Intervenor-Defendant. | |

On June 17, 2010, the Court denied Plaintiffs' motion for a preliminary injunction to halt the Arizona 1 uranium mine until this case could be resolved on the merits. The Court found Plaintiffs were not likely to succeed on merits, finding Federal Defendant U.S. Bureau of Land Management (BLM) did not violate the Federal Land Policy and Management Act (FLPMA) and its implementing regulations by failing to approve a new plan of operations for Arizona 1 and did not violate the National Environmental Policy Act (NEPA) by failing to prepare a supplemental environmental review document. The Court did not address the equitable factors, including Plaintiffs' irreparable harms.

On July 12, 2010, Plaintiffs appealed the order denying a preliminary injunction motion under 28 U.S.C. § 1292(a)(1). In accordance with FRAP 8, Plaintiffs first seek an injunction pending appeal in this Court because Arizona 1 mining operations are irreparably harming Plaintiffs. Because the standard for issuing an injunction pending appeal is the same as for a preliminary injunction (*Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983)), Plaintiffs incorporate their prior preliminary injunction briefing.[1]

I.   PLAINTFFS WILL SUFFER IRREPARABLE INJURY

In several ways, mining operations at Arizona 1 are currently irreparably harming Plaintiffs and will continue to do so. *See Am. Trucking Ass'n v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). Uranium mining at Arizona 1 likely introduces radioactive pollution to Grand Canyon National Park and the Colorado River. The U.S. Geological Survey (USGS) documented in March 2010 that water quality samples taken nearby Arizona 1 had uranium concentrations above the limit for drinking water.

> Fifteen springs and 5 wells in the region contain concentrations of dissolved uranium that exceed the U.S. Environmental Protection Agency maximum contaminant level for drinking water and are related to mining processes.

Dkt. 66-1 at 71 (Exh. 54 at 194); *id.* at 67 (Exh. 54 at 188) (samples taken near Arizona 1). USGS also explained: "there is concern that digging into breccia pipes . . . can mobilize the uranium, causing it to be carried by water moving through the rock strata

---

[1] Plaintiffs file this Motion to satisfy Ninth Circuit rules, but intend to file a similar motion in the Ninth Circuit in short order due to the continuing nature of their irreparable harms.

1

into the Redwall-Muav aquifer and other aquifers, which eventually discharge into seeps and springs." Dkt. 38 at 211 (Exh. 27 at 1).  The National Park Service similarly recognized that "caves and other karst features within the redwall limestone may act as conduits to transport contaminants from distance sites to impact park resources." Dkt. 39 at 120 (Exh. 41 at 2).  Recent scientific information provides that goundwater in the region moves at far greater speeds than previously believed.  A 2005 study determined: "water discharging though the aquifer is relatively young and susceptible to rapid impacts from land-use activities on the Kaibab Plateau." Dkt. 40 at 58 (Exh. 43 at 91). New information also indicates that breccia pipes, wherein uranium is found and mined, "are pathways for surface and groundwater" and "intercept precipitation, runoff, and groundwater in perched water-bearing zones and can direct that water deeper into the subsurface." Dkt. 66-1 at 50 (Exh. 54 at 146).  The USGS further reports that "[m]ine shaft and sump samples were located on mining property on the Kanab plateau [Arizona 1's location] and, unsurprisingly, have elevated dissolved uranium concentrations" in the groundwater. Dkt. 66-1 at 64 (Exh. 54 at 183).

For these reasons, two of the largest water districts in the country have opposed mining on public lands adjacent to the Colorado River due to concerns over drinking water. Dkt. 38 at 214 (Exh. 28 at 1) (Southern Nevada Water Authority letter "request[ing] Interior carefully evaluate the implication for water quality in the Colorado River before authorizing mining operations within its watershed"); Dkt. 38 at 195 (Exh. 22 at 1) (Southern California Metropolitan Water District letter stating "mining of radioactive mater near a drinking water source may impact the public's confidence in the safety and reliability of the water supply").  Due to uranium mining's impact to groundwater, water supply, and natural resources within Grand Canyon National Park, the Secretary of the Interior took the extraordinary action of calling a "time-out" on mining on 1-million acres of public lands surrounding the Park through the July 2009 Segregation Order. 72 Fed. Reg. 35887 (July 21, 2009); *see* Dkt. 38 at 176 (Exh. 16 at 2) (Interior press release identifying impacts to drinking water for Phoenix, Los Angeles, San Diego, Tucson and Las Vegas).  Secretary Salazar explained

2

that the two-year segregation and proposed 20-year withdrawal was needed because "we have a responsibility to ensure we are developing our nation's resources in a way that protects local communities, treasured landscapes, and our watersheds." Dkt. 38 at 175 (Exh. 16 at 1). The Segregation Order explicitly recognized that mining "could result in permanent loss of significant values and irreplaceable resources at the site." 74 Fed. Reg. 35887 col. 3. Past uranium mining at the Orphan Mine caused the Park Service to close portions of Grand Canyon National Park, warning park visitors to avoid all contact with water sources in Horn Creek. Dkt. 38 at 206 (Exh. 25) (Park Service letter stating "we closed the area to avoid human exposure").

Further, Plaintiffs' tribal members will suffer irreparable harm because they are unable to access sacred sites due to operations at Arizona 1. Mt. Trumbull Road is the only access road to Arizona 1 mine. It is also the only road that Kaibab Paiute tribal members can use to visit Toroweap Point and other places where they pray and take part in ceremony and song to remember their deceased family members and ancestors. Rogers Decl. ¶¶ 9,13; Jake Decl. ¶¶ 3-5; Homer Decl. ¶¶ 4, 5. Increased truck traffic -- 12 roundtrips by 25-ton ore trucks daily -- and poor road conditions on Mt. Trumbull Road are not the only reasons access is prevented. The dubious legacy of uranium mining in the region has left people scared to live and pass-by mines like Arizona 1. *See Cano v. Everest Minerals*, 362 F.Supp.2d 814 (W.D. Tex. 2005) (seeking compensation for cancer allegedly resulting from radiation exposure to uranium ore trucks). For years, uranium mining companies promised native peoples that there was nothing to fear. However, "previous uranium mining operations near Grand Canyon National Park . . . have left a legacy of debilitating illness and death among Native Peoples in the area and resulted in contaminated soil and ground water that remains unremediated." Jake Decl. ¶6; *see, e.g., Begay v. U.S.*, 591 F. Supp. 991 (D. Ariz. 1998), *aff'd*, 768 F.2d 1059 (9th Cir. 1985).

Recently, after the Court denied the preliminary injunction, additional irreparable harms have come to light that are being caused by activities associated with Arizona 1. Such activities have destroyed archeological resources and sacred sites belonging to the

3

Kaibab Pauite tribe and will continue to do so. *See* John Doe and Jane Doe Declarations filed under seal; Skrzynski Decl. ¶ 4-5.  Plaintiffs are not permitted to provide the details of these irreparable harms in this public filing because BLM refuses to sign a confidentiality agreement concerning the location of these resources.  Pl. Mot. for Injunction Pending Appeal (July 14, 2010).

Harms to these environmental and cultural resources are irreparable. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007); *S. Fork Band Council of W. Shoshone v. U.S. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009).  Notably, BLM has never analyzed or disclosed these impacts from uranium mining at Arizona 1 in a NEPA document. *See S. Fork Band Council*, 588 F.3d at 728 ("likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high").

II.   THE BALANCE OF HARMS AND PUBLIC INTEREST WARRANT AN INJUNCTION PENDING APPEAL

The public has an interest in protecting the iconic Grand Canyon National Park and the water supply for the millions of people in the southwest's largest cities.  Although the Department of the Interior has recognized the significance of the resources at risk from uranium mining -- as evident by last years Segregation Order, BLM, an Interior agency, is ignoring the public's interest.  Further, as the Ninth Circuit has made clear, Congress enacted NEPA and FLPMA to preserve the public's interest in environmental and cultural resources. *See S. Fork Band Council*, 588 F.3d at 728 ("Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending a project until that consideration has occurred thus comports with the public interest.").

BLM and Denison have raised financial reasons to avoid an injunction.  Such economic harms are not irreparable and are temporary in nature. *See S. Fork Band Council*, 588 F.3d at 728; *Save Our Sonoran v. Flowers*, 408 F.3d 1113, 1124-25 (9th Cir. 2005).  Moreover, Denison and its predecessors closed Arizona 1 in 1992 and,

4

despite intentions to resume mining in late 2007, did not begin mining at Arizona 1 until late December 2009.  An injunction pending appeal will be of limited duration, until the Ninth Circuit can address the critical legal issues raised by the case's merits.

III. **PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR APPEAL BECAUSE FLPMA REGULATIONS REQUIRE BLM TO APPROVE A NEW PLAN OF OPERATIONS FOR URANIUM MINING**

Under FLPMA and its implementing regulations, BLM must approve a plan of operations before mining activities occur on public lands.  Once approved, plans of operations remain in effect as long as mining activities are occurring.  For the Arizona 1 uranium mine, BLM approved a Plan of Operations in 1988 on public lands a few miles from Grand Canyon National Park.  Soon thereafter, in 1992, mining operations at Arizona 1 ceased and no mining operations were conducted for at least 17 years.  The 1988 Plan of Operations for Arizona 1 is thus no longer in effect.  Under FLPMA, mining is prohibited absent an approved plan.  Accordingly, BLM "unlawfully withheld" compliance with FLPMA by failing to approve a new plan of operations before mining resumed at Arizona 1. *See* 5 U.S.C. 706(1).

A. **FLPMA's Scheme For Regulating Mining On Public Lands Dictates The 1988 Plan Of Operations In Not In Effect**

BLM approves and regulates mining activities on public lands in accordance with FLPMA and its implementing regulations. *See* 43 U.S.C. §§ 1701 *et seq*.; 43 C.F.R. §§ 3809 *et seq*. (the "3809 Regulations").  FLPMA's overarching command directs BLM to take actions to prevent "unnecessary or undue degradation" of the public lands. 43 U.S.C. 1732(b). Public lands are defined in FLPMA as "any land and interest in land owned by the United States ... and administered by the Secretary of the Interior through the Bureau of Land Management." *Id*. § 1702.  To implement the unnecessary and undue degradation standard, BLM first developed a regulatory scheme for mining the public lands in 1980, which was updated and revised in 2000. 45 Fed. Reg. 78902 (Nov. 26, 1980); 65 Fed. Reg. 69998 (Nov. 21, 2000).  Under FLPMA's regulations, BLM regulates mining activities pursuant to a three-tiered scheme: casual use, notice-

level operations, and plan-level operations. 43 C.F.R. § 3809.10. Each tier corresponds to an increasing level of public land impact and BLM regulatory oversight.

Relevant in this case, mining activities on public lands that cause a surface disturbance of more than 5 acres are governed by a plan of operations. 43 C.F.R. § 3809.10(c); *id*. § 3809.11(a), § 3809.21(a). The plan is prepared by the operator and submitted to BLM for approval. *Id*. § 3809.412 ("You must not begin operations until BLM approves your plan of operations"). Plans of operations must contain several components: a description of operations; a general schedule of operations; plans for access roads; a reclamation plan; and a monitoring plan. *Id*. § 3809.401(b). They also must include an "interim management plan" that governs during "temporary closures." *Id*. § 3809.401(b)(5). BLM must ensure that mining activities do not cause unnecessary or undue degradation upon approving a plan of operations. *Id*. § 3809.401(a) ("Your plan of operations must demonstrate that the proposed operations would not result in unnecessary or undue degradation of public lands").

Generally, an approved plan of operations will remain valid for the duration of mining activities. However, one of the purposes of the 2000 regulatory revisions was to ensure that plans of operations do not remain valid indefinitely. 64 Fed. Reg. 6422, 6439 (February 9, 1999) (intending to eliminate prior expectation that "plan of operations [] remain in effect indefinitely"). Section 43 C.F.R. § 3809.423 thus sets forth two scenarios where an approved plan of operations becomes ineffective.

> Your plan of operations remains in effect as long as you are conducting operations, unless BLM suspends or revokes your plan of operations for failure to comply with this subpart [3809 regulations].

43 C.F.R. § 3809.423. Relevant here, a mining company's inactivity will render an approved plan of operations ineffective.[2] This occurs when a company decides on its own volition to stop operations such that they are no longer "conducting operations." *Id*. FLPMA regulations define "operations" to mean:

---

[2] The other scenario involves a BLM decision to "suspend or revoke" an approved plan of operations upon finding an operator fails to comply with the Subpart 3809 regulations. 43 C.F.R. §§ 3809.423; *see also* § 3809.601 & § 3809.602 (suspension and revocation procedures). This scenario is not at issue here.

6

> all functions, work, facilities, and activities on public lands in connection with prospecting, explorations, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws;
>
> reclamation of disturbed areas; and,
>
> all other reasonably incident uses, whether on a mining claim or not, including the construction of roads, transmission lines, pipelines, or other means of access across pubic lands for support facilities.

43 C.F.R. § 3809.5. According, when a mining company ceases active exploration, mining, or reclamation activities, the plan of operations is no longer "in effect" under 43 C.F.R. § 3809.423.

It is undisputed that mining activities stopped in 1992, if not earlier, at Arizona 1. Energy Fuels Nuclear closed the mine when uranium prices dropped. Dkt. 71 at 2:10-11. BLM has admitted as much. Dkt. 17 ¶ 24; Dkt. 22 ¶ 24 (BLM admitting "for 15 years, the Mine did not produce uranium ore in commercial quantities"); Dkt. 38 at 208 (Exh. 26 at 1) (BLM's letter to Arizona: "These mines are not currently in operation and have not operated since the early 1990s."). Denison also acknowledged that no mining operations were conducted for 17 years. Dkt. 38 at 162 (Exh. 11) ("Denison is planning on restarting operations at Arizona 1 this year to complete the shaft and begin mining in 2008."); *see also* Dkt. 40 at 70 (Exh. 45) (Mining Safety Health Administration (MSHA) datasheet indicating no worker hours were logged at Arizona 1 until 2007); Dkt. 38 at 122 (Exh. 4 at 3) (2007 AGFD Report noting "possible renewed production by Denison Resources" at Arizona 1).

Accordingly, based on the plain language of 43 C.F.R. § 3809.05 and § 3809.423, the 1988 Plan of Operation is not valid. Denison is operating Arizona 1 without an approved plan of operations. This Court found it compelling that no regulatory provision explicitly states that a *new* plan operations must be approved before mining operations resume after 17 years. Dkt. 71 at 5 ("Third and most significantly, the regulations never state that a new plan must be approved before operations resume."); *id*. at 6 ("There is simply no requirement in the regulations that a new plan of operations must be approved after a temporary closure."). Yet, the regulations explicitly mandate that BLM approve a plan of operations before mining

7

occurs. 43 C.F.R § 3809.11(a); § 3809.412; § 3809.605.  And, if a previously-approved plan because ineffective under § 3809.423 or any other provision, operations cannot proceed unless BLM approves a new plan of operations.

      B.      The Existence Of An Interim Management Plan Does Not Save The 1988 Plan Of Operations

When a mining company chooses to stop "conducting operations," not only is the plan of operations no longer in effect under 43 C.F.R. § 3809.423, but the mining company must still comply with an approved interim management plan.  However, the existence or implementation of an interim management plan does not mean a plan of operations remain in effect.

The provision governing interim management provides that if "you stop conducting operations for any period of time," "you must follow your interim management plan." 43 C.F.R. § 3809.424(a)(1).  This provision makes clear that implementation of interim management only occurs when a mining company "stops conducting operations." *Id*.  The effect of stopping operations is thus twofold: the plan of operative becomes ineffective and the interim management plan must be implemented.

Section 3809.424(a)(1) is thus consistent with the definition of operations.  The regulatory definition of operations at 43 C.F.R. § 3809.05 is broad and even includes actions associated with reclamation activities.  But noticeably absent from the definition are interim management actions.  BLM certainly could have included interim management actions in the definition of operations, but did not.  Accordingly, an interpretation of the regulatory definition of operations that includes interim management is plainly erroneous and inconsistent with the definition's plain language. *See Long Island Care v. Coke*, 551 U.S. 158, 171 (2007).

The district court noted that Arizona 1 had an "interim" management plan and its existence means the mine was closed temporarily and the 1988 Plan of Operations remand effective. Dkt. 71 at 6:20.  However, the Arizona 1 "plan" was not actually a plan at all, but simply a list of measures that required one-time actions:

8

> Nearly all mobile equipment and a portion of the fixed equipment would be removed from the Project Area. Fans would be removed and the ventilation shaft capped with perforated steel plates welded in place to allow natural ventilation but to prevent access to the workings. The buildings, headframe, and hoist would be left in place but secured and maintained in the same manner as s short-term closure.

Dkt. 66-1 at 25 (Exh. 50 at 20). These measures took place years ago. Accordingly, even if interim management was included in the definition of operations, which it is not, the operator of Arizona 1 stopped conducting such operations a long time ago.

Moreover, the issue of mine closure is different than the issue of whether the plan of operations remains in effect under 43 C.F.R. § 3809.423. If the mine wishes to reopen after a temporary closure, it may do so after seeking and obtaining approval of a new plan of operations. The plain language of 43 C.F.R. § 3809.423, however, makes clear that a previously-approved plan is no longer in effect when an operator ceases "conducting operations," whether temporary or otherwise.

      C.    <u>BLM's Regulatory Authority To Terminate Inactive Mines Does Render The 1988 Plan Of Operations For Arizona 1 Valid Or In Effect</u>

In addition to BLM taking steps to "suspend or revoke" a plan of operations for non-compliance with the 3809 Regulations under 43 C.F.R. § 3809.423, BLM may also "terminate" a plan of operations. 43 C.F.R. § 3809.424(a)(3). Under the relevant regulation, BLM first reviews a mine when "operations are inactive for 5 consecutive years." *Id*. An "inactive" mine is one that "is <u>not</u> operating (mining, exploring or reclaiming), but is following its interim management plan." 65 Fed. Reg. at 70055 (emphasis added). Based on this mandatory 5-year review, BLM may then "terminate the plan of operations and direct final reclamation and closure." *Id*.; *see also* 65 Fed. Reg. at 70054 ("After 5 consecutive years of inactivity BLM will review the operation *to determine whether the operation is abandoned and whether BLM should direct final reclamation and closure*.") (emphasis added); *id*. at 70055 (§ 3809.424 "puts limits on the amount of time an operation can remain temporarily closed without undergoing review to determine if it is abandoned"). BLM may also determine that the mine has been "abandoned" and begin collecting on the reclamation bond to perform reclamation activities. 43 C.F.R. §§ 3809.424(a)(4); 65 Fed. Reg. at 70055 ("If the operator could

9

not demonstrate the site would reasonably be expected to reopen, BLM may consider it abandoned and order reclamation.").[3]  43 C.F.R. § 3809.424(a)(3) and (a)(4) thus provide a regulatory framework for inactive mines, ensuring they are not left "unreclaimed indefinitely." *Id*. at 70054.  However, inactive mines lack a valid and effective plan of operation because they operator necessarily stopped conducting operations under 3809.424(a)(3), meaning only the interim management plan component of the plan of operations can be terminated.

In any case, although BLM and the Court relied on §§ 3809.424(a)(3) and (a)(4) to keep the 1988 Plan of Operations alive, neither provision applied to the 1988 Plan.  It is undisputed BLM never conducted the 5-year review required by 43 C.F.R. § 3809.424(a)(3).  Accordingly, the only applicable provision is 43 C.F.R. § 3809.423, under which the 1988 Plan became ineffective once the operator at Arizona 1 stopped conducting operations in 1992.

In sum, the intent behind 43 C.F.R. § 3809.423 was to ensure plans of operations do not continue in perpetuity. 64 Fed. Reg. at 6439 (purpose was to eliminate prior expectation that "plan of operations [] remain in effect indefinitely").  Yet, the Court's reading of the regulations allow a plan of operations to continue on indefinitely as long as the plan of operations contains the mandatory interim management plan and BLM does nothing -- by not performing the mandatory 5-year review or after a the 5-year review -- in response to an inactive mine.  As Arizona 1 illustrates, mines with a very old plans of operations could remain "inactive" for decades and simply resume without any review of the operations to reflect current technological or environmental conditions.  While this interpretation allows mining companies to react to changes and fluctuations in the uranium market, it does not similarly recognize changes in the environment or relevant technologies or BLM's intent to ensure plans of operations do not remain in effect indefinitely.

---

[3] Alternatively, BLM's five-year review may reveal that the mining company intends to renew operations at some point in the future, in which case the agency will not direct that reclamation activities begin or collect on the reclamation bond. 65 Fed. Reg. at 70054 ("If … persuasive reasons exist to maintain an inactive status, there may be no reason for BLM to terminate the plan and direct final closure.").

## IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE BLM MUST PREPARE A SUPPLEMENTAL EA OR EIS

Congress enacted NEPA to ensure that federal agencies (1) take a "hard look" at all environmental impacts of their decisions, and (2) disclose and provide an opportunity for the public to comment on such environmental impacts. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 350 (1989). Federal agencies must thus prepare and circulate an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. Alternatively, agencies may prepare an EA to assess whether a project may have significant impacts such that an EIS is not required. 40 C.F.R. § 1501.4(c); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730-31 (9th Cir. 2001). If an EIS is not necessary, agencies detail the reasons why the project's impacts are insignificant and issue a "finding of no significant impact." 40 C.F.R. § 1508.13.

NEPA regulations require that agencies prepare a supplemental EIS or EA when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). As the Ninth Circuit has ruled, "[t]he agency must be alert to new information that may alter the results of its original environmental analysis." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557-58 (9th Cir. 2000). New circumstances and information are "significant" under the factors set forth in 40 C.F.R. § 1508.27. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371-73 (1989).

In 1988, BLM prepared an EA for Arizona 1, concluding there would be no significant impacts. Since the 1988 EA, BLM has not prepared a supplemental EA or EIS nor has the agency analyzed new information to assess whether a supplemental NEPA analysis is needed.

### A. BLM Was Required To -- And Did -- Provide Additional Approvals For Arizona 1

Although BLM approved Arizona 1 in 1998, mining did not occur. After 17 years of non-operations, additional BLM approvals were required. Accordingly, "there remain[ed] major Federal action to occur" and BLM has a duty to prepare a

11

supplemental EA or EIS for mining to resume at Arizona 1. *See Marsh,* 490 U.S. at 374; *Sierra Club v. Bosworth*, 465 F.Supp.2d 931, 939 (N.D. Cal. 2006) (finding Forest Service had to provide additional approvals prior to logging).  As the Council of Environmental Quality provided in adopting the regulation requiring supplementation,

> if the proposal has not yet been implemented . . . EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement.

46 Fed. Reg. 18026 (Mar. 23, 1981).

      The requirement to post a reclamation bond is part of BLM's approval process for mines.  In 1988, BLM required Energy Fuels Nuclear to post of reclamation bond upon reviewing and approving the Plan of Operations.  When Denison informed BLM of its intent to resume operations, BLM required Denison to amend its reclamation bond. Dkt. 17 at ¶ 58 (Complaint); Dkt. 22 at ¶ 58 (BLM Answer admitting "BLM required Denison to post a new reclamation bond" before restarting operations); Dkt. 66-1 at 36 (Exh. 53 at 1) (BLM Feb. 21, 2008 bonding decision stating "[t]he amount of the financial guarantee required is based on the following reclamation measures.").  A new bond is required only if BLM finds the prior one inadequate. *See* 43 C.F.R. § 3809.505 ("You do not need to post a new financial guarantee if your existing financial guarantee satisfies this subpart.").  BLM's decision on the updated bond provides: "The bond and financial documents have been examined, found satisfactory, and are therefore accepted effective April 7, 2008." Dkt. 52-4 at 1; *see also id*. at 2 (BLM's "determin[ation] that the amount appropriate for the cost of surface reclamation for these operations is $377,800.").  BLM thus assessed a new bond amount before permitting mining to proceed. Dkt. 52-3.

      In addition to the bonding requirement, BLM was required to ensure that Arizona 1 avoids "unnecessary or undue degradation." 43 U.S.C. § 1732(b); *see Mineral Policy Ctr.*, 292 F.Supp.2d at 35 ("FLPMA, by its plain terms, vests the Secretary of the Interior with the authority -- and indeed the obligation -- to disapprove of an otherwise permissible [activity] because the [activity] … would unduly harm or degrade the public land.").  The unnecessary and undue degradation standard includes compliance with

"Federal or State laws related to environmental protection." 43 C.F.R. § 3809.415(a); *id.* § 3809.5 (definition of 'unnecessary or undue degradation' requires compliance with "other Federal and state laws related to environmental protection").  Accordingly, as part of the Arizona 1 approval process, BLM required Denison to obtain a new air permit before mining could begin because the 1988 air permit became inoperative when mining activities stopped. Dkt. 66-1 at 31 (Exh. 51) (1988 EPA permit); Dkt. 17 at ¶ 58 (Complaint); Dkt. 22 at ¶ 58 (BLM Answer admitting "[b]efore Denison could renew operations at the Arizona 1 Mine, <u>BLM required Denison to . . . secure an air permit</u>" from the State of Arizona.") (emphasis added).  Similarly, BLM reviewed whether a Clean Water Act permit was needed before permitting Denison to begin operations at Arizona 1. Dkt. 52-5 at 2.

      BLM informed Arizona that these approvals were needed for Arizona 1:

> [FLPMA] regulations state that mining and milling operations <u>cannot start</u> until all health, safety, and environmental permits have been issued and an adequate reclamation bond has been accepted.

Dkt. 38 at 208 (Exh. 26 at 1) (emphasis added).  Similarly, to EPA, BLM wrote:

> our jurisdiction would be predicated on whether the operation was meeting the unnecessary or undue degradation standard of our mining regulations.  If it meets it, it can continue.  If it does not (e.g. for lack of any state, county or local permits) then we would assume our authority to ensure compliance.

Dkt. 38 at 155 (Exh. 9).  Because BLM had to provide additional approvals, Denison could not simply move forward with mining as initially planned under the 1988 Plan of Operations.  Indeed, Denison intended to resume operations in late 2007 or early 2008. AR 2308.  However, because additional BLM approvals were needed, mining did not commence until late December 2009 after all approvals were provided.

      Because further BLM approvals were needed, the *Marsh* case applies. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989).  In *Marsh*, the Army Corps of Engineers had not completed constructing a dam.  Because there was still federal agency action to occur, the Corps was required to prepare a supplemental NEPA analysis. *Id.* at 367, 373.  Here, too, there was still agency action to occur -- providing

additional BLM approvals of Arizona 1 mining.[4]  For this reason, the Supreme Court decision in *SUWA* and the Ninth Circuit ruling in *Cold Mountain v. Garber* do not apply.  In *SUWA, the* Supreme Court concluded that supplemental NEPA was not required after BLM approved a programmatic-level management plan for an entire unit of public land. *SUWA*, 542 U.S. at 72-73.  No additional agency action was needed with respect to the land management plan and future site-specific approvals under that management plan would receive their own approvals and associated NEPA analysis.  In *Cold Mountain*, the Ninth Circuit determined the Forest Service lacked ongoing oversight or involvement after issuing a special use permit for a bison capturing facility to Montana. 375 F.3d 884, 894 (9th Cir. 2004).  Because the facility had been approved and constructed and no additional approvals were required, the court rejected a claim for supplemental NEPA.  Here, in contrast, Denison could not reopen the mine until approved by subsequent BLM actions.  In this respect, BLM additional approvals are like the Forest Service's approvals of operating plans prior to the commencement of logging in *Bosworth,* 465 F.Supp.2d at 939.

Accordingly, BLM is required to supplement the 1988 EA.  Because mining never commenced at Arizona 1, the approved action had yet to be implemented or completed. *See* Dkt. 52-5 at 1 ("[N]o ore has been produced from the Arizona 1 mine."). Because BLM was required to provide additional approvals, major federal action had yet to occur. *See, e.g., Klamath-Siskiyou Wildlands Center v. U.S. Forest Serv.*, 2007 WL 2068667 *1 (D. Or. July 16, 2007) (because "the timber sale contract was awarded in 1997, but no logging occurred," agency action was ongoing); *Friends of the Clearwater,* 222 F.3d at 559 (where action not yet been completed, agency has "a continuing duty to gather and evaluate new information relevant to the environmental impacts of its actions").

---

[4]  In contrast to the district court's contention, BLM monitoring is not the agency action that warrants supplementation of the 1988 EA. Dkt. 71 at 11.

B. **Significant New Information And Changed Circumstances Require BLM To Prepare A Supplemental NEPA Document**

As Plaintiffs detailed in their prior briefing, new information concerning (1) cumulative impacts from other nearby uranium mines, (2) impacts to the public lands protected under the July 2009 Segregation Order, (3) impacts to groundwater resources, including Grand Canyon National Park's seeps, springs and Colorado River water supply, (4) impacts to endangered California condor, and (5) impacts to public safety and human health from radon gas emissions warrant a supplemental EA or EIS. *See* 40 C.F.R. § 1508.27(b). This new information is summarized below.

The status of "reasonably foreseeable" uranium mines in the Arizona Strip has changed significantly. Whereas uranium mining in the Arizona Strip was slowing down at the time of the 1988 EA (Dkt. 38 at 109 (Exh. 3 at 84)), today there is a uranium boom throughout the Arizona Strip. *See* Exh 14. Denison itself intends to explore and mine the EZ1, EZ2, DB1, WHAT and Moonshine Springs uranium deposits in the immediate vicinity of Arizona 1. Dkt. 22 at ¶ 35 (BLM Answer); Dkt. 28 at ¶ 35. Moreover, new information regarding the actual impacts from uranium mining and inadequate reclamation measures is now available. A recent USGS's "presents new data that examines the remnant effects of uranium mining and reclamation on soils and stream sediments." Dkt. 39 at 13 (Exh. 31 at 50) (comparing elevated radioactivity at mine sites with finding "[v]ery little radiation above background concentrations was found at the unmined Kanab South site"); *id.* at 27 (Exh. 31 at 101) (reporting "[e]levated radioactivity . . . at all sites"); *id.* at 28 (Exh. 31 at 102) (documenting blowing radioactive dust from old mine site); *Id.* at 25 (Exh. 31 at 98) (finding "dust from trucks may contribute to these elevated uranium concentrations").

On July 21, 2009, the Secretary of the Interior issued an Order to protect approximately 1 million acres of public lands adjacent to Grand Canyon National Park from uranium mining. 74 Fed. Reg. 35887 (July 21, 2009) ("The purpose of the withdrawal, if determined to be appropriate, would be to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining."). Interior issued the Segregation Order for this area because

15

> The lands are within portions of the Grand Canyon watershed next to Grand Canyon National Park in northern Arizona and contain significant environmental and cultural resources as well as substantial uranium deposits.

Dkt. 38 at 175 (Exh. 16 at 1). In support of the Order, the National Park Service expressed to the Secretary "a number of concerns relative to resource impacts from uranium mining and exploration" on Grand Canyon National Park. Dkt. 39 at 119 (Exh. 41 at 1). The new land use designation contemplated by the Segregation Order applies to Arizona 1 and warrants a supplement NEPA analysis.

New information concerning impacts to groundwater, which in part led Interior to issue the Segregation Order, must be evaluated. The 1988 EA concluded no such impacts because, according to BLM's old analysis, groundwater moves very slowly and the rock layers surrounding the mine shaft are impenetrable. Dkt. 38 at 48-49, 96-98 (Exh. 3 at 23-24, 71-73). Since then, the State required Arizona 1 to secure a Aquifer Protection Permit (Dkt. 39 at 62 (Exh. 34 at 1)), which by definition means discharges "of a pollutant from a facility either directly to an aquifer . . . in such a manner that there is a reasonable probability that the pollutant will reach an aquifer." A.R.S. at § 49-201(12.); *id.* § 49-241(A). More specifically, breccia pipes -- wherein lies uranium ore -- are conduits that facilitate groundwater recharge and groundwater moves much quicker than previously realized. Dkt. 66-1 at 50 (Exh. 54 at 146); Dkt. 39 at 109 (Exh. 39 at 9); Dkt. 38 at 216-17 (Exh. 29); Dkt. 40 at 58 (Exh. 43 at 91) (concluded that "water discharging from the aquifer is relatively young and susceptible to rapid impacts from land-use activities on the Kaibab Plateau").

There is also new information about impacts of Arizona 1 mining activities on the threatened California condor, a bird listed under the ESA. In 1996, condors were reintroduced to the area. 61 Fed. Reg. 54044 (Oct. 16, 1996). According to the Park Service, "[t]he endangered California condor utilize the [Segregation Area's] North Parcel for feeding and rearing activities." Dkt. 39 at 120 (Exh. 41 at 2); Dkt. 40 at 79 (Exh. 46 at 7) ("condors use the northwest mining withdrawal area as a foraging site and as a travel corridor"). There is also documented evidence that uranium mining activities adversely affect this endangered species. Dkt. 39 at 120 (Exh. 41 at 2) (condors "are

known to be attracted to construction activities and other disturbance activities . . . putting these animals at risk"); Dkt. 38 at 204 (Exh. 24) ("the area of the Orphan Mine poses a threat to the California condor"); Dkt. 40 at 79 (Exh. 46 at 7) (harmed "by the consumption of mining waste water and contaminated carrion").[5]

Respectfully submitted,

Dated: July 14, 2010

*/s/ Amy Atwood*
Amy R. Atwood
Center for Biological Diversity

Neil Levine
Grand Canyon Trust

Roger Flynn
Western Mining Action Project

Attorneys for Plaintiffs

---

[5] Moreover, new information recently became available concerning the mine's impacts to archaeological sites and resources.

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2010, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants

Tyler Guy Welti
Tyler.Welti@usdoj.gov
Michael Thorp
Michael.Thorp@usdoj.gov

Attorneys for Defendants

Bradley Joseph Glass
brad.glass@gknet.com
Michael K Kennedy
mkk@gknet.com

Attorneys for Applicants in Intervention

/s/ *Amy Atwood*
Amy Atwood