1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Center for Biological Diversity; Grand          No. CV-09-8207-PCT-DGC
    Canyon Trust; Sierra Club; Kaibab Band of
10  Paiute Indians of the Kaibab Indian             **ORDER**
    Reservation; and the Havasupai Tribe,
11
                    Plaintiffs,
12
    vs.
13
    Ken Salazar, Secretary of the Interior;
14  United States Bureau of Land Management;
    Denison Arizona Strip, LLC; and Denison
15  Mines (USA) Corp.,
16                  Defendants.

17       This case arises from the renewed operation of a uranium mine near Grand

18  Canyon National Park.  Plaintiffs allege that the Bureau of Land Management violated

19  mining and environmental laws when it allowed the mine to resume operations.  Plaintiffs

20  ask the Court to enjoin mining activities until the Bureau of Land Management approves

21  a new plan of operations for the mine and completes updated environmental reviews.

22       The parties have filed motions for summary judgment.  Docs. 130, 136, 141.  The

23  Court heard oral argument on May 20, 2011.  For reasons that follow, the motions will be

24  granted in part and denied in part.

25  **I.    Background.**

26       The Bureau of Land Management ("BLM") administers public lands within a five-

27  million-acre area in the northwestern corner of Arizona known as the "Arizona Strip."

28

1   These public lands are located between the Colorado River and the Utah line, in

2   Coconino and Mohave Counties.  The Arizona Strip offers a host of recreational activities

3   for the public.  It is also rich in cultural and natural resources, and has been mined for

4   copper, silver, and uranium.

5       The Arizona 1 mine is located within the Arizona Strip about 35 miles south of

6   Fredonia, Arizona, and 6 miles north of the Grand Canyon.  The mine occupies 19 acres

7   of surface land and extracts uranium ore from a shaft more than 1,000 feet deep into a

8   breccia pipe – an underground formation that contains uranium ore.  Ore is brought to the

9   surface and transported by truck to a mill near Blanding, Utah.

10      Arizona 1 originally was owned by Energy Fuels Nuclear, Inc.  In 1984, BLM

11  approved Energy Fuels' plan to explore for uranium at the site.  In early 1988, Energy

12  Fuels submitted a plan of operations to develop the mine and extract ore.    BLM

13  performed an environmental assessment, found the mine would have no significant

14  environmental impact, and approved the plan of operations in a decision dated May 9,

15  1988.  Energy Fuels constructed the mine, but ceased operations in 1992 when uranium

16  prices fell.  Denison Arizona Strip, LLC and Denison Mines (USA) Corp. (collectively,

17  "Denison") purchased the mine in 2007 and resumed operations two years later.

18      This action was brought in November 2009 against BLM and the Secretary of the

19  Interior by three environmental groups:  the Center for Biological Diversity, the Grand

20  Canyon Trust, and the Sierra Club.  Doc. 1.  Two Indian tribes whose reservations are

21  located at or near the Grand Canyon – the Kaibab Band of Paiute Indians and the

22  Havasupai Tribe – have joined as Plaintiffs.  Docs. 17, 68.  Denison has intervened as a

23  Defendant.   Docs. 19, 31.   The Court denied Plaintiffs' motion for a preliminary

24  injunction (Docs. 36, 71), a decision recently affirmed on appeal.  *See Ctr. for Biological*

25  *Diversity v. Salazar*, No. 10-16513, 2011 WL 1742998 (9th Cir. May 6, 2011).

26      Plaintiffs seek declaratory and injunctive relief under the Administrative

27  Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  The third amended complaint asserts five

28

claims for relief. Doc. 126. First, Plaintiffs claim that the plan of operations approved by BLM in 1988 became ineffective when operations at Arizona 1 ceased in 1992, and that BLM violated the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785, the General Mining Law of 1872, 30 U.S.C. §§ 21-54, and the implementing regulations for those statutes when it allowed operation of the mine to resume in 2009 without a new plan of operations. *Id.* ¶¶ 57-62. Second, Plaintiffs claim that if the 1988 plan of operations is effective, then BLM violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370g, by failing to supplement the environmental analysis performed in 1988. *Id.* ¶¶ 63-68. Third, Plaintiffs claim that BLM is in violation of the FLPMA by failing to prevent unnecessary and undue degradation of public lands. *Id.* ¶¶ 69-72. Fourth, Plaintiffs claim that BLM violated NEPA by providing Mohave County with a free use permit to excavate gravel without performing adequate NEPA analysis. *Id.* ¶¶ 73-82. Finally, Plaintiffs claim that BLM erroneously failed to perform required NEPA analysis before approving an updated reclamation bond for Arizona 1. *Id.* ¶¶ 83-88.[1]

## II.   Standard and Scope of Review Under the APA.

The APA allows a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A claim to compel action may proceed under the APA "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original); *see Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).

The APA does not allow a court to overturn an agency action simply because the court disagrees with the action. *See River Runners for Wilderness v. Martin*, 593 F.3d

---

[1] Citations to the administrative record will be to the "AR" number at the bottom of each record. Citations to pages in the parties' briefs and other filings in the Court's electronic docket will be to page numbers applied to the top of each page by the electronic docket system, not to page numbers at the bottom of each page.

1064, 1070 (9th Cir. 2010).  A court may set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotes and citation omitted).

In addition to these substantive limitations, review under the APA generally is restricted to the administrative record.  *See* 5 U.S.C. 706(2); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001).  The Court may consider materials outside of the administrative record only in limited circumstances, none of which exists in this case.  *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006).  The Court's decision therefore is limited to the administrative record supplied by the parties.  *See* Docs. 61, 129.[2]

**III.    Claims One and Three.**

The Arizona 1 mine is subject to regulations issued by BLM under the FLPMA, 43 U.S.C. §§ 3809.01 et seq. (the "3809 regulations").  These regulations require mine owners to prepare a plan of operations and obtain BLM approval of the plan before beginning mining operations greater than casual use.  43 U.S.C. § 3809.11(a); *see Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 643 (9th Cir. 2010).  The plan of operations must provide a significant amount of information about the owner's mining plans, including a complete description of the operations, maps of the project area, preliminary designs, a schedule of anticipated periods of temporary closure, plans for monitoring, interim management, and reclamation, and any other information necessary to ensure that the operations will comply with the regulations.  43 U.S.C. § 3809.401.  The plan approval process, depending on the circumstances, may require

---

[2] BLM objects to certain extra-record exhibits submitted in support of Plaintiffs' motion for summary judgment.  Doc. 137 at 19-20.  The Court has not considered those exhibits in ruling on the summary judgment motions.

BLM to review public comments and consult with other agencies and state and tribal officials.  43 C.F.R. § 3809.411.  BLM cannot approve a plan of operations unless BLM complies with NEPA and, as required by the FLPMA, 43 U.S.C. § 1732(b), the plan ensures that the owner will prevent unnecessary and undue degradation while conducting mine operations.   43 C.F.R. §§ 3809.411(a)(3)(ii), 3809.415; *Ctr. for Biological Diversity*, 623 F.3d at 644; *see also Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 34-36 (D.D.C. 2003) (discussing how the 3809 regulations have established various procedures to prevent unnecessary and undue degradation, including the "prudent operator" standard utilized by the regulations).

As noted above, BLM approved a plan of operations for Arizona 1 in 1988.  That approval has never been challenged.  Denison restarted the mine in 2009 under the 1988 plan.

Plaintiffs contend that the closure of Arizona 1 in 1992 rendered the 1988 plan of operations "ineffective" under § 3809.423 of the regulations, and that BLM therefore was required to approve a new plan before operation of the mine could resume.  Plaintiffs assert in claim one that BLM's approval of the renewed operation violated § 3809.11's requirement that mining operations begin only under an approved plan of operations.  Doc. 126 ¶¶ 61-62.  Plaintiffs assert in claim three that BLM has failed to comply with its duty under the FLPMA and the regulations to ensure that the mine does not cause unnecessary and undue degradation of public lands, *see* 43 U.S.C. § 1732(b), 43 C.F.R. § 3809.01.  *Id.* ¶¶ 69-72.[3]

In seeking summary judgment on claims one and three, Plaintiffs essentially reassert the arguments made in their preliminary injunction briefing.  Docs. 37 at 16-19,

---

[3] Claim three specifically alleges that BLM has allowed Arizona 1 to operate without an air permit for radon emissions (*id.* ¶ 71), but Plaintiffs do not seek summary judgment on this alleged violation of the Clean Air Act.  Plaintiffs instead seek summary judgment on claim three for the same reason as claim one:  that BLM has violated the FLPMA and its regulations by allowing operation of Arizona 1 to resume without approval of a new plan of operations.  Doc. 131 at 9, 12-20.

66 at 12-18.   The Court previously rejected those arguments, finding that BLM's interpretation of the 3809 regulations  is largely consistent with the language and intent of the regulations as a whole.   Doc. 71 at 3-8.   For the reasons that follow, the Court finds no basis to deviate from that conclusion.

Plaintiffs' argument that operations at Arizona 1 could not resume without BLM approving a new plan of operations is based primarily on § 3809.423 of the regulations. That section reads as follows:

**How long does my plan of operations remain in effect?**

Your plan of operations remains in effect as long as you are conducting operations, unless BLM suspends or revokes your plan of operations for failure to comply with this subpart.

43 C.F.R. § 3809.423 (bold type in original).   Plaintiffs rely on the language of this regulation to argue that when a mine owner stops "conducting operations," the plan of operations no longer is "in effect."   If the plan no longer is in effect, they assert, then a new plan must be approved before mining operations resume because the regulations clearly require an effective plan of operations for mining to occur.[4]

Plaintiffs' argument appears persuasive when one focuses solely on § 3809.423, but the Court must examine the regulations as a whole.   *Alaska Trojan Partnership v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. 2005).   Considered as a whole, the regulations clearly suggest that a plan of operations does not become ineffective when mine operations cease temporarily.   To the contrary, the regulations specifically anticipate interruptions in mining operations – they *require* that each plan of operations include an "interim management plan" to govern "periods of temporary closure."   43 C.F.R.

---

[4] Plaintiffs cite to the definition of "operations" in 43 C.F.R. § 3809.5 to argue that active mining operations are required for a plan to remain in effect under § 3809.423. BLM asserts a more narrow interpretation of "operations," noting that the definition includes the mere presence of facilities at a mine site.   The Court need not decide between the parties' competing interpretations of "operations" because BLM does not dispute that Arizona 1 was in a period of "non-operation" from the time it closed in 1992 until Denison restarted the mine in 2009.   Doc. 128 ¶ 2.

§ 3809.401(b)(5); *see also* 65 Fed. Reg. at 70055.  Requiring a plan to address periods of temporary closure would, of course, be wholly unnecessary if the plan became permanently ineffective upon the first temporary closure as Plaintiffs claim.

Indeed, as if to anticipate the precise issue raised in this case, § 3809.424 asks the following question:  "What are my obligations if I stop conducting operations?"  Significantly, the regulation's response to this question does not state that the plan of operations becomes ineffective and that a new plan must be approved before mining operations resume.  The section instead explains that a mine operator who "stop[s] conducting operations" must follow the "approved interim management plan" that is part of the plan of operations.  § 3809.424(a)(1).  The section also explains that if mine operations remain inactive for five consecutive years, "BLM will review [the] operations and determine whether BLM should terminate [the] plan of operations and direct final reclamation and closure."  *Id*. at § 3809.424(a)(3).  Such termination would be wholly unnecessary if the plan of operations had already become ineffective as Plaintiffs claim.

The obvious import of these provisions is that a plan of operations remains effective for periods of operation before and after temporary closures, with such closures being governed by the interim management portion of the plan unless BLM elects to terminate the plan after five years of inactivity.  Plaintiffs seek to refute this interpretation by arguing that there is a difference between a plan being "ineffective" under § 3809.423 and a plan being "terminated" under § 3809.424.  According to Plaintiffs, §§ 3809.423 and 3809.424 reflect a step-down process:  (1) the plan of operations remains in effect while the mine is actively operated, (2) the plan automatically terminates when operations cease, except for the interim management portion of the plan which continues to be effective, (3) BLM may terminate the interim management portion of the plan, close the mine, and direct reclamation if inactivity continues for five consecutive years, and (4) any resumption of activity after step (2) requires approval of a new plan.

Plaintiffs' reading of the regulations has several flaws.    First and most

significantly, the regulations do not say what Plaintiffs claim they say.  Section 3809.424 explains in some detail what a mine owner must do when it "stop[s] conducting operations," but nowhere does it provide that a new plan of operations must be approved before operations resume.   To the contrary, the regulations make clear that a mine owner must submit a plan of operations only at the outset of the project, "before *beginning* operations greater than casual use," § 3809.11(a), and that the owner must not actually "*begin* operations until BLM approves [the] plan," § 3809.412 (emphases added). Second, § 3809.431 identifies several circumstances requiring a mine owner to modify its plan of operations, but resuming operations after a temporary closure is not one of them. Third, the regulations include detailed definitions in § 3809.5, and yet never draw Plaintiffs' distinction between "ineffective" and "terminate."  If BLM had intended to establish the step-down approach Plaintiffs suggest, it could have done so clearly. Fourth, the regulations do not distinguish between the plan and its interim management plan.  They require a single plan of operations with an interim management portion.  *See* 40 C.F.R. § 3809.401. Fifth, Plaintiffs' key provision, § 3809.423, refers to "your plan of operations."   If that section has the effect of rendering a plan ineffective as Plaintiffs contend, then by its terms the entire plan becomes ineffective.  Plaintiffs' gloss – that the interim management portion of the plan remains effective with all other portions rendered permanently ineffective – does not appear in the language of the regulation.

BLM argues that a plan of operations remains effective throughout the life of the project, with the plan covering periods of operation and the interim management plan covering periods of temporary closure.  The Court finds this interpretation to be more consistent with the language of the regulations as a whole.  As noted, there simply is no requirement in the regulations that a new plan of operations be approved after a temporary closure.  To the contrary, the regulations specifically provide for the plan to cover "periods of temporary closure." 43 C.F.R. §§ 3809.401(b)(5), 3809.424(a)(1).

BLM's interpretation also comports with the original intent of the regulations.

When BLM promulgated the 3809 regulations it recognized that "an approved plan of operations has financial value" and, as in this case, may be "transferred to another owner or operator as part of a total mining package."  65 Fed. Reg. 69998-1, 70054 (Nov. 21, 2000).  BLM further recognized that mining activities may need to be discontinued when commodity prices are not high enough to make the operation profitable, and that the frequency "or length of these 'down times'" cannot be determined in advance.  *Id.* at 70053.  Given the acknowledged intermittent nature of mining activities and the financial value of an approved plan of operations, BLM clearly did not intend for a plan automatically to terminate upon a temporary interruption of mining activities.  Indeed, in adopting § 3809.423 as originally proposed, BLM declined to issue plan of operation approvals "with limited periods of effectiveness," concluding instead that the plan of operations should be "good for the life of the project[.]"  65 Fed. Reg. at 70053.  BLM also explained that § 3809.424 was adopted to "define conditions of temporary closure, and define conditions under which temporary closure becomes permanent and all reclamation and closure requirements must be completed."  *Id.* at 70054.  This comment, like the final regulations, distinguishes between temporary closures and permanent closures and does not suggest that the first temporary closure causes a permanent termination of the plan.  On the contrary, the regulations specifically provide for the plan of operations to cover periods of temporary closure, and BLM's lengthy discussions of §§ 3809.423 and 3809.424 never suggests that a mine operator must create a new plan before restarting a mine after temporary closure.  *Id.* at 70053-57.

The language and intent of the regulations thus plainly support BLM's application of the regulations in this case.  But this is not the only reason to accept BLM's interpretation.  The Supreme Court has explained that an agency's interpretation of its own regulations "is controlling unless plainly erroneous or inconsistent with the regulation[s]."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citations and quotation marks omitted).  For reasons explained above, BLM's interpretation of the mining regulations is

- 9 -

not plainly erroneous or inconsistent with the regulations.  BLM's interpretation therefore controls.  *Id.*; *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (courts lack authority to "decide which among several competing interpretations [of an agency's own regulations] best serves the regulatory purpose"); *Sierra Pac. Power Co. v. EPA*, 647 F.2d 60, 65 (9th Cir. 1981) ("We have held that [an agency's] interpretation of its regulations is entitled to great deference[.]"); *Balvage v. Ryderwood Improvement & Serv. Ass'n, Inc.*, --- F.3d ----, 2011 WL 1570377, at *7 (9th Cir. Apr. 27, 2011) ("'The agency is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in force.'") (citation and brackets omitted).[5]

Plaintiffs make several additional arguments the Court will address.

Plaintiffs argue that the Court's interpretation renders § 3809.423 meaningless. The Court does not agree.  That section provides that the "plan of operations remains in effect *as long as* you are conducting operations."  (Emphasis added.)  Common dictionary definitions of the phrase "as long as" include "provided that" and "during the whole time that."  *See* Merriam-Webster, http://www.merriam-webster.com; Oxford Dictionaries Online, http://www.oxforddictionaries.com (last visited May 23, 2011). Using these definitions, § 3809.423 provides that a plan of operations remains in effect "provided that you are conducting operations" or "during the whole time that you are conducting operations."  These meanings would include operations before and after temporary closures.  Thus, § 3809.423 reasonably can be read to mean that the plan of operations is effective whenever operations are being conducted at a mine, with § 3809.424 specifying what occurs when the mine is not being operated.  So interpreted,

---

[5] Plaintiffs argue that deference to an agency's interpretation is appropriate only when regulations are ambiguous.  The Court concludes that §§ 3809.423 and 3809.424 are somewhat ambiguous as evidenced by the parties' vigorous disagreement over their meaning.  Although these provisions are ambiguous, the regulations as a whole and their intent as explained in the Federal Register clearly support BLM's interpretation.  The Court could not conclude that the regulations unambiguously convey Plaintiffs' meaning, nor that BLM's interpretation is plainly erroneous or inconsistent with the regulations. *Auer*, 519 U.S. at 461.

§§ 3809.423 and 3809.424 both have meaning and the Court's interpretation does not render § 3809.423 meaningless as Plaintiffs contend. *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) (applying the "cardinal principle of statutory construction" to "give effect, if possible, to every clause and word of a statute") (quotation marks and citations omitted).

Plaintiffs argue that BLM's interpretation of the regulations is entitled to no deference because it was developed for the first time in this litigation. Plaintiffs base this argument on the fact that the administrative record contains no express consideration of whether the 1988 plan remained effective. Doc. 157 at 11. But such consideration would not be necessary if BLM always viewed plans of operations as remaining in effect before and after periods of temporary closure. "There is simply no reason to suspect that [BLM's] interpretation does not reflect the agency's fair and considered judgment on the matter," *Auer*, 519 U.S. at 462, and "its litigation position" therefore "is entitled to deference." *Balvage*, 2011 WL 1570377, at *7 (citation omitted); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 942 (9th Cir. 2006) (agency's reasonable interpretation of its regulations entitled to deference where it had never interpreted the regulations to impose the duty alleged by the plaintiffs and the interpretation was not merely an "expedient" litigation position).

Plaintiffs argue that BLM never performed the five-year review of the plan required by § 3809.424(a)(3), but that is not the agency action Plaintiffs are suing to enforce. They are not claiming in this case that BLM should conduct a five-year review. Instead, Plaintiffs claim that BLM had an affirmative duty to approve a new plan of operations. Doc. 126 ¶ 62. For reasons stated above, the Court does not agree.

In summary, the Court concludes that BLM's decision to allow Denison to resume operations at Arizona 1 under the 1988 plan of operations was based on a permissible interpretation of the regulations. Plaintiffs have not shown BLM's decision to be arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). Nor have Plaintiffs shown that BLM has a mandatory duty to

require Denison to obtain approval of a new plan of operations to prevent unnecessary and undue degradation of public lands.  *See* 5 U.S.C. § 706(1).  The Court will grant summary judgment on claims one and three in favor of Defendants.

**IV.   Claim Two.**

Plaintiffs allege in claim two that BLM violated NEPA by failing to supplement the environmental analysis performed in 1988.  "NEPA is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007) (citation omitted).  NEPA requires federal agencies to perform environmental analysis before taking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The Council on Environmental Quality has issued regulations implementing the relevant NEPA procedures, 40 C.F.R. §§ 1500.1 et seq. (the "CEQ regulations").  An environmental assessment ("EA") is used to provide sufficient evidence and analysis for determining whether to make a finding of no significant impact or to prepare a more detailed environmental impact statement ("EIS").  40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.11.  An agency has an obligation to supplement an EA or an EIS where there remains major federal action to occur and there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii); *see Price Road Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509-10 (9th Cir. 1997) (the standard for supplementing an EA is the same as for an EIS).

When BLM received the proposed plan of operations for the Arizona 1 mine in early 1988, BLM complied with NEPA.  It prepared an EA and, based on a finding of no significant environmental impact, took the "major federal action" of approving the plan operations on May 9, 1988.  *See* 40 C.F.R. § 1508.18(b)(4); 43 C.F.R. § 3809.411(a)(1),

(d)(1). In the absence of new major federal action, no supplemental NEPA analysis is required. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1312-13 (9th Cir. 1988); *N. County Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 749 (9th Cir. 2009). Indeed, "the most important threshold question is whether the action falls within NEPA in the first place." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071, 1099 (N.D. Cal. 2005). If there is no new major federal action, "that is the end of the inquiry; the agency need not prepare [NEPA analysis]." *Id.*

Plaintiffs allege that by requiring Denison to update the reclamation bond and secure a clean air permit before resuming operations in 2009, BLM took major federal action triggering the need for supplemental NEPA analysis. Doc. 126 ¶ 66.[6] As previously explained in the Court's preliminary injunction ruling (Doc. 71 at 8-13), however, those actions on the part of BLM were monitoring activities – actions taken to ensure the mine's continuing compliance with BLM regulations and applicable state and federal environmental laws. Plaintiffs have failed to show that those monitoring activities are major federal actions within the scope of NEPA or its regulations.

This Circuit has made clear that "BLM's obligation to monitor compliance with statutory and regulatory requirements to deter undue degradation is insufficient" to constitute major federal action. *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir. 1988); *see* 40 C.F.R. § 1508.18(a) (major federal actions "do not include bringing judicial or administrative civil or criminal enforcement actions"). "Because the [plan of operations] has been approved and issued, [BLM's] obligation under NEPA has been

---

[6] Plaintiffs assert in their summary judgment motion that the issuance of a free use permit for removing road-repair gravel from Robinson Wash was "an additional BLM approval action that was necessary to mine at Arizona 1." Doc. 131 at 30. All parties agree that issuance of the permit was a major federal action, and BLM sought to comply with NEPA as discussed later in this order. But Plaintiffs have not shown that issuance of the permit was a major federal action *at the mine*, requiring BLM to supplement the 1988 EA for the mine. The permit was issued to Mohave County (not Denison), for excavation of gravel (not uranium), in Robinson Wash (not the 19 acres occupied by the Arizona 1 mine). *See* Doc. 134 at 26-29. The propriety of BLM's finding that the free use permit qualified for a "categorical exclusion" under NEPA is the subject of claim four (Doc. 126 ¶¶ 73-82) and not material to claim two (*see id.* ¶¶ 63-68).

1    fulfilled," *Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004), and "there is no

2    ongoing 'major Federal action' that could require supplementation" of the 1988 EA,

3    *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 73 (2004).

4         Plaintiffs assert that in this case, unlike in *SUWA* and *Cold Mountain*, new

5    approvals by BLM were required before mining operations at Arizona 1 could resume.

6    But as explained in the preceding section, the mining regulations do not require approval

7    of a new plan of operations before mining can resume.  The original plan approved in

8    1988, which has never been modified, continues to control.  BLM's approval of that plan

9    was the "major federal action" contemplated by NEPA.  42 U.S.C. § 4332(C); *see* 40

10   C.F.R. § 1508.18(b)(4); 43 C.F.R. § 3809.411(a)(1), (d)(1).  BLM's ongoing role of

11   overseeing Arizona 1's compliance with environmental and mining laws is not a major

12   federal action requiring NEPA analysis.  *SUWA*, 542 U.S. at 73; *Cold Mountain*, 375

13   F.3d at 894.  In short, because BLM "took the necessary 'hard look' at the environmental

14   consequences of [Arizona 1], its [NEPA] 'review is at an end.'"  *Protect Lake Pleasant,*

15   *LLC v. Connor*, No. CIV 07-0454-PHX-RCB, 2010 WL 5638735, at *58 (D. Ariz. July

16   30, 2010) (citation omitted); *see Wyoming v. U.S. Dep't of Interior*, 360 F. Supp. 2d

17   1214, 1238 (D. Wyo. 2005) (following *SUWA* and concluding that "once the [wolf]

18   reintroduction plan went into effect the need for [NEPA] supplementation was at an

19   end"); *see Envtl. Protection Info. Ctr. v. U.S. Fish & Wildlife Serv.*, No. C 04-4647 CRB,

20   2005 WL 3877605, at *2 (N.D. Cal. Apr. 22, 2005) ("In 1999 the government issued

21   Pacific Lumber its incidental take permit.  There is no other ongoing major federal

22   action; accordingly NEPA does not apply.").

23        Plaintiffs assert that *Penfold* is inapposite because it involved BLM's limited

24   review of notice-level mining for which BLM approval is not required.  Doc. 131 at 25.

25   But regardless of whether mining operations are notice-level or plan-level, the same

26   detailed performance standards apply, 43 C.F.R. § 3809.420, and BLM has an obligation

27   to ensure compliance with all pertinent federal and state laws and otherwise to prevent

28

unnecessary or undue degradation of public lands, 43 C.F.R. § 3809.421.  *Penfold* found that BLM's review of notice-level mining did not amount to major federal action triggering NEPA review even after observing that (1) BLM had promulgated the regulations governing notice mining, (2) BLM's involvement in reviewing the notices was extensive, (3) BLM had conducted compliance inspections of the mine, and (4) BLM had issued letters indicating that the mining was "approved."  857 F.2d at 1314.  Having acknowledged "NEPA's broad mandate obligating compliance to the fullest extent possible and the [FLPMA's] charge to take any action necessary to prevent unnecessary or undue degradation," *Penfold* specifically held that "[n]either BLM's approval process nor regulatory involvement is sufficient to trigger NEPA."  *Id.*  Thus, although *Penfold* concerns notice-level mining, the Court finds *Penfold* "sufficiently analogous" to control this case.  *Karuk Tribe of Cal.*, 379 F. Supp. 2d at 1100.  Other courts have held that monitoring and enforcement activities do not constitute major federal actions under NEPA.  *See Envtl. Protection Info. Ctr.*, 2005 WL 3877605, at *2 (agency took no major federal action by imposing sanctions for violations of environmental laws and an incidental take permit); *Tucson Rod & Gun Club v. McGee*, 25 F. Supp. 2d 1025, 1029 (D. Ariz. 1998) (agency's temporary suspension of a special use permit was not a major federal action).

Plaintiffs' reliance on *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), is misplaced.  NEPA supplementation was necessary in *Marsh* because the major federal action – construction of dams by the Army Corps of Engineers – had not been completed.  490 U.S. at 367, 373.  The major federal action in this case – approval of the plan of operations – was completed in 1988.  *See SUWA*, 542 U.S. at 73; *Cold Mountain*, 375 F.3d at 894.  The fact that BLM continues to monitor the Arizona 1 mine to ensure compliance with relevant laws does not require NEPA supplementation.  *See SUWA*, 542 U.S. at 68 (noting that BLM monitored off-road vehicle use in connection with its approved land use plan); *Cold Mountain*, 375 F.3d at 889 (noting that the Forest Service

1    had investigated alleged bison hazing violations in connection with the approved special

2    use permit).

3         Plaintiffs' reliance on *Sierra Club v. Bosworth*, 465 F. Supp. 2d 931 (N.D. Cal.

4    2006), is also misplaced.  The district court in *Bosworth* found ongoing federal major

5    action under *Marsh* because "final approval of the [logging] project had yet to be

6    executed at the time the Forest Service awarded the contract and completed its initial

7    NEPA reviews."  465 F. Supp. 2d at 939.  In this case, only the plan of operations needed

8    approval before mining activities could begin.  43 C.F.R. §§ 3809.11(a), 3809.412.  BLM

9    approved the plan in 1988 and has taken no further major federal action in connection

10   with the mine.

11        Because BLM has taken no new major federal action in connection with the

12   Arizona 1 mine, BLM was not required to supplement the 1988 EA.  *See Penfold*, 857

13   F.2d at 1312-13; *N. County Cmty. Alliance*, 573 F.3d at 749.  To require supplementation

14   merely because significant new circumstances and information have arisen "would task

15   [BLM] with a sisyphean feat of forever starting over in [its] environmental

16   evaluations[.]"  *Price Road Neighborhood Ass'n*, 113 F.3d at 1510.  Plaintiffs have

17   demonstrated no triable issue as to whether BLM has "unlawfully withheld or

18   unreasonably delayed" agency action.  5 U.S.C. § 706(1); *SUWA*, 542 U.S. at 64; *see also*

19   *W. Watersheds Project v. Salazar*, --- F. Supp. 2d ----, 2011 WL 499275, at *10 (D.

20   Mont. Feb. 14, 2011) (when an agency "determines that supplemental NEPA

21   documentation is not required, a court 'must defer to that informed decision'") (citing

22   *Price Road Neighborhood Ass'n*, 113 F.3d at 1509-12).  The Court will grant summary

23   judgment on claim two in favor of Defendants.

24   **V.    Claim Four.**

25        In early 2008, Mohave County applied for a free use permit to excavate gravel

26   from a five-acre borrow pit for road maintenance purposes.  Doc. 134 at 26.  The

27   proposed excavation site is part of Robinson Wash located in the Arizona Strip.  The site

28

historically has been excavated by BLM and others to maintain roads.

BLM performed an environmental review of the proposed action and, in a NEPA document dated April 24, 2008 (Doc. 134 at 90-95), determined that the excavation was "categorically excluded" from further NEPA analysis because it was limited to a five-acre area and no more than 50,000 cubic yards of gravel (*id.* at 92). BLM further determined that the categorical exclusion was appropriate because there were "no extraordinary circumstances potentially having effects that may significantly affect the environment." *Id.* at 93. The application was approved on June 24, 2008. *Id.* at 26. Gravel removed from Robinson Wash has been used by Denison – under a contract with Mohave County – to maintain Mt. Trumbull Road, the main access route to the Arizona 1 mine. Claim four asserts that BLM violated NEPA by issuing the free use permit under a categorical exclusion without preparing an EA or an EIS. Doc. 126 ¶ 82.

### A.     Standing.

Denison argues that Plaintiffs lack standing to bring claim four. To sue in federal court, a plaintiff must have standing under Article III of the United States Constitution, that is, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

To satisfy the injury requirement of standing, a plaintiff asserting a procedural injury, including the alleged failure to comply with NEPA, must show that the procedures "are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003) (quotation marks and citations omitted). Denison argues that Plaintiffs lack standing to challenge the issuance of the free use permit to the extent Plaintiffs' claimed "concrete interests" stem not from the actual removal of gravel from Robinson Wash, but instead from impacts of Denison's use of that gravel to maintain Mt. Trumbull

Road.  Plaintiffs, however, also allege injury directly traceable to excavation activities.

Taylor McKinnon, a member and employee of Plaintiff Center for Biological Diversity, has testified that he visited Robinson Canyon in April 2011, that he intended to hike and photograph the canyon, but that due to excavation activities in the wash area, "the scenic and fragile desert at the bottom of Robinson Canyon had been turned into an industrial zone and an eyesore."  Doc. 149-3 ¶ 3.  McKinnon claims that BLM's issuance of the free use permit "injures [his] recreational and aesthetic interests in the Arizona Strip area because it allowed Denison to excavate the wash in the bottom of Robinson Canyon."  *Id.*  Denison asserts that because standing must exist at the time suit is filed, McKinnon's trip to Robinson Canyon in April 2011 is too late to establish standing.  But McKinnon avows that he has taken many prior trips to the Arizona Strip, including to "lands in and around Robinson Canyon."  *Id.* ¶ 2; *see* Doc. 130-5 at 2-10.

McKinnon's declaration presents sufficient evidence of genuine injury fairly traceable to issuance of the free use permit.  The first two requirements of standing are therefore met.  The redressability requirement also is met because if the Court rules in favor of Plaintiffs on the merits of claim four, that is, that BLM erroneously issued the free use permit under a categorical exclusion, and if on remand BLM performs further NEPA analysis and concludes that the free use permit should not have issued and reclamation of Robinson Wash is required, then the Court's ruling would redress the claimed injury.  In short, the Court finds that McKinnon has standing to bring claim four.  *See W. Watersheds Project*, 632 F.3d at 482-83 (an organization has standing to bring suit on behalf of its members where a member would have standing to sue in his own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires participation of the member in the suit).

Given this conclusion, the Court need not address the standing of other Plaintiffs.  "The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of

the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993); *see W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 484 n.7 (9th Cir. 2011).

**B.    Merits.**

In order to satisfy the requisite "hard look" at environmental consequences under NEPA, 42 U.S.C. § 4332(2)(C), agencies generally prepare an EA or EIS before taking major federal action. *See* 40 C.F.R. §§ 1501.3, 1501.4.  In some cases, however, neither an EA nor an EIS is required.  The CEQ regulations "authorize an agency to use a 'categorical exclusion' for 'a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations.'"  *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 927 (9th Cir. 2000) (quoting 40 C.F.R. § 1508.4).  "The definition of 'categorical exclusion' also contains a mandate that an agency make allowances for 'extraordinary circumstances in which a normally excluded action may have a significant environmental effect.'"  *California v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012-13 (9th Cir. 2009) (quoting 40 C.F.R. § 1508.4).  "When an action falls within a categorical exclusion and an agency reasonably determines that there are no extraordinary circumstances, further documentation under [NEPA] is unnecessary."  *Id.* at 1013; *see Sierra Club v. Bosworth*, 510 F.3d 1016, 1018-19 (9th Cir. 2007); *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 853-54 (9th Cir. 1999).

Pursuant to the CEQ regulations, 40 C.F.R. § 1507.3(b)(1)(ii), BLM has determined that excavation of gravel "in amounts not exceeding 50,000 cubic yards or disturbing more than 5 acres, except in riparian areas," is entitled to a categorical exclusion under NEPA.  Doc. 132 at 90.  This categorical exclusion is set forth in BLM's NEPA Handbook.  *Id.* (App. 4, § F(10)).  Plaintiffs do not challenge the categorical exclusion itself, but instead argue that BLM erroneously applied the exclusion to the free use permit.  "An agency's determination that a particular action falls within one of its

categorical exclusions is reviewed under the [APA's] arbitrary and capricious standard." *Alaska Ctr.*, 189 F.3d at 857; *see Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir. 1996); 5 U.S.C. § 706(2)(a).

Section 1508.25 of the CEQ regulations identifies three types of actions (in addition to the underlying major federal action) to be considered in determining the scope of an EIS:  connected actions, cumulative actions, and similar actions.  40 C.F.R. § 1508.25(a).   The section also requires consideration of direct, indirect, and cumulative impacts.  40 C.F.R. § 1508.25(c).  Plaintiffs contend that BLM erroneously failed to consider the connected actions, indirect impacts, and cumulative impacts of the free use permit as required by § 1508.25.  That section of the regulations governs not what must be considered in applying a categorical exclusion, but what must be considered in preparing an EIS.  This Circuit has made clear that "where an agency action falls under a categorical exclusion, it need not comply with the requirements for preparation of an EIS."  *Wong v. Bush*, 542 F.3d 732, 737 (9th Cir. 2008) (the Coast Guard was not required to consider the "no action" alternative for an EIS when establishing a security zone pursuant to a categorical exclusion).

Plaintiffs assert that *Wong* is limited to the "no action" alternative required by § 1502.14, and has no application to the other requirements for an EIS set forth in § 1508.25.  Doc. 157 at 37-38 n.22.  The CEQ regulations require agencies to reduce excessive paper work by, among other things, using categorical exclusions for actions that have no significant effect on the environment and "which are therefore exempt from the requirements to prepare an [EIS]"  40 C.F.R. § 1500.4(p).  Consistent with the goal to reduce paperwork, *Wong* makes clear that an agency "need not comply with the requirements for preparation of an EIS" when applying a categorical exclusion.  542 F.3d at 737.  The Court does not read *Wong* as being limited to an agency's consideration of the "no action" alternative required by § 1502.14.  *See Sequoia Forestkeeper v. U.S. Forest Serv.*, No. CV F 09-392 LJO JLT, 2010 WL 5059621, at *17 (E.D. Cal. Dec. 3,

2010) ("the cumulative effects analysis required by an [EIS] need not be performed" where the agency applies a categorical exclusion).  Nor does the Court read *Wong* as requiring BLM to consider the "secondary environmental effects" of the free use permit given that the issuance of the permit and the approval of 1988 plan of operations for Arizona 1 "are not so intertwined as to constitute one federal action[.]"  *Wong*, 542 F.3d at 737; *see also Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1116 (9th Cir. 2000) (an agency may not limit its NEPA review to the effects of the proposed federal action where that action and non-federal activity "are sufficiently interrelated to constitute a single 'federal action' for NEPA purposes") (quotation marks and citation omitted).

Plaintiffs cite several cases for the proposition that NEPA's requirements are not limited to an EIS.  Doc. 157 at 36-37.  The cases addressing the requirements for EAs, as opposed to categorical exclusions, are unhelpful.  *See S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983); *Price Road Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509-10 (9th Cir. 1997); *Kern v. U.S. Bur. of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002).  To the extent *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 16 (D.D.C. 2009), stands for the proposition that an agency must always consider all foreseeable direct, indirect, and cumulative impacts before applying an established categorical exclusion, even in the absence of extraordinary circumstances, the Court finds the case inconsistent with the purpose of a categorical exclusion.  *See* 40 C.F.R. § 1500.4(p); *Wong*, 542 F.3d at 737.

Plaintiffs' reliance on *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1988), is also misplaced.  While an agency's consideration of alternative actions may be required even absent an EIS, that duty is triggered only where the proposed federal action involves "unresolved conflicts as to the proper use of resources[.]"  *Bob Marshall Alliance*, 852 F.2d at 1229; *see* 42 U.S.C. § 4332(2)(E).  Plaintiffs identify no such conflict with the free use permit.

Where, as in this case, a proposed action fits within a categorical exclusion, further "NEPA review is not required unless there are 'extraordinary circumstances' related to the proposed action." *Alaska Ctr.*, 189 F.3d at 858; *see Sequoia Forestkeeper*, 2010 WL 5059621, at *17; *Los Padres Forestwatch v. U.S. Forest Serv.*, --- F. Supp. 2d ----, 2011 WL 835797, at *2 (N.D. Cal. Mar. 2011).  One such circumstance identified in BLM's NEPA Handbook is where the proposed action has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental impacts." Doc. 132 at 93 (App. 5, § 2.6); *see also* 40 C.F.R. § 1508.27(b)(7); *Alaska Ctr.*, 189 F.3d at 859 (noting that in determining whether an action will significantly affect the environment, the CEQ regulations require the agency to consider "whether the action is related to other action which has individually insignificant, but cumulatively significant impacts"); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (same).

Contrary to BLM's assertion (Doc. 137 at 45), Plaintiffs do not rely solely on the CEQ regulations governing the preparation of an EIS in support of their "cumulative impacts" argument.  Plaintiffs explicitly note that BLM's NEPA Handbook lists "cumulative impacts" as an extraordinary circumstance that may relate to a proposed action.  Docs. 131 at 47 n.23, 157 at 42.  In determining whether the free use permit qualified for a categorical exclusion, Plaintiffs assert, BLM was required to consider not only the impact of the proposed excavation activities in Robinson Wash, but also the cumulative impacts of those activities and the maintenance of Mt. Trumbull Road, Arizona 1 mining operations, and operations at Denison's other mines within the Arizona Strip.  Plaintiffs argue that BLM's failure to provide a reasoned basis for its finding of no significant cumulative impacts (Doc. 134 at 94) renders its decision to issue the free use permit arbitrary and capricious.  The Court agrees.

Pursuant to the free use permit, Denison has excavated roughly 20,000 cubic yards of gravel from Robinson Wash and has used that gravel to maintain Mt. Trumbull Road.

1  Docs. 135, 140, 144 ¶¶ 15.  A passable Mt. Trumbull Road is an "absolute necessity" to

2  the operation of Arizona 1 given that it is the main access road to the mine and Denison's

3  employees and ore trucks use the road daily.  Doc. 132 at 144-45.  Because Denison's

4  road maintenance and mining activities have a direct relationship to the excavation of

5  gravel under the free use permit, Plaintiffs assert, BLM was required to consider and

6  discuss the cumulative effects of those activities before issuing the free use permit.

7       BLM found in its NEPA document that the proposed excavation activities had no

8  "direct relationship to other actions with individually insignificant, but cumulatively

9  significant environmental effects."  Doc. 134 at 94.  But BLM provided no supporting

10 rationale.  *See id.*  BLM did not discuss the environmental impacts of Denison's road

11 maintenance activities, the operation of Arizona 1 mine, or any other activity that may be

12 related to the excavation of gravel at Robinson Wash.  Instead, BLM made its finding of

13 no significant cumulative impacts with the single word "no" on a "checklist" of potential

14 extraordinary circumstances.  *Id.*

15      This Circuit has made clear that when an agency decides to apply a categorical

16 exclusion and "proceed with an action in the absence of an EA or EIS, that agency must

17 adequately explain its decision."  *Alaska Ctr.*, 189 F.3d at 859.  "'An agency cannot

18 avoid its statutory responsibilities under NEPA merely by asserting that an activity it

19 wishes to pursue will have an insignificant effect on the environment.'"  *Id.* (quoting

20 *Jones v. Gordon*, 792 F.2d 821, 827 (9th Cir. 1986)); *see also* 71 Fed. Reg. 54816-01,

21 54820 (Sept. 19, 2006) (noting that some courts have required documentation showing

22 that the agency has considered extraordinary circumstances and that this requirement

23 facilitates judicial review under the APA).  BLM's unexplained conclusion that the free

24 use permit has no "cumulatively significant" environmental effects is therefore

25 insufficient to support its application of the categorical exclusion.  *See California v. U.S.*

26 *Dep't of Agric.*, 575 F.3d at 1017-18.

27      BLM argues that the categorical exclusion was reviewed by multiple BLM

28

specialists, state game and fish officials, and an environmental coordinator for the Kaibab Paiute tribe; that these professionals considered the potential impacts of the free use permit under the criteria for identifying extraordinary circumstances; and that it was determined that issuance of the free use permit was consistent with the Arizona Strip resource management plan.  Contrary to the law of this Circuit, however, BLM failed to explain its reasons for finding no cumulatively significant impacts (Doc. 134 at 94). *Alaska Ctr.*, 189 F.3d at 859.

The Court recognizes that the APA's arbitrary and capricious standard of review is a "narrow one" and that the Court is "not empowered to substitute [its] judgment for that of the agency." *Sierra Club*, 510 F.3d at 1022 (quotation marks and citations omitted). The Court's inquiry, however, must be "searching and careful." *Id.*  Having carefully reviewed BLM's NEPA document (Doc. 134 at 90-95), and having considered the parties' arguments and the law of this Circuit, the Court finds that BLM erroneously provided no more than a "cursory statement" of no cumulatively significant impacts in applying the categorical exclusion (*id.* at 94).  *California v. U.S. Dep't of Agric.*, 575 F.3d at 1018; *see Sierra Club*, 510 F.3d at 1028 (agency's report found "inadequate as a cumulative impacts analysis because it offer[ed] only conclusory statements that there would be no significant impact"); *California v. Norton*, 311 F.3d at 1178 (agency erroneously failed to "provide a reasoned explanation for its reliance on the categorical exclusion, including an explanation of why the exceptions do not apply").

The Court will remand the free use permit issue to BLM for a more complete explanation of the categorical exclusion determination, and withhold ruling on claim four pending post-remand briefing.[7]

---

[7] This ruling does not require BLM to conduct further NEPA review of the Arizona 1 mine.  As explained above, no new plan of operations need be approved for Arizona 1 and the 1988 EA need not be supplemented.  BLM must, however, in a format consistent with a categorical exclusion, explain its finding of no significant cumulative impact.

1   **VI.     Claim Five.**

2          On February 21, 2008, BLM determined that Denison was required to increase the

3   amount of its reclamation bond for the Arizona 1 mine.  Doc. 133 at 14-16.  As noted

4   above, Plaintiffs assert in claim two that this decision required BLM to supplement the

5   EA performed in 1998 for the mine.  In claim five, Plaintiffs assert that BLM violated

6   NEPA by performing no environmental review before requiring an increase in the bond

7   amount.  Doc. 126 ¶ 88.

8          Defendants contend that Plaintiffs lack standing to bring claim five.  The Court

9   does not agree.  Plaintiffs claim that operation of Arizona 1 significantly harms the

10  surrounding environment and that NEPA required BLM to analyze the environmental

11  effects of the "entire mining operation" before deciding to increase the amount of the

12  bond.  Doc. 131 at 53.  Plaintiffs have demonstrated a concrete interest in the Arizona

13  Strip and areas directly affected by operation of Arizona 1.  *See* Docs. 130-1 through

14  130-5.   Plaintiffs allege that BLM's failure to perform a NEPA analysis has led to

15  environmental harm to public and tribal lands within the Arizona Strip.  A ruling in favor

16  of Plaintiffs on claim five – that BLM is required to perform adequate NEPA analysis –

17  will redress the claimed injury.  The Court therefore finds that Plaintiffs have standing to

18  bring claim five.

19         The Court also agrees with Defendants, however, that claim five fails as a matter

20  of law because BLM's decision to increase the bond amount does not constitute a major

21  federal action requiring NEPA review.  Contrary to Plaintiffs' assertion (Doc. 131 at 51),

22  BLM's bonding decision was not an "approval of a specific project" by permit or

23  regulatory decision.  *See* 40 C.F.R. § 1508.18(b)(4).  The NEPA project approved by

24  BLM was operation of the Arizona 1 mine.  That major federal action was taken more

25  than 20 years ago.  As explained above, the plan approved in 1988 – including the

26  reclamation portion of the plan, *see* 43 C.F.R. § 3809.401(3) – continues to control at the

27  mine.  BLM did not require Denison to submit a new reclamation plan for Arizona 1

28

before resuming operations.  Instead, BLM simply reviewed the cost of implementing the existing reclamation plan and, after "crunching some numbers," determined that the amount of the bond should be increased.  AR2347-48, 2360; *see* 43 C.F.R. § 3809.505 (requiring an updated bond amount where operations are being conducted under a plan approved before January 20, 2001); § 3809.522 (BLM will conduct periodic reviews of the bond amount to ensure that it "cover[s] the estimated cost as if BLM were to contract a third party to reclaim [the] operations according to the reclamation plan").

The relatively simple process of approving the bond amount did not require any environmental review on the part of BLM.  In September 2007, Denison provided BLM with a cost estimate for reclamation according to the 1988 plan of operations.  AR2322-45.  BLM evaluated the adequacy of the proposed bond amount using cost-estimating software for underground mines called "Sherpa."  *See* http://www. aventurineengineering .com/SherpaUnderground.html (last visited May 23, 2011).  After relevant information was loaded into the Sherpa program by BLM, the program produced a cost-estimate lower than Denison's.  BLM therefore accepted Denison's proposed bond amount. AR2359-80.  That decision, even if construed as affirmative conduct on the part of BLM, *see Karuk Tribe of California v. U.S. Forest Serv.*, --- F.3d ----, 2011 WL 1312564, at *11 (9th Cir. Apr. 7, 2011), is a mere oversight action which does not constitute "major federal action" triggering NEPA review.  *See Penfold*, 857 F.2d at 1314.  The Court will grant summary judgment on claim five in favor of Defendants.

**IT IS ORDERED:**

1.      With respect to the parties' motions for summary judgment (Docs. 130, 136, 141), summary judgment is granted in favor of Defendants and against Plaintiffs on claims one, two, three, and five of the third amended complaint (Doc. 126).

2.      With respect to claim four, the categorical exclusion determination is remanded to BLM for further consideration consistent with this order.  BLM shall have until **June 24, 2011** to revise its decision to apply a categorical exclusion to the free use

permit (*see* Doc. 134 at 90-5; AR3159-64).  BLM shall promptly provide Plaintiffs with a copy of the revised decision.

3.      By **July 22, 2011**, the parties shall file simultaneous memoranda, not to exceed 10 pages in length, addressing their respective positions on (a) the merits of claim four in light of the revised decision, and (b) any remedies the Court should impose if it grants summary judgment in favor of Plaintiffs on claim four.   The parties shall file simultaneous responses, not to exceed 5 pages, by **July 29, 2011**.

Dated this 27th day of May, 2011.

David G. Campbell
United States District Judge